NELLIE ARNOLD 1/25/2022

```
 1                    UNITED STATES DISTRICT COURT
                     EASTERN DISTRICT OF ARKANSAS
 2                        CENTRAL DIVISION

 3

 4   NELLIE ARNOLD,                       )
                Plaintiff,                )
 5   vs.                                  )
                                          )
 6   DEPUTY MARANDA TURNER, Individually  )Case No. 4:20-cv-729
     and in her Official Capacity;        )
 7   DEPUTY BRENT BITTLE, Individually    )
     and in his Official Capacity;        )
 8   SALINE COUNTY SHERIFF'S OFFICE;      )
     SHERIFF RODNEY WRIGHT, Individually  )
 9   and in his Official Capacity; and    )
     SALINE COUNTY, ARKANSAS,             )
10              Defendants.               )

11

12

13          VIDEOCONFERENCE DEPOSITION OF NELLIE ARNOLD

14             Taken via remote means whereby all parties

15   appeared via Zoom on January 25, 2022 at 9:03 a.m.

16

17

18

19

20

21

22

23

24

25
```

**Saline County Defendants' MSJ Exhibit E**

```
 1                    APPEARANCES

 2          FOR THE PLAINTIFF:

 3          MR. RALPH "WIN" WILSON, III
            Hope, O'Dwyer, Wilson & Arnold, P.A.
 4          211 Spring Street
            Little Rock, AR 72201
 5          (501)313-4208
            wwilson@hope-lawyers.com
 6

 7          FOR THE DEFENDANTS:

 8          MR. COLIN R. JORGENSEN
            Association of Arkansas Counties
 9          1415 W. 3rd Street
            Little Rock, AR 72201
10          cjorgensen@arcounties.org

11

12

13          -Stevi R. Way - Certified Court Reporter

14

15

16

17

18

19

20

21

22

23

24

25
```

NELLIE ARNOLD  1/25/2022

Page 3

```
 1                          INDEX
 2   TESTIMONY BY MS. NELLIE ARNOLD:              PAGE:
 3   EXAMINATION BY MR. JORGENSEN                 4
 4   EXAMINATION BY MR. WILSON                    61
 5
 6                         EXHIBITS
 7   (No Exhibits Offered.)
 8
 9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
```

**Saline County Defendants' MSJ Exhibit E**

NELLIE ARNOLD  1/25/2022

Page 4

```
 1                          PROCEEDINGS
 2                    (BEGAN AT 9:03 AM)
 3          THE COURT REPORTER:  Today's date is January 25,
 4      2022 and the time is 9:03 a.m.  This is the zoom
 5      deposition of Nellie Arnold.  At this time I need
 6      counsel to agree on the record that there is no
 7      objection to me administering a binding oath to the
 8      witness via zoom.  And we'll start with Mr. Jorgensen.
 9          MR. JORGENSEN:  No objection.
10          MR. WILSON:  No objection on my end either.
11          THE COURT REPORTER:  Ma'am, if you'll raise your
12      right hand to be sworn?
13                          NELLIE ARNOLD,
14  called as a witness herein, having been first duly sworn
15  under oath, was examined and testified as follows:
16                          EXAMINATION
17  BY MR. JORGENSEN:
18  Q.    Good morning, Ms. Arnold.
19  A.    Good morning.
20  Q.    My name is Colin Jorgensen.
21  A.    Good morning.
22  Q.    I represent the defendants in the lawsuit you filed
23        that we're here for today for you to give your
24        deposition.  Have you ever given a deposition before
25        in any other cases?
```

**Saline County Defendants' MSJ Exhibit E**

NELLIE ARNOLD  1/25/2022

```
 1    Q.   Well, and it's a long time ago no doubt regardless of
 2         your age.
 3    A.   Well, I had two husbands die so there you go.
 4    Q.   All right.  Please tell us in your own words why you
 5         filed the lawsuit in this case?
 6    A.   I was pushed down unnecessarily by a Saline County
 7         officer.
 8    Q.   Anything else?
 9    A.   No.
10    Q.   Did you know any of the defendants in your lawsuit
11         before the incident on July 3, 2017?
12    A.   Would you repeat that please?
13    Q.   The defendants in your lawsuit are Maranda Turner,
14         Brent Bittle, the Saline County Sheriff's Office and
15         Saline County, and the Saline County Sheriff Rodney
16         Wright.  Did you know any of those folks before the
17         incident on July 3, 2017?
18    A.   I did not know them, sir, no.
19    Q.   Had you had any interactions with any of them before
20         that date?
21    A.   Yes, sir.
22    Q.   Who did you have any interaction with before July
23         3rd?
24    A.   I don't know their name.  I don't know if it was them
25         or another officer, officers --
```

NELLIE ARNOLD  1/25/2022

```
 1   Q.   Are you talking about -- I'm sorry.  Are you talking

 2        about other times when Saline County Sheriff's

 3        Deputies came to your residence before that date?

 4   A.   Yes, sir.  Yes, sir.

 5   Q.   You don't recall which deputy on which day.  You just

 6        know that --

 7   A.   No, sir, it was too many of them.

 8   Q.   Understood.  Do you know who the deputy was who pushed

 9        you on July 3, 2017?

10   A.   Her first name is Maranda.

11   Q.   Maranda Turner, the one I just --

12   A.   Yes.

13   Q.   One of the defendants, right?

14   A.   Maranda Turner.

15   Q.   Can you recall if you know if Maranda Turner had ever

16        been to your residence before?

17   A.   No, I can't -- yes, she had been.

18   Q.   Earlier that day or before that day?

19   A.   Yes, sir, earlier that day.

20   Q.   Okay.  What about before that day, do you know?

21   A.   No, I don't believe so.

22   Q.   Okay.  How about Brent Bittle?  He was the other

23        deputy who was with Maranda Turner according to your

24        complaint and I think we all agree?

25   A.   In that subject I'm not good, you know, when you say
```

NELLIE ARNOLD 1/25/2022

Page 19

```
1        an officer.  A lot of people I remember their face.  I
2        don't remember their face so I would like to say she
3        could have been or could not have been.  I don't know.
4    Q.  That's fine.  If you don't know or don't remember
5        that's a truthful answer.  I understand.  Okay.  When
6        I'm asking you these questions about the past I'm only
7        asking for the answer if you remember it.  So why have
8        you named Maranda Turner as a defendant in your
9        lawsuit?
10   A.  Because she's the one done it.
11   Q.  Okay.  Anything else?
12   A.  No, sir.
13   Q.  Why have you named Brent Bittle as a defendant?
14   A.  As a defendant what do you mean, sir?
15   Q.  I mean you filed a lawsuit.
16   A.  Right.
17   Q.  In which you are the plaintiff and you named multiple
18       defendants including Maranda Turner and Brent Bittle
19       and some others.  And so why is Brent Bittle a
20       defendant in your lawsuit?
21   A.  He's the one who told her to arrest me.
22   Q.  Okay.  Any other reason he's a defendant in your
23       lawsuit?
24   A.  No, sir.
25   Q.  Why is the Saline County Sheriff's Office or Saline
```

NELLIE ARNOLD  1/25/2022

Page 20

```
 1        County a defendant in your lawsuit?
 2   A.   I believe they are the boss of these officers.  Is
 3        that not true?
 4   Q.   Yes, these officers are Saline County employees,
 5        that's true.
 6   A.   So they would be telling them what to do.
 7   Q.   Okay.  Any other reason they are named as a defendant?
 8   A.   No.
 9   Q.   And the final defendant is Saline County Sheriff
10        Rodney Wright.  Why is he a defendant in your lawsuit?
11   A.   He's the main man there.
12   Q.   I'm sorry?
13   A.   He's the main man I thought at the facility.
14   Q.   Oh, right, you mean he's the top boss?
15   A.   Right.
16   Q.   Is that what you mean?  Okay.  So because he is the
17        boss over Miranda Turner and Brent Bittle who were at
18        your residence?
19   A.   Yes.
20   Q.   Any other reason Sheriff Rodney Wright is a defendant?
21   A.   Well, in my way of thinking -- which I could be
22        wrong -- he's over them and they should be taught not
23        to do what they did.
24   Q.   Okay.  You filed your complaint in this case on June
25        10th, 2020.  And I want to ask you a few questions
```

NELLIE ARNOLD 1/25/2022

```
 1          about the complaint.  Do you know what I'm talking
 2          about when I say the complaint the lawsuit?
 3    A.    Yes, sir.
 4    Q.    Okay.  And on page 20 of the complaint you filed you
 5          signed a verification stating that you had reviewed
 6          the allegations in the complaint, is that correct?
 7    A.    I don't understand that, sir.  Would you repeat that?
 8    Q.    Did you sign the complaint that you filed in this
 9          case?
10    A.    If I filed it I did.
11    Q.    Okay.  Let me see if I can share my screen real quick
12          and show you.  This is a copy of the Court's website
13          the complaint you filed.  See it says document one at
14          the top and verification?  Can you see that?
15    A.    Yes, I see that notification.
16    Q.    And is that your signature?
17    A.    Yes, sir, it is.
18    Q.    Okay.  So did you review your complaint and confirm
19          the allegations in your complaint before it was filed?
20    A.    I reviewed it a lot of times, sir.
21    Q.    Okay.  And when you reviewed it were you comfortable
22          that everything that was stated in there is true and
23          accurate to the best of your knowledge?
24    A.    Yes, sir.
25    Q.    And that's why you signed the verification, right?
```

NELLIE ARNOLD  1/25/2022

Page 22

```
 1        That's what that means?
 2   A.   Yes, sir.
 3   Q.   Okay.  In your complaint you indicate that deputies
 4        with the Saline County Sheriff's Office were
 5        dispatched to your residence multiple times on July
 6        3rd, 2017, is that correct?
 7   A.   Yes, sir.  Probably three.  I'm not sure.
 8   Q.   You anticipated my next question.  I was going to ask
 9        you do you recall how many times deputies came out to
10        your residence on that day?
11   A.   I believe three.
12   Q.   But you're not sure?  Is that kind of an estimate?
13   A.   It's an estimate, yes.  I know they came two.
14   Q.   Okay.  Who called to ask for Sheriff's Deputies to
15        come to your residence the first time on July 3, 2017?
16   A.   I'm really not sure, sir.  I don't know if I did or if
17        the gentleman that stayed at my house then.
18   Q.   The gentleman --
19   A.   Yes.
20   Q.   I'm sorry, I just only heard the gentleman.  The
21        gentleman what?
22   A.   That stays at my house.
23   Q.   Is that Lowell Best?
24   A.   Right.
25   Q.   Does he still stay at your house today?
```

NELLIE ARNOLD  1/25/2022

Page 23

```
 1   A.   Yes, sir.
 2   Q.   And he was living at your house on that day on July 3,
 3        2017?
 4   A.   Yes, sir.
 5   Q.   So it could have been you or him that called?
 6   A.   It wasn't me that called.
 7   Q.   Oh, okay.  Well, who might it have been if it wasn't
 8        Lowell Best?
 9   A.   There was about 15 people standing outside looking
10        with their phones and cameras.
11   Q.   At the time when the phone call was made?
12   A.   No, later.  But they were all listening arguing not
13        with the police but with each other.
14   Q.   So I'm trying to go back a little in time on that day
15        until the first time someone called and requested
16        assistance from the Sheriff's Office at your home.
17        And I believe you said it wasn't you that called it
18        might have been Lowell Best.  Is there anyone else it
19        could have been?
20   A.   Yes, yes.
21   Q.   That could have made that call?
22   A.   No, no.
23   Q.   So was it Lowell Best then that called?
24   A.   I think so, yes, sir, I believe so.
25   Q.   Was it Mr. Best who called each time that --
```

NELLIE ARNOLD  1/25/2022

Page 24

```
 1    A.   Not every time, no.  I called some myself.
 2    Q.   Do you remember which time you called?
 3    A.   No.  I called so many times I don't remember.
 4    Q.   Okay.  Do you remember if --
 5    A.   I needed help so I called the police department.
 6    Q.   Do you remember if it was you or Mr. Best who called
 7         the -- I don't think we know exactly how many times so
 8         let's talk about the -- I mean, we do, there's
 9         dispatch records but I don't think we're going to be
10         able to remember every detail of each earlier in the
11         day.  I'm really interested in the time that deputies
12         came.  The second to last time they came to your home
13         that day.  Then of course the final time when you were
14         injured.  Okay?  So the time before, the second to
15         last time deputies came to your home do you remember
16         that visit by the deputies?
17    A.   Second to last time?
18    Q.   The time they were at your home immediately before the
19         time they came and you were injured?
20    A.   Are you saying the second time?
21    Q.   The second to last.  I don't know what numbered time
22         it was for the day.  Just the time immediately before
23         6:18 p.m. that ended in you riding in an ambulance to
24         a hospital.  The time right before that that deputies
25         came to your home do you remember that?
```

**Saline County Defendants' MSJ Exhibit E**

```
 1   Q.   Did they ask him or tell him anything else?
 2   A.   What was the problem.
 3   Q.   What was his response?
 4   A.   That I was trying to get him to leave and my family
 5        was causing all the trouble and he didn't have
 6        anywhere to go.
 7   Q.   Do you recall any other details of any other
 8        conversations involving the deputies before the final
 9        time they came to your home that day?
10   A.   It was almost the same thing every time.
11   Q.   Do you recall at any point during any of those visits
12        at your home that day that anyone said anything about
13        you having a can of mace?
14   A.   That's right.  I'm glad you told me, said that.  That
15        brings me back to knowing that he made the call.  I
16        had a can of that and he called the police department
17        to ask them was it legal for me to carry that.
18   Q.   Did he get a response to that question?
19   A.   Yes.
20   Q.   What was the response?
21   A.   No.
22   Q.   No meaning that it was not legal for you to have mace?
23   A.   No, it was legal for me to have it.
24   Q.   Correct.  Okay.  So someone with -- was this on the
25        phone or was this a conversation he had with them when
```

NELLIE ARNOLD 1/25/2022

1        the deputies came to --

2   A.   I didn't know it until they got there because I didn't

3        know he was talking about it, you know.

4   Q.   Okay.

5   A.   When they got there he said well I asked them I didn't

6        want them to do anything to you I just wanted to know

7        that.

8   Q.   And they told him you are allowed to have mace?

9   A.   (Nods head up and down.)

10  Q.   Did you use the mace at any point that day?

11  A.   No, no, never.

12  Q.   Did you have the mace on you somewhere on that day?

13       Did you have it with you?

14  A.   I don't believe I had it on me that day at all, no.  I

15       don't know why it was brought up that day.

16  Q.   Well, it sounds like Mr. Best brought it up, is that

17       right?

18  A.   Sounds like.

19  Q.   Did Deputies Bittle and Turner provide any warnings at

20       any point to Mr. Best or you during any of their

21       visits that day?

22  A.   Yes, sir, they did.  They asked me was there anywhere

23       that I could go.

24  Q.   What was your response to that question?

25  A.   I said what do you mean is there any way I could go

NELLIE ARNOLD 1/25/2022

Page 29

```
 1        this is my house.
 2   Q.   Did either of the deputies provide any warnings to you
 3        or Mr. Best during any of their visits to your
 4        residence that day?
 5   A.   Yes, they did.
 6   Q.   What warning or warnings?
 7   A.   For us to take Mr. Best and he has to do something
 8        towards you like hit you, push you, something to
 9        irritate you, do something that would, you know, harm
10        him not just talk.
11   Q.   Okay.  So is it your understanding that was a warning
12        to Mr. Best that if he did any of those things he
13        would be arrested?
14   A.   He knew, yes, sir.  I'm sure they were talking to both
15        of us.
16   Q.   Did they provide any warnings to you at any point that
17        day?
18   A.   They told me, you know, they lectured me do you know
19        how many times we've been out here.  I said I haven't
20        counted them but I'm sure you've been out here a lot
21        of times.
22   Q.   Did they say anything else when they lectured you
23        about how many times they've been out there?
24   A.   No.  I think I counted after that and I said I think
25        they've been out here 17 times.  I counted it up.
```

```
 1        When they said that after they left I said oh my God
 2        they've been out here about 17 times.  Not that one
 3        day.  Okay.  They've come other times.
 4  Q.    Sure.  But they had been out there multiple times that
 5        day also, right?
 6  A.    More than once.
 7  Q.    So what was your understanding why did you interpret
 8        that comment as a warning, if you did?
 9  A.    They were letting me know what I was lawfully allowed
10        to do and not do without being arrested.
11  Q.    Okay.  So was it your understanding they were warning
12        you that if you called them out too many times that
13        somebody might get arrested?
14  A.    No.
15  Q.    Okay.  Did you have a different understanding that you
16        can tell us?
17  A.    No.  I knew what they were saying when they told me
18        this we're not going to come out here, we're not going
19        to arrest him just because you and he are into an
20        argument.  It has to be more than verbal for us to
21        take him in or you.
22  Q.    In that conversation with that warning was sometime
23        earlier in the day before the final time they came to
24        your residence, is that correct?  It wasn't the --
25  A.    It wasn't the last time?
```

NELLIE ARNOLD  1/25/2022

Page 31

```
 1   Q.   Right.

 2   A.   No, it wasn't the last time.

 3   Q.   Okay.  Do you remember --

 4   A.   Excuse me, I'm sorry.  The last time they come out

 5        they didn't tell me anymore.  But they had told me

 6        previous times.

 7   Q.   Okay.  Very good.  Do you remember if it was you or

 8        Mr. Best who called them out the last time?

 9   A.   You mean when I went to the hospital?

10   Q.   Yes.

11   A.   I didn't call anybody.  I was begging them to let me

12        up and they didn't offer to help me up.  I laid there

13        45 minutes.

14   Q.   I'm talking about the call that somebody made that

15        resulted in them being dispatched to your residence

16        that time?

17   A.   He says that he called them.

18   Q.   He being Lowell Best?

19   A.   He being Lowell Best.

20   Q.   All right.  Can you please tell us what happened when

21        the deputies arrived the final time on July 3, 2017?

22        Can you please just tell us in your own words every

23        detail of what happened?

24   A.   You mean when they come out the last time?

25   Q.   Yes.
```

NELLIE ARNOLD  1/25/2022

Page 32

```
 1   A.   Well, they come out the last time and they said do you
 2        realize how many times we've been out here.  I said I
 3        know you've been a lot of times but I don't know how
 4        many.  And that's when I counted them or tried to
 5        remember.  And I said, yes, sir, and I think that's
 6        ridiculous.
 7   Q.   What happened next?
 8   A.   They said well you called or someone called from this
 9        residence.  I said yes, sir.
10   Q.   So was this Brent Bittle you were talking to if you're
11        saying yes, sir?
12   A.   I don't really know.  I was just really talking to
13        both of them I guess.
14   Q.   Were you outside the residence during this
15        conversation?
16   A.   I was on my front porch.
17   Q.   All right.  What happened next?
18   A.   They said for us to take you or take him there has to
19        be licks, blow, or some kind of reaction other than
20        orally.  Do you understand that.  I mean, I'm not
21        saying that to you.  I'm saying what they said to me.
22        And I said, yes, I understand that.  I said what you
23        need for me is to either get hit or hit him.  I said
24        yes.
25   Q.   What happened next?
```

```
 1   A.   I slapped his face.

 2   Q.   You slapped Lowell Best's face?

 3   A.   Yes.

 4   Q.   What happened next?

 5   A.   He slapped mine.

 6   Q.   What happened next?

 7   A.   I was so irritated, sir, I don't really remember to

 8        the effect everything that I said.  And I apologize

 9        for that been angry and my memory.  I know they said,

10        you know, they would take me to jail because I had hit

11        him.  And then my son run down from across the street

12        and was just hysterical and said to them before they

13        paid any attention aren't you going to take him.  And

14        they put him in the back of the car and took him.

15   Q.   You're talking about Lowell Best again?

16   A.   (Nods head up and down.)

17   Q.   So Mr. Best was placed under arrest?

18   A.   (Nods head up and down.)

19             MR. WILSON:  Is that a yes?

20             THE WITNESS:  Yes, sir.

21             MR. JORGENSEN:  Q.  All right.  What else

22   happened during the final dispatch to your residence on

23   July 3, 2017?

24   A.   Well, I told them I said I'll go with you, you know,

25        you don't have to make me go with you or anything.
```

NELLIE ARNOLD  1/25/2022

Page 35

```
 1          to do that but there was no reason for it.  I was
 2          going to get into the car.  You understand, sir?  I
 3          was voluntarily going to get into the car.
 4     Q.   Okay.  Was Maranda Turner attempting to put handcuffs
 5          on you at this time?  You said earlier you were not
 6          handcuffed.  Were there ever handcuffs involved?
 7     A.   There were never any handcuffs at all.
 8     Q.   She never placed any handcuffs on either of your
 9          hands?
10     A.   No.  She tried to when he said that.  She was reaching
11          for me and she knocked me down.
12     Q.   Was she reaching for you to try to put handcuffs on
13          you?
14     A.   I didn't have any on me.
15     Q.   Do you know why she was reaching for you?
16     A.   To put me into the car.
17     Q.   Did she say anything to you at this time when she was
18          reaching for you?
19     A.   No.
20     Q.   Did she ever ask you to put your hands behind your
21          back?
22     A.   Yes.
23     Q.   And did you when she asked you to?
24     A.   I said I will just a minute.  And I was going to close
25          my car down and I did.  I didn't have anything in my
```

**Saline County Defendants' MSJ Exhibit E**

NELLIE ARNOLD 1/25/2022

```
 1        standing out.
 2   Q.   Did those people all come out because they heard you
 3        screaming?  Did any other police officers arrive on
 4        the scene and have any interactions with you during
 5        that 45 minutes besides --
 6   A.   I was hurting so bad but I don't know.  I don't think
 7        so.
 8   Q.   What about firefighters or any other type of first
 9        responder aside from the ambulance?
10   A.   Firefighters, I think firefighters came.
11   Q.   Did they provide you any medical care?
12   A.   Somebody called the ambulance.  I don't know who
13        called the ambulance.  The ambulance was -- excuse me.
14   Q.   I'm sorry, I'll stop.  You finish.
15   A.   After she tripped me I was beside myself.  My ball was
16        taken out of my arm.  My son was hysterical screaming.
17        And they were doing nothing but standing straight over
18        me and looking at me.
19   Q.   Do you recall if any other law enforcement or
20        firefighters or anyone aside from the two deputies who
21        had been there the whole time ever showed up at the
22        scene?
23   A.   No, I don't but they could have.  I was in such agony
24        I just couldn't explain to you.
25   Q.   Okay.  So you don't remember because you were in pain
```

NELLIE ARNOLD  1/25/2022

Page 43

```
 1   A.   That I said it was a what, sir?

 2   Q.   That you said Maranda Turner's actions were a felony.

 3   A.   I might've said that.  I don't remember.

 4   Q.   Okay.

 5   A.   But I would certainly call it more than a felony.

 6   Q.   Did you submit a complaint to the prosecuting attorney

 7        regarding Deputy Turner's actions on July 3, 2017?

 8   A.   Sure did.

 9   Q.   What was the response --

10   A.   I was in the hospital for two surgeries.  They

11        couldn't use regular instruments to put my hand back

12        together so they had to go and find something to do it

13        with.  This is a professional A-1 doctor.

14   Q.   We'll talk about your doctor in a minute.  I'm curious

15        if you had any interaction with the prosecuting

16        attorney's office about Maranda Turner.  Did you

17        attempt to pursue charges against Maranda Turner;

18        felony charges?

19   A.   No, I didn't go down there.

20   Q.   Okay.

21   A.   I thought they already knew it.

22   Q.   Since you -- well, let's just go ahead and talk about

23        the doctor you just mentioned, your excellent doctor.

24        Is that John Bracey, Dr. John Bracey that you're

25        talking about?
```