Page 1

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF ARKANSAS
CENTRAL DIVISION

NELLIE ARNOLD,            )
                          )
    Plaintiff,            )
                          )
v.                        ) No. 4:20-cv-729
                          )
DEPUTY MARANDA TURNER, et al.  )
                          )
    Defendants.           )


DEPOSITION OF MARANDA TURNER
TAKEN ON BEHALF OF THE PLAINTIFF
JANUARY 26, 2022


(Starting time of the deposition: 9:12 a.m.)

---

Page 2

                I N D E X

QUESTIONS BY:                          PAGE
Mr. Wilson                               5


                E X H I B I T S

EXHIBIT      DESCRIPTION              PAGE

            (No exhibits marked.)

---

Page 3

1    UNITED STATES DISTRICT COURT
2    EASTERN DISTRICT OF ARKANSAS
3         CENTRAL DIVISION
4
5    NELLIE ARNOLD,         )
                            )
6        Plaintiff,         )
                            )
7    v.                     ) No. 4:20-cv-729
                            )
8    DEPUTY MARANDA TURNER, et al.    )
                            )
9        Defendants.        )
10
11
12
13       Deposition of MARANDA TURNER, produced, sworn and
14   examined on January 26, 2022, between the hours of
15   9:00 a.m. and 11:00 a.m. via Zoom videoconference,
16   before Christine Hoenig, a Missouri Certified Shorthand
17   Reporter within and for the state of Missouri, in a
18   certain cause now pending in the above matter.

---

Page 4

              A P P E A R A N C E S
    FOR THE PLAINTIFF:
    Mr. Ralph Wilson (via videoconference)
    Hope, O'Dwyer, Wilson & Arnold, PA
    211 Spring Street
    Little Rock, Arkansas 72201
    501-372-4144

    FOR THE DEFENDANT:
    Mr. Colin Jorgensen (via videoconference)
    Association of Arkansas Counties
    1415 West Third Street
    Little Rock, Arkansas 72201
    501-372-7550



    Ms. Christine Hoenig, CCR No. 1417
    Alaris Litigation Services
    711 North Eleventh Street
    St. Louis, Missouri, 63101
    314-644-2191

**Plaintiff's Statement in Opposition - Exhibit A**

Page 5

1   IT IS HEREBY STIPULATED AND
2   AGREED by and between counsel for Plaintiff and
3   counsel for the Defendant that this deposition
4   may be taken in shorthand by Christine Hoenig,
5   Certified Court Reporter, and afterwards
6   transcribed into typewriting; and the signature
7   of the witness is waived.
8              * * * * *
9          MARANDA TURNER,
10   Of lawful age, produced, sworn and
11   examined on behalf of the Plaintiff, deposes and
12   says:
13              EXAMINATION
14   QUESTIONS BY MR. WILSON:
15      Q.  Ms. Turner, would you state your name and
16   address, please.
17      A.  Maranda Kay Turner.  My physical address
18   is 10030 Tate Lane, Danville, Arkansas 72833.
19      Q.  Will you spell the road, please?
20      A.  T-A-T-E.
21      Q.  Okay.  Have you ever given a deposition
22   before?
23      A.  No, sir.
24      Q.  Okay.  Just want to go over some ground
25   rules with you.  Essentially, we're doing a good job

Page 6

1   right now.  The court reporter's taking a
2   transcription of this, so she needs to have a clear
3   record.  And if you would wait to answer until I'm
4   done with my question, and, likewise, I will wait
5   for you to end your answer before I ask another
6   question.  Do you agree with that?
7      A.  Yes, sir.
8      Q.  Okay.  I don't think we're going to be
9   very long this morning, but if any time you need to
10   take a break, visit with counsel, etc., just let us
11   know and we'll do that.  The only thing I would
12   mention is if we're in the middle of a question that
13   you would answer the question before we take the
14   break.  Is that okay?
15      A.  Yes.
16      Q.  Okay.  Are you on any type of medication
17   today or anything else or feeling ill in any sort of
18   fashion that it would affect you giving answers this
19   morning?
20      A.  No.
21      Q.  Okay.  If any time you don't understand a
22   question of mine, let me know, because at the end of
23   the day, I want to have a clear understanding of
24   what your answers are going to be.  So if you don't
25   understand a question, just ask me to rephrase and

Page 7

1   I'd be happy to do that.  Is that okay?
2      A.  Yes.
3      Q.  Okay.  Are you currently married?
4      A.  Yes.
5      Q.  Okay.  And who are you married to?
6      A.  Joseph Donnell.
7      Q.  D-O-N-A-L-D?
8      A.  D-O-N-N-E-L-L.
9      Q.  Donnell, okay.  And how long have you all
10   been married?
11      A.  Seven months.
12      Q.  Okay.  Have you had any other previous
13   marriages?
14      A.  No.
15      Q.  At the time of this incident on July the
16   3rd of 2017, were you cohabitating or in any type of
17   relationship with someone at that time?
18      A.  Yes.
19      Q.  Okay.  And who was that?
20      A.  Mitchell Hall.
21      Q.  Okay.  And tell me a little bit about that
22   relationship.
23      A.  We had been together for a few years at
24   that point.  We lived together in Bryant, Arkansas,
25   and we were both pursuing law enforcement.  He

Page 8

1   worked at the detention center.
2      Q.  Okay.  In which detention center?
3      A.  Saline County.
4      Q.  Did he start employment there before you
5   did?
6      A.  We started at the same time.
7      Q.  And when did you all end your
8   relationship?
9      A.  I'm not for sure on the exact date, but
10   2019.
11      Q.  Okay.  What is your date of birth,
12   Ms. Turner?
13      A.  September 6th of 1993.
14      Q.  And I call you Turner.  Are you still
15   Turner with the last name or is it Donnell?
16      A.  Donnell.
17      Q.  Okay.  Would you prefer that I refer to
18   you as Ms. Donnell then?
19      A.  It doesn't matter to me.
20      Q.  In connection with your education, did you
21   finish high school?
22      A.  Yes.
23      Q.  Okay.  And where was that?
24      A.  Danville High School.
25      Q.  Okay.  And what year did you graduate?

2 (Pages 5 to 8)

**Plaintiff's Statement in Opposition - Exhibit A**

Page 9

1     A.  2012.
2     Q.  Okay.  Did you do any college or attend
3  college?
4     A.  Yes.
5     Q.  Okay.  And where was that?
6     A.  Arkansas Tech University in Russellville.
7     Q.  Did you receive a degree?
8     A.  Yes.
9     Q.  Okay.  And what was that in?
10    A.  Wellness science.
11    Q.  Okay.  And when did you graduate?
12    A.  2016.
13    Q.  Okay.  Was there any employment from
14  graduating from Arkansas Tech prior to your law
15  enforcement job with Saline County?
16    A.  No, I volunteered work at a gym in
17  Russellville.
18    Q.  Okay.  What led you to law enforcement?
19    A.  I'd been around law enforcement my whole
20  entire life.  My father was a police officer.  And I
21  just kind of had a knack for it.  I found that a
22  position was open at Saline County and applied for
23  it.
24    Q.  Okay.  And where was your dad a police
25  officer?

Page 10

1     A.  Highway police.
2     Q.  Okay.  Was there a certain -- I guess it's
3  not a precinct -- a certain division that he was in
4  or with?
5     A.  DEA.
6     Q.  Okay.  And where was he mainly stationed
7  and located?
8     A.  Little Rock.
9     Q.  Okay.  When you applied for the Saline
10  County position, were you applying anywhere else at
11  that time?
12    A.  No.
13    Q.  Okay.  I think I saw what they -- your
14  attorneys furnished me with some information about
15  some personnel records.  I think I saw something
16  where you were applying for both a deputy patrol
17  position as well as a detention center position.  Do
18  you recall that?
19    A.  I -- I don't recall.
20    Q.  Okay.  Was there one or the other that you
21  were wanting to do or preferred to do?
22    A.  The deputy position.
23    Q.  Okay.  With patrol?
24    A.  Yes.
25    Q.  Okay.  Do you recall when you got hired by

Page 11

1  Saline County?
2     A.  I believe it was around November, December
3  of 2016.
4     Q.  Had you done any law enforcement training
5  prior to that?
6     A.  No.
7     Q.  Okay.  Did you -- I guess did you attend
8  the police academy?
9     A.  Yes.
10    Q.  Okay.  And when did you do that and where?
11    A.  January 2017 at Camden, Arkansas.
12    Q.  At the ALETA program or whatever they call
13  it?
14    A.  Yes.
15    Q.  Okay.  I'm assuming -- well, I don't want
16  to assume.  When you got the position in Saline
17  County, did you move from the Danville area to
18  Saline County?
19    A.  Yes.
20    Q.  Okay.  And did Mitchell Hall move with you
21  at that time?
22    A.  Yes.
23    Q.  And you all were living together in Saline
24  County?
25    A.  Yes.

Page 12

1     Q.  When you got back from the police academy,
2  what were you doing for the county as a deputy?
3     A.  I don't really understand the question.
4     Q.  Okay.  When you got -- when you finished
5  the police academy training, what were your job
6  duties at that time?
7     A.  I was a deputy.
8     Q.  Okay.  And what does that entail?
9     A.  When you first get out of the academy,
10  you're in FTO training for 12 to 15 weeks, so you
11  ride around with a certified officer who's been on
12  that job for quite a while.
13    Q.  Okay.  As I understand, Brent Bittle was
14  one of those FTO officers; is that correct?
15    A.  Yes.
16    Q.  Okay.  Who would have been some of the
17  other officers that you would have been with?
18    A.  Officer Knabb.  I do not recall the other
19  person's name.
20    Q.  Okay.  I think I recall a Kosters.  Would
21  that have been one of the deputies?
22    A.  Yes, sir.
23    Q.  Any issues with any of these officers
24  during training?
25    A.  No.

3 (Pages 9 to 12)

**Plaintiff's Statement in Opposition - Exhibit A**

Page 13

1  Q. Tell me a little bit about your training
2  that you went through. What all did you do?
3  A. At ALETA or the police department?
4  Q. The police department.
5  A. Okay. So it's broken up into three
6  phases. The first phase is the easiest. You learn
7  the basics of policies and basically how Saline
8  County operates and does things. You only observe
9  in that stage in the first phase, so you're only
10 observing a certified officer at that point.
11     In phase two, you're more phased into
12 actually making actions and arresting people and
13 talking to people. And in phase three is pretty
14 much you need to be by yourself and the certified
15 officer that's running with you is just observing.
16 Q. Okay. Is there some type of certification
17 or certificate that you get once you pass phase
18 three?
19 A. Not that I recall.
20 Q. Okay. At any point were you on your own
21 in your own vehicle on patrol?
22 A. Yes.
23 Q. Okay. Was that before or after the
24 July 3, 2017, incident?
25 A. Before.

Page 14

1  Q. Did you ever see any of the, I guess,
2  reports from your FTO officers?
3  A. I don't remember.
4  Q. Or recall signing any of them?
5  A. I don't -- I do know that we did have to
6  sign, yes.
7  Q. Okay. Would these officers have gone over
8  issues they saw with you?
9  A. Yes.
10 Q. Okay. Do you recall any outstanding, you
11 know, definitive issues that any officer had of you?
12 A. No.
13 Q. Okay. And, like I said, today I'm just
14 trying to get information from you and what -- you
15 know, ask the questions so I know what you're going
16 to tell the jury for it. I've looked through a
17 couple of these field training program observation
18 reports, and I've noticed there's anything from, you
19 know, I guess it's on a 1 to 7 scale. And I'm
20 noticing anything from 2 to 6's and 7's during your
21 field training. Does that sound accurate to you or?
22 A. I haven't looked at those in years, so I
23 wouldn't -- I wouldn't remember what scores I was
24 given.
25 Q. Okay. On the date of the incident, July

Page 15

1  the 3rd, what was your title with Saline County?
2  A. Deputy.
3  Q. Okay. During that same timeframe, what
4  was your standard workday, workweek?
5  A. I don't recall what my standard workweek
6  was. It was -- the hours were 4 a.m. to 4 p.m.
7  Q. Okay. So essentially you'd be working
8  12-hour shifts?
9  A. Yes.
10 Q. Okay. And were those multiple days in a
11 row, days off in between?
12 A. I believe it was on three, off two, on
13 two, off three.
14 Q. So you'd be on three days, then off two,
15 working two, and then off three?
16 A. Yes.
17 Q. Okay. And you say 4 a.m. to 4 p.m. Would
18 there be instances where you would have to be
19 working past 4 p.m. on certain days?
20 A. Yes. So it was split up from 30 days. It
21 would be 30 days 4 a.m. to 4 p.m., and then you
22 would switch 30 days 4 p.m. to 4 a.m.
23 Q. Okay. And as of July the 3rd, you don't
24 recall if that was day one of the three-day on
25 three, off two or whether you worked the day prior

Page 16

1  or two days prior?
2  A. I don't recall.
3  Q. I want to talk about the incident in
4  question of July 3rd of 2017. And I've seen your
5  incident report, and I'm trying to get some
6  background information on this. But it notes at
7  1756 hours, you and Corporal Bittle responded to
8  Ms. Arnold's residence. And 1756, I take it that's
9  around six o'clock in the evening. Would that be
10 correct?
11 A. Correct.
12 Q. Okay. And so if you're there at six
13 o'clock, would this have been a 4 p.m. to 4 a.m.
14 shift?
15 A. Yes.
16 Q. Okay. You wouldn't have worked from
17 4 a.m. and still been on at six o'clock taking a
18 call?
19 A. No.
20 Q. Okay. Do you recall how many times you
21 went out to the residence that day?
22 A. I know that it was seven times total that
23 Saline County went out to the residence that day.
24 Q. Okay. At least you would have made a trip
25 out there until sometime after -- at least after

4 (Pages 13 to 16)

**Plaintiff's Statement in Opposition - Exhibit A**

Page 17

1   4 p.m.?
2        A.   Correct.
3        Q.   Okay.  It appears your incident report at
4   least discusses two times going out there.  Do you
5   recall specifically if you'd made it out there more
6   than twice?
7        A.   I don't recall.
8        Q.   Okay.  If you had gone out there more than
9   twice, do you think that would have been in the
10  incident report?
11       A.   I don't recall.  I'm -- I'm not for sure.
12       Q.   Fair enough.  Do you know any of the
13  officers that went out there previously in the day?
14       A.   No.
15       Q.   Okay.  Had dispatch notified you of prior
16  instances of officers going out there to the
17  residence that day?
18       A.   Not that I can recall.
19       Q.   Do you know -- I guess did you have any
20  conversation with any officer after the event
21  occurred that had gone out there earlier in the day?
22       A.   No.
23       Q.   Okay.  Okay.  What do you recall as your
24  first time out there to the residence?  Let's walk
25  through that.  How did you get notified to go out

Page 18

1   there?
2        A.   I was with Corporal Bittle, and dispatch
3   advised that we needed to go to Ms. Arnold's address
4   in reference to a disturbance.  When we got there we
5   made contact with Lowell Best on the front porch of
6   the residence.  He advised that he wanted to know if
7   it was illegal for anyone to carry mace spray
8   because Nellie Arnold was threatening him with it.
9   We told him that it was not illegal to carry mace
10  spray.
11            While finishing up our conversation with
12  Mr. Best, Nellie Arnold walked out onto the porch,
13  and she had what appeared to be red lipstick all
14  over her face.  She started screaming saying she
15  wasn't crazy and that she could see into the future.
16  She then said that she was wearing the stuff on her
17  face, which she called her warpaint, because she was
18  getting ready to kick Lowell Best's ass.
19       Q.   Okay.  What was Mr. Best's demeanor at
20  this time?
21       A.   Just asking a question.
22       Q.   Okay.  Was he angry?  He wasn't angry,
23  agitated?
24       A.   No, just asking a question.
25       Q.   Okay.  Do you know who called 911 or

Page 19

1   dispatch --
2        A.   No.
3        Q.   -- on that trip?  Did you make contact or
4   just discuss this issue with anybody else besides
5   those two individuals?
6        A.   Not that I recall.
7        Q.   Okay.  Did you have any conversations
8   specifically with Ms. Arnold during that visit?
9        A.   Yes.
10       Q.   Okay.  And what did you all discuss?
11       A.   She told us that it was the warpaint on
12  her face and that she was wearing it because she was
13  going to kick his ass.  She then told us that we
14  needed to remove Mr. Best from the residence because
15  he had called her a bitch.  We advised Ms. Arnold of
16  the legal eviction process and how to go about doing
17  that.  She then said that she was going to put
18  Mr. Best in a pine box and that if we did not take
19  him from the residence, she would take care of it
20  herself.
21       Q.   Okay.  And I guess that conversation or
22  statement of Ms. Arnold at that time, that didn't
23  lead to any charges, arrests, incident regarding her
24  on that visit; correct?
25       A.   It didn't.  We advised her -- due to her

Page 20

1   known mental status, we advised both parties,
2   Ms. Arnold and Mr. Best, gave them a verbal warning
3   and advised that if we were to have to come back
4   out, which would be the seventh time, that they
5   would be taken into custody.
6        Q.   Okay.  And you mentioned Ms. Arnold's
7   mental status.  What -- how do you know of her
8   mental status?
9        A.   When I say "known mental status," I mean
10  that day, just blurting out, you know, saying she's
11  not crazy, she can see into the future.
12       Q.   Okay.  Nothing that you had specific
13  knowledge prior to this?
14       A.   No.
15       Q.   The dispatch or other officers hadn't
16  mentioned anything about Ms. Arnold's mental state?
17       A.   No.
18       Q.   Okay.  Just what you observed during that
19  first trip out there?
20       A.   Correct.  If -- I don't know if Corporal
21  Bittle had dealt with her previously.  He worked for
22  Saline way longer than I did, so I'm not for sure.
23       Q.   Okay.  Did you notice anybody else around
24  the residence or in the general area during this
25  trip?

**Plaintiff's Statement in Opposition - Exhibit A**

Electronically signed by Chris Hoenig (101-050-243-2525)                    2dde67bd-22a8-4b4d-9135-d0faa59321ee

Page 21

1  A. No.
2  Q. Okay. You had -- you had never met
3  Ms. Arnold prior to this date?
4  A. I had met Ms. Arnold previously on a call.
5  She had just pulled up in a vehicle, when her and
6  Lowell Best were in a vehicle. I didn't -- all she
7  said was, This is my daughter's house. Because I
8  was at a call for her daughter's house I do believe.
9  But that was the only thing that was ever said or I
10 ever had any contact before. And I didn't even know
11 that was her at the time.
12 Q. Okay. And it wasn't at this residence
13 where that occurred?
14 A. No, not that I recall.
15 Q. Okay. Any other trip out there prior to
16 the main incident that happened with Ms. Arnold
17 injuring herself?
18 A. No.
19 Q. Okay. What were Ms. Arnold and Mr. Best
20 doing when you and Corporal Bittle left the first
21 time out there?
22 A. I don't recall necessarily what they were
23 exactly doing when we left.
24 Q. Okay. Were they yelling at each other,
25 fighting with each other?

Page 22

1  A. I don't remember.
2  Q. You don't know whether things had calmed
3  down at that point or if they were still agitated
4  with each other?
5  A. They weren't physical with one another
6  while we were leaving or anything of that nature,
7  no.
8  Q. Okay. Did you ever go inside the house on
9  that first visit?
10 A. No.
11 Q. Okay. Okay. On this at least second trip
12 out there, the final trip out there, how were you
13 notified at that time?
14 A. Dispatch once again advised us that we
15 needed to go back to the residence in reference to
16 another disturbance.
17 Q. Do you recall how long it was between the
18 two?
19 A. Probably 20-something minutes.
20 Q. Do you recall how far you and Corporal
21 Bittle were from the residence when you got that
22 call?
23 A. Not far.
24 Q. And I ask is it something where if
25 dispatch gets notified or 911 is called, do they

Page 23

1  alert one of the closest officers to the residence?
2  A. Usually, you're assigned areas to work.
3  Q. Okay. Did you and Corporal Bittle make
4  any statement, either of you to the other, once you
5  got the notification from dispatch?
6  A. I don't remember.
7  Q. No "here we go again"? No -- I mean, were
8  either of you irritated to have to go back over
9  there?
10 A. Irritated, no.
11 Q. Did you want to have to go back over there
12 and deal with them?
13 A. No.
14 Q. Okay. When you and Corporal Bittle showed
15 up -- and you're riding together at this point;
16 correct?
17 A. Correct.
18 Q. Okay. Tell me about where you pulled up,
19 where you parked, and what happened from there.
20 A. We got the call from dispatch to go back.
21 We pulled up behind Ms. Arnold's car, which was in
22 front of the residence. Ms. Arnold was standing at
23 the back of her car by the trunk.
24 Q. Okay. Was Mr. Best visible at that time?
25 A. At that time I don't recall him being

Page 24

1  visible.
2  Q. Or at least Mr. Best wasn't outside to
3  your recollection?
4  A. When we pulled up, I don't remember. I
5  don't -- I don't think so.
6  Q. Okay. Were you directed to do anything by
7  Mr. Bittle when you pulled up at the residence?
8  A. Yes.
9  Q. Okay. And what was that?
10 A. Corporal Bittle advised me to put
11 Ms. Arnold in handcuffs and put her in the back of
12 the patrol unit.
13 Q. Was Corporal Bittle going to do the same
14 for Mr. Best?
15 A. He -- yes. He advised that while I was
16 getting Ms. Arnold, he was going to put Mr. Best
17 into custody.
18 Q. Okay. And then you were going to place
19 both of them in your squad car?
20 A. Yes.
21 Q. To your knowledge, did Corporal Bittle
22 witness the incident regarding Ms. Arnold and her
23 injury?
24 A. Yes.
25 Q. Okay. He hadn't gone inside by that time?

6 (Pages 21 to 24)

**Plaintiff's Statement in Opposition - Exhibit A**

Page 25

1  A. No.
2  Q. Okay. Tell me specifically, once you get
3  out of the vehicle, Corporal Bittle's told you to
4  place Ms. Arnold in handcuffs, what happened.
5  A. I walked up to Ms. Arnold, advised her to
6  put her hands behind her back. She just looked at
7  me. Didn't say anything, just looked at me. I told
8  her once again.
9  Q. Where was she standing at this time?
10  A. At her -- at the trunk.
11  Q. Okay. Was -- do you recall if the trunk
12  was open?
13  A. I believe so.
14  Q. Okay. Recall if she had anything in her
15  hands or saw her put anything in the trunk?
16  A. Her keys were in her right hand.
17  Q. Okay. So trunk's open and you're telling
18  her what?
19  A. "Put your hands behind your back."
20  Q. Okay. And what does she do?
21  A. The first time I told her to put her hands
22  behind her back, she just looked at me.
23  Q. Okay. When you say looked at you, was she
24  turned around with her back to her car or did she
25  turn her head around but still facing the trunk?

Page 26

1  A. It was kind of half -- halfway,
2  shoulder -- over the shoulder kind of look at me.
3  Q. Okay. And I know I'm trying to get your
4  recollection and I'm not trying to dig too deep in
5  this, but do you recall which way she was facing?
6  A. No, I do not.
7  Q. Okay. Don't know if it was her left hand
8  out towards you when she's turned sideways or the
9  right hand with the keys out sideways?
10  A. No, I don't. I don't recall that.
11  Q. Okay. So after she's giving you this what
12  you described as a blank stare, what happened?
13  A. I told her once again to place her hands
14  behind her back. And she tells me, No, I will do so
15  when I'm ready to.
16  Q. Okay. What happened next?
17  A. She keeps fiddling around and putting her
18  hand into her left pocket. I advised her to take
19  her hand out of her pocket. She doesn't do so. I
20  advise her again. She says that she's getting her
21  car keys, but her car keys were in her right hand.
22  I'm able to get the left hand out of her pocket as
23  she's consistently resisting me moving any -- any --
24  anything on her, any body part on her.
25  Q. Okay. These car keys, was it just a

Page 27

1  single key? Do you recall if it was house keys,
2  other stuff on it?
3  A. I don't recall.
4  Q. Do you recall if the keys were ever on the
5  ground after the incident?
6  A. I don't recall that either. No, I don't
7  remember.
8  Q. Okay. So you're having this issue with --
9  well, let me ask you this: Did Ms. Arnold make any
10  statement saying -- strike that. Ms. Arnold said --
11  let me get your testimony right. What was the
12  statement that Ms. Arnold made that she said, I'll
13  go when I'm ready to? What did she say?
14  A. Talking about putting her hands behind her
15  pack -- her back, she said, No, I will do so when
16  I'm ready to.
17  Q. Okay. Did she make any statement to you
18  about agreeing to get into the vehicle?
19  A. No.
20  Q. When you're having this issue with
21  Ms. Arnold and you say you're attempting to get
22  her -- I guess you were attempting to get her left
23  hand out of the pocket; is that correct?
24  A. Yes.
25  Q. Okay. How are you standing or where were

Page 28

1  you --
2  A. Direct --
3  Q. -- related to her?
4  A. Directly behind her, so just lined up
5  square with her.
6  Q. Okay. Were you doing anything with her
7  right hand at that time?
8  A. No.
9  Q. Okay. Had you gotten -- well, I'll
10  tell -- tell me after you're messing with her left
11  hand what happened.
12  A. Also I want to advise she was still kind
13  of turned when she had her hand in her pocket, which
14  way I don't know. I don't remember. Once I got the
15  left hand out of the pocket -- like I said, she
16  resisted pretty much me getting the hand out, but I
17  got the hand out in fear that the mace might be in
18  there. I told her again to put her hands behind her
19  back. She refused. I was able to get the right
20  hand and bring it behind her back and get my
21  handcuffs off my duty belt.
22       At that time I put the -- while putting
23  the right wrist into the right handcuff, she started
24  to reach for that left pocket again and trying to
25  put her hand in that pocket. Like I said, her right

7 (Pages 25 to 28)

**Plaintiff's Statement in Opposition - Exhibit A**

Electronically signed by Chris Hoenig (101-050-243-2525)                                    2dde67bd-22a8-4b4d-9135-d0faa59321ee

Page 29

1  wrist is cuffed at this time, and I put a little bit
2  of pressure on the right cuff to try to reach around
3  to grab the left hand that is going into the left
4  pocket. She resisted, like I said, the whole time
5  me doing this. Also resisting, she tried to kind of
6  pull away, and she lost her balance and -- and fell.
7      Q. Okay. I want to dissect that a little
8  bit. You were standing behind her. And you get
9  cuffs on the right wrist; correct?
10     A. Yes. Finally, after her resisting, yes.
11     Q. Okay. What do you mean about put -- you
12 mentioned something about putting pressure on her
13 right wrist. What is that?
14     A. What I mean by that is if I have her right
15 hand in the cuff, holding the handcuffs, because I'm
16 not going to let them go because it then becomes a
17 weapon, holding, and when I'm reaching to grab the
18 left hand, her hand is obviously coming with me, her
19 right hand is coming with me because it's in the
20 cuff.
21     Q. So you're saying you're putting pressure.
22 Are you holding the -- holding her hand with the
23 cuff in it to do that or are you holding the loose
24 uncuffed portion of the handcuffs?
25     A. I'm holding the -- there's a spot in

Page 30

1  between the hand -- both the handcuffs. So not --
2  not her hand, not the right cuff, not the left cuff.
3  I'm holding right in between so that I can grab that
4  left hand and hook it onto that other handcuff.
5      Q. Okay. Tell me specifically about your
6  statement of Ms. Arnold losing her balance.
7      A. When I went to reach for that left hand
8  that was going back into the pocket, she is
9  resisting forcefully and kind of doing one of these
10 numbers with the shoulder trying to prevent me from
11 getting the left hand. When she does that, she
12 loses her balance and falls on her left, catching
13 herself with that left -- left hand.
14     Q. Okay. I just want to make sure I get your
15 testimony correct. You had mentioned she was going
16 back for her left pocket during this time; is that
17 correct?
18     A. Not -- she had pants on that had just side
19 pockets. No back pockets. Side pockets like a
20 regular pair of pants.
21     Q. Did she ever get her hand back in that
22 left pocket?
23     A. I don't recall if she got it fully into
24 the pocket.
25     Q. And I understand your testimony of

Page 31

1  Ms. Arnold losing her balance. Was there any force
2  on your part that led to that fall?
3      A. None.
4      Q. Even applying pressure and trying to get
5  the right hand to the left hand?
6      A. No.
7      Q. Okay. After Ms. Arnold falls, what
8  happens next?
9      A. She falls and immediately, like I said,
10 she tried to catch herself on that right wrist,
11 which made her have a compound fracture in the left
12 arm. Immediately, Brent Bittle saw what happened,
13 made contact with dispatch to send medical. I got
14 my key cuff out and uncuffed the right -- front
15 right wrist. And she, Ms. Arnold, was flinging the
16 broken arm around. And I advised her to stay calm
17 and to -- to keep that arm still.
18     Q. Okay. Did you apply or do anything for
19 medical attention to her?
20     A. No. Just told her to keep the arm still.
21     Q. Okay. I guess what did you observe
22 specifically of her arm?
23     A. That the bone was through the skin.
24     Q. Okay. Was there blood? Was it bleeding?
25     A. Yes.

Page 32

1      Q. Okay. Was it -- was it gushing blood
2  profusely?
3      A. No. There was hardly really any extensive
4  blood.
5      Q. Okay. Prior to this fall and the
6  incident, I guess your testimony is thinking she had
7  mace in her left pocket; is that correct?
8      A. Yes.
9      Q. Okay. After the fall did you all check
10 her for any contraband or the mace?
11     A. No.
12     Q. Okay. Do you know if anybody did?
13     A. I'm not for sure if anybody did.
14     Q. Okay. And you don't know whether she had
15 it on her or not at that moment?
16     A. No.
17     Q. Okay. Did she make any threatening
18 remarks to you?
19     A. No.
20     Q. Did you make any other commands other than
21 "Put your hands behind your back"?
22     A. "Put your hands behind your back." And
23 "Take your hand out of your pocket."
24     Q. Okay. No "Stop moving" or "Don't go
25 anywhere"?

8 (Pages 29 to 32)

**Plaintiff's Statement in Opposition - Exhibit A**

Electronically signed by Chris Hoenig (101-050-243-2525)    2dde67bd-22a8-4b4d-9135-d0faa59321ee

Page 33

1    A. Not that I can recall. She was standing
2  still.
3    Q. Okay. And you talked about Corporal
4  Bittle calling dispatch. Is this the police
5  dispatch? Is this 911? Who was he specifically
6  contacting?
7    A. The Saline County dispatch, and then from
8  there they contact medical help.
9    Q. Okay. Did Ms. Arnold -- do you recall
10 Ms. Arnold asking you or Corporal Bittle for any
11 medical help?
12   A. No, she did not.
13   Q. Do you recall anybody else asking you or
14 Corporal Bittle to help her?
15   A. No.
16   Q. Do you recall anybody -- let me go back.
17 When you and Corporal Bittle were exiting your
18 vehicle on the second trip, do you recall anybody
19 else across the street outside or in the general
20 vicinity at that time?
21   A. No.
22   Q. Okay. Did people come out eventually to
23 Ms. Arnold?
24   A. Yes.
25   Q. Okay. Do you recall the first instance

Page 34

1  that you would have seen anybody?
2    A. After she had fell and broke her arm and
3  she was screaming.
4    Q. Okay. Did you get any statement or have
5  any conversations with those persons?
6    A. No. The only person that actually came to
7  the scene I believe was her son, but he did not stay
8  around very long at all.
9    Q. Okay. Nobody made a comment that they saw
10 what happened to you?
11   A. No.
12   Q. Okay. Do you know how long it took for
13 medical personnel to show up?
14   A. I don't know. I know that Shannon Hills
15 Police were the first to show up after medical was
16 called. And they showed up rather quickly.
17   Q. In your vehicle did you have any, I guess,
18 medical devices, anything in the squad car to help
19 Ms. Arnold?
20   A. No.
21   Q. Was there something that you normally
22 carried in your squad car?
23   A. No.
24   Q. Do you recall what the Shannon Hills
25 police officers did?

Page 35

1    A. They had a trauma bag. I don't recall the
2  exact measures of what they did to Ms. Arnold.
3    Q. Okay. After the incident happened, did
4  you just stand by the squad car? Did you go
5  somewhere else?
6    A. I stood by Ms. Arnold rather close and
7  told her to stay calm, an ambulance is coming. And,
8  like I said, she kept moving that arm that was
9  broken, and I advised her to set it down and to not
10 move it.
11   Q. Okay. Corporal Bittle never directed you
12 to give any medical attention; correct?
13   A. Correct.
14   Q. Okay. Did Corporal Bittle do anything for
15 medical attention for Ms. Arnold?
16   A. No. He just advised dispatch to send
17 medical.
18   Q. Okay. It's been talked about that it
19 might have been 45 minutes between the incident and
20 the ambulance arriving. Do you have any reason to
21 dispute that?
22   A. I have no idea how long it took for
23 Medtran to arrive.
24   Q. And when you say you're not sure, I
25 understand that. Would it have been anything in

Page 36

1  your mind where you say, Well, it felt like it was
2  really quick when they showed up and they showed up
3  immediately?
4    A. Can you ask the question one more time?
5    Q. Sure. So as it becomes to -- I understand
6  Shannon Hills Police showed up at some point, but
7  the actual -- do you know which ambulance service
8  showed up?
9    A. Medtran.
10   Q. Okay. Did it feel like it was immediate
11 that Medtran showed up?
12   A. Immediately, no.
13   Q. Okay. Did it feel like it was some time
14 that it took Medtran to show up?
15   A. Yes.
16   Q. Okay. Did anybody else besides the
17 Shannon Hills Police and Medtran show up for medical
18 care?
19   A. Yes, a fire truck showed up, and they got
20 out and assessed Ms. Arnold as well.
21   Q. Okay, do you know if they did anything
22 specifically?
23   A. I don't remember.
24   Q. Okay. You didn't follow or go with
25 Ms. Arnold to any hospital; correct?

Page 37

1  A. Correct.
2  Q. Okay. Do you know where she was taken to?
3  A. UAMS eventually. I don't know if she went
4  somewhere else before that.
5  Q. You're not sure if she went to Saline
6  Memorial or somewhere closer?
7  A. No. To be honest, when she was in the
8  ambulance, I didn't know where she went.
9  Q. Okay. During your employment with Saline
10 County, had anybody been injured that you had been
11 around?
12 A. Not that I remember.
13 Q. Okay. No vehicle accident? No other type
14 of fall?
15 A. Not that I remember.
16 Q. Let's see if I can do this. Did
17 Ms. Arnold move at any time?
18 A. During what time?
19 Q. Do what?
20 A. I'm sorry. You asked if she moved
21 anytime?
22 Q. Correct. After the incident did she stay
23 in the same position and area where she was?
24 A. Yes. She was laying on her back in that
25 same area.

Page 38

1  Q. I'm assuming you can't see anything on
2  your screen; correct?
3  A. I can see what looks like a Word document.
4  Q. That's not the one I was wanting.
5     MR. JORGENSEN: It looks like your
6  outline, Win. I'm looking away.
7  Q  (By Mr. Wilson) How about now? Can you
8  see a picture?
9  A. Yes.
10 Q. Okay. This may be a little hard to see.
11 And I'm just -- the reason I'm asking for this is
12 not so much for Ms. Arnold's injury, but I'm just
13 trying to get the lay of the land. I see a
14 gentleman in the picture. Do you recognize him?
15 A. I believe that's her son that I advised
16 earlier that showed up.
17 Q. Okay. And I know we're not there together
18 where you can put X's and mark things, but I see
19 some tires of a vehicle in the background. Is that
20 the Saline County patrol unit in relation to where
21 Ms. Arnold is?
22 A. I wouldn't be able to tell you from this
23 picture because I'm not for sure when this picture
24 was taken and if, you know, anybody else had showed
25 up at that point.

Page 39

1  Q. Okay. And I'm just asking. I see -- I'm
2  trying to get some specifics just from my point. I
3  see two -- I don't know if you can see my cursor. I
4  see two shoes and what looks like sheriff's deputy
5  pants over here, but if you can't tell me
6  specifically, that's fine. I'm just trying to --
7  for my own benefit and purpose to get the lay of the
8  land for it.
9     After the incident happened, did you move
10 your squad car at all?
11 A. I didn't.
12 Q. Okay. Do you know if Corporal Bittle
13 moved the squad car?
14 A. I'm not for sure if he did or not.
15 Q. Okay. Do you recall where the Shannon
16 Hills Police showed up?
17 A. Like where they parked? I do not.
18 Q. Okay. Did anybody go inside the residence
19 after the incident happened?
20 A. Not that I'm aware of.
21 Q. Okay. Did Mr. Best come outside the
22 house?
23 A. Yes.
24 Q. Okay. And what happened with him?
25 A. He -- there was a fence, as you can see in

Page 40

1  that picture, in front of her residence. He stayed
2  on the inside of the fence where the house was. I
3  don't recall anything of what he did except kind of
4  saying, "My baby, my baby" when she had fell.
5  Q. Okay. Was he subsequently arrested?
6  A. Yes.
7  Q. Okay. And what was he arrested for?
8  A. Disorderly conduct.
9  Q. Okay. Was that something that transpired
10 after the incident occurred or was that what he was
11 going to be arrested for from the get-go?
12 A. That was the warning we had gave both of
13 them prior -- you know, the sixth time coming out.
14 Told them that if we had to come back out, both
15 would be put into custody.
16 Q. Okay. He didn't do anything else outside
17 the residence that would warrant a criminal charge?
18 A. No, not that I recall.
19 Q. There was some information provided to me
20 about people across the street from Ms. Arnold's
21 residence. Did you see anybody coming and going
22 from that house?
23 A. No. I saw somebody on the porch after the
24 incident happened when Ms. Arnold was on the ground,
25 but nobody ever walked over to the scene except the

10 (Pages 37 to 40)

**Plaintiff's Statement in Opposition - Exhibit A**

Page 41

1  person you saw in the picture.
2      Q.  Okay.  And to your recollection, nobody
3  told you or Corporal Bittle to help her?
4      A.  No.
5      Q.  Okay.  Do you recall anybody taking
6  pictures?
7      A.  No.
8      Q.  Okay.  As it relates to Saline County
9  Sheriff's Office guidelines, are there specific
10 guidelines related to arresting persons to your
11 knowledge?
12     A.  Yes.
13     Q.  Okay.  And what are those?
14     A.  When a person is to be arrested, they are
15 to be put in handcuffs and placed in the back of the
16 patrol unit with their seat belt on.
17     Q.  Any specific guidelines to make contact
18 with the person to do that?
19     A.  Can you rephrase your question?
20     Q.  Sure.  If -- you just said you've got
21 guidelines to go in and handcuff them and do that.
22 Are there any verbal guidelines of what you're
23 supposed to tell them?
24     A.  You're -- you're under arrest.
25     Q.  Did you ever tell Ms. Arnold that she was

Page 42

1  under arrest?
2      A.  I -- I don't recall.
3      Q.  What about use of force guidelines and
4  policies?  Does the sheriff's office have those?
5      A.  Yes.
6      Q.  Okay.  And I don't necessarily want to get
7  into lethal use of force, but, you know,
8  specifically regarding nonlethal use of force, are
9  there defense tactics a deputy officer is authorized
10 to take?
11     A.  Yes, depending on, you know, the situation
12 and how much force is put up by the other person,
13 there's pressure points and ways to manipulate
14 handcuffs.
15     Q.  And we talked about some pressure and
16 things of that as -- did you do any of that in
17 attempting to handcuff Ms. Arnold?
18     A.  No, the only pressure that came from me
19 was on that handcuff on that right wrist because I
20 was trying to reach for the left hand.
21     Q.  Okay.  And it's your testimony that you
22 thought Ms. Arnold might have had some mace in her
23 pocket; is that correct?
24     A.  Yes, left pocket.
25     Q.  Okay.  And you didn't -- and it's your

Page 43

1  testimony you didn't use any use of force related to
2  that potential threat?
3      A.  No.
4      Q.  Would you have been authorized to use any
5  use of force if she had mace in her pocket?
6      A.  If she had mace in her pocket and she was
7  avidly going for it, yes, because that can be
8  detrimental to an officer.
9      Q.  And if that's the case, what all types of
10 nonlethal use of force are you authorized to take?
11     A.  Like I said, you could use the pressure
12 points or manipulating the handcuff.  Depending on
13 where the subject is, she could -- he/she could be,
14 you know, in this case pushed up against the vehicle
15 possibly if -- you know.
16     Q.  Okay.  Have you been trained on any
17 takedown techniques?
18     A.  Yes.
19     Q.  Okay.  And what were those?
20     A.  I don't think they have specific names
21 really to -- to give.
22     Q.  Okay.  Well, I mean, just tell me --
23 describe for me what you would do.
24     A.  It depends on the instance once again and
25 the person obviously, how big, how small they are.

Page 44

1  But there are takedown, you know, take like down to
2  the ground tactics that you can do.
3      Q.  Are those, like, leg sweeps or?
4      A.  No.  We are taught that at the academy,
5  but I would say that that's hardly ever used.  I've
6  never used a leg sweep tactic ever.
7      Q.  Okay.
8      A.  It's more of use your body weight to bring
9  the person to the ground pretty much.
10     Q.  If an individual is injured, is there any
11 guidelines with the sheriff's department or
12 sheriff's office in performing medical care?
13     A.  To a certain degree, yes.  If there's
14 excessive bleeding or, you know, somebody's passed
15 out, we can administer CPR.  But as far as compound
16 fracture, no, never taught on how to fix that.
17     Q.  Okay.  And I understand that you're not a
18 physician, but there's no guidelines as to, I guess
19 even if it's bleeding to, you know, apply pressure
20 to an injury to stop bleeding, wrap blood up, etc.?
21     A.  If there is excessive gushing blood, then
22 yes.
23     Q.  Okay.  Did you believe any medical
24 assistance was needed for Ms. Arnold by you?
25     A.  No.

11 (Pages 41 to 44)

**Plaintiff's Statement in Opposition - Exhibit A**

Page 45

1  Q. Okay. At any time that it took medical
2  personnel to arrive?
3  A. No. I advised her to keep her arm still,
4  and that was my medical helping in that situation.
5  Q. Okay. Did you -- was Ms. Arnold in pain?
6  A. Yes.
7  Q. Okay. Did she let you know that?
8  A. Verbally, I don't remember if she said,
9  I'm in pain. But screaming, yes, I would say that
10 she was in pain.
11 Q. And I know I've got some discovery from
12 you and the sheriff's office, but to your knowledge
13 there's no video of this incident?
14 A. No.
15 Q. Okay. And at the time of this incident,
16 at least you and Corporal Bittle didn't have body
17 cams on you; is that correct?
18 A. Correct.
19 Q. Okay. The squad car that you're in had a
20 dash cam; is that correct?
21 A. Correct.
22 Q. Okay. But it wasn't otherwise turned on
23 on this instance?
24 A. Correct.
25 Q. Okay. And as I understand it, did you

Page 46

1  have to -- what turns on the dash cam?
2  A. Initiating the blue lights. So as soon as
3  you turn the blue lights on, the camera will start
4  recording I think up to a few minutes before you
5  actually turned your lights on.
6  Q. Okay. Can you do it manually?
7  A. Yes.
8  Q. Okay. And, obviously, I haven't seen a
9  video. And I'm assuming it wasn't turned on
10 manually in this instance either?
11 A. Correct.
12 Q. Okay. You talked about parking behind
13 Ms. Arnold at the time when you showed up. Was the
14 squad car parked behind Ms. Arnold's vehicle and
15 where she was?
16 A. Yes. It was parked behind -- if -- maybe
17 not directly behind. Maybe a little bit staggered
18 but behind her vehicle, yes.
19 Q. Okay. I'm just trying to get some
20 information. If you had clicked on the dash cam, do
21 you believe it would have shown the incident?
22 A. Possibly depending on -- you know, if it
23 was staggered, probably not. If it was right behind
24 and set up like a traffic stop, possibly.
25 Q. Okay. For today's deposition, what all

Page 47

1  did you do to prepare?
2  A. I read over the incident report and, you
3  know, thought back about the incident. And that's
4  pretty much it.
5  Q. Okay. Other than your attorney, did you
6  talk to anybody about your deposition today?
7  A. No.
8  Q. Okay. Have you talked to anyone besides
9  your attorney in the last year about the case?
10 A. No, not -- not in the sense of discussing
11 anything. My father knew that I was being sued, but
12 other than that, no.
13 Q. Okay. Nobody -- you haven't talked to
14 Deputy or Corporal Bittle about it recently?
15 A. No.
16 Q. Have you talked to him since the lawsuit
17 was filed?
18 A. Not that I can recall, no.
19 Q. Okay. Anybody else with the Saline County
20 Sheriff's Office?
21 A. No.
22 Q. Okay. How long were you a deputy patrol
23 officer with Saline County?
24 A. From when I got hired from November,
25 Decemberish till I think it was end of July maybe.

Page 48

1  Q. Okay. Sometime during the same month of
2  this incident?
3  A. Correct, around the same timeframe.
4  Q. Okay. And where did you go from there?
5  A. I went to a domestic violence position
6  within the sheriff's office.
7  Q. Okay. Tell me a little bit about that.
8  What are your job duties there?
9  A. This was an in-office position, eight to
10 five, Monday through Friday. Domestic violence
11 victims would come in and I would speak to them,
12 interview them, and we would set up orders of
13 protection. Then from there the order of protection
14 was given to the deputies and they would serve, you
15 know, the offender. And then we would go to court
16 and represent these victims of domestic violence to
17 try to get the order of protection order in place.
18 Q. Okay. What led to your decision to do
19 that?
20 A. Officer safety reasons.
21 Q. What do you mean?
22 A. There is a handful of stuff that in the
23 county you're by yourself doing for the most part.
24 Your backup is 45, 50 minutes away. You're having
25 to, you know, look through houses at night by -- by

Page 49

1  yourself, and just for that reason alone, to me
2  there was just some officer safety concerns for
3  myself.
4      Q.  Okay.  A personal issue for you being in a
5  squad car by yourself and officer on your own; is
6  that correct?
7      A.  No, not necessarily me being an officer by
8  myself.  Just the fact that when help was -- when
9  help is needed, it's very, very far away.
10     Q.  During your employment with the Saline
11 County Sheriff's Office, how often were you by
12 yourself in your own squad car?
13     A.  I was by myself after I got off FTO
14 training.  They do not group -- they do not put two
15 -- two in a unit.  The only reason that Officer
16 Bittle and I were in a unit together was because I
17 was already in the transitioning phase to go to the
18 domestic violence position and prior to making that
19 transition, I had a conference and was stating my
20 officer safety concerns.  So they advised that
21 Bittle would need to ride with me until I could
22 transition into that other position.
23     Q.  Okay.  Was there any specific instance of
24 harm against you?
25     A.  No.

Page 50

1      Q.  Okay.  And who did you let know at the
2  sheriff's office for this transfer or change?
3      A.  The meeting was with Corporal Bittle and
4  the lieutenant at that time.  I'm not for sure who
5  that was.
6      Q.  Okay.  I've noted a Parsons or a Parson.
7  Would that have --
8      A.  He was not in the meeting.
9      Q.  Okay.
10     A.  No.  I think Wade -- it was Wade Gilliam
11 is who the -- our lieutenant was.
12     Q.  Any idea about the spelling of the last
13 name?
14     A.  No.
15     Q.  Okay.  And I'm just asking you because
16 it's something I've seen.  I know there was a
17 contract to fulfill a one-year duty as a deputy.  Do
18 you recall signing that?
19     A.  No, I don't.  I don't remember signing
20 that.
21     Q.  Okay.  But no -- no issue with the
22 sheriff's department -- if there was a signed
23 contract that you had with the sheriff's department
24 to fulfill at least one year as a deputy patrol
25 officer, the sheriff's department never had you pay

Page 51

1  any training money back, never had any issues with
2  this transfer?
3      A.  No.
4      Q.  Okay.  In connection with the issue
5  involving Ms. Arnold, did you receive any type of
6  reprimand from the sheriff's office?
7      A.  No.
8      Q.  Do you know if there was any internal
9  investigation by the sheriff's office?
10     A.  No.
11     Q.  Is that a -- you don't know one way or the
12 other or there was not?
13     A.  I believe there was not.
14     Q.  Okay.  In connection with your training,
15 and I've looked over some of that, there was an
16 incident -- and I believe Corporal Bittle was your
17 FTO at the time -- an incident allowing an
18 individual to walk away at a traffic stop, maybe to
19 use the restroom and then come back.  Can you
20 explain what occurred with it?
21     A.  Yes.  I was in FTO training still, and
22 Corporal Bittle and I stopped a vehicle out in East
23 End at -- we tried to stop them, but they pulled
24 into Sonic.  So they were in the stall at Sonic.  I
25 made contact with the driver, who was I believe a

Page 52

1  woman.  And while discussing things with her, the
2  male went into the bathroom at Sonic and came back.
3      Q.  Okay.  Did you receive any reprimand or
4  any issue regarding your actions that day?
5      A.  Corporal Bittle advised me to never let
6  anybody walk off the scene again.
7      Q.  Okay.  And when he said this, was it
8  something where it was just in passing "Don't do
9  it"?  Was he agitated?  What was his demeanor?
10     A.  Serious and stern.
11     Q.  I'm assuming you took that to heart to not
12 let it happen again?
13     A.  Yes, of course.
14     Q.  Are you still with the Saline County
15 Sheriff's Office?
16     A.  No.
17     Q.  Okay.  Do you recall what month and year
18 your employment ended with them?
19     A.  I believe December 2017.
20     Q.  Okay.  Did you do any other position
21 besides deputy patrol and this domestic violence
22 position?
23     A.  No, not at the Saline County Sheriff's
24 Office.
25     Q.  Okay.  So you worked for them for

13 (Pages 49 to 52)

**Plaintiff's Statement in Opposition - Exhibit A**

Page 53

1  approximately a year or so?
2     A.  Correct.
3     Q.  Okay.  Where did you go after
4  December 2017?
5     A.  I got a position at Benton Police
6  Department as a police officer.  That's ultimately
7  why I left Saline County.
8     Q.  And what did you do at -- for Benton?
9     A.  I was a police officer.
10    Q.  What were your normal job duties for them?
11    A.  Answering calls, taking reports, dealing
12  with -- you know, dealing with calls.  Front line.
13    Q.  Okay.  You were a patrol officer or going
14  out on calls for them?
15    A.  Yes.  Basically, the same thing as a
16  deputy but in the city for Benton.
17    Q.  Okay.  Did you have any of the personal
18  concerns we talked about, safety concerns with the
19  Benton Police Department?
20    A.  I think altogether there -- there are
21  safety concerns with being a police officer in
22  general.  So yes, there are safety concerns when I
23  moved to Benton but not as far as how the county was
24  where backup was not available.
25    Q.  Understood.  Were you in a squad car on

Page 54

1  your own?
2     A.  Yes.  I had to go through FTO, just like
3  any other person again, and then I was released to
4  be on my own.
5     Q.  How long did that FTO training take?
6     A.  The same, three months.
7     Q.  Any issues that come to light in
8  connection with that training with your officers or
9  supervising officers?
10    A.  No.
11    Q.  Okay.  Are you still with the Benton
12  Police Department?
13    A.  No.
14    Q.  Okay.  When did you stop working for
15  Benton Police Department?
16    A.  I believe it was around the time of
17  October.
18    Q.  2018?
19    A.  2018, yes.
20    Q.  Okay.  So did you transfer directly from
21  Saline County to Benton in December of 2017?
22    A.  Yes.
23    Q.  Okay.  And what happened with leaving --
24  strike that.  With Benton County Police Department,
25  did you have any other job title than what we just

Page 55

1  talked about?
2     A.  No, just police officer.
3     Q.  Okay.  And what led to leaving the Benton
4  County -- Benton Police Department?
5     A.  Ultimately, I just didn't want to be a
6  police officer anymore.
7     Q.  Okay.  Any specific instance or instances?
8     A.  No.  No.
9     Q.  Okay.  So after April -- I'm sorry,
10  October 2018, have you had any other law enforcement
11  employment?
12    A.  No.
13    Q.  Okay.  What are you doing now?
14    A.  I am in sales and I do roofing.
15    Q.  Okay.  Like it better?
16    A.  Yes.
17    Q.  Okay.  On July 3, 2017, was there any
18  medication that you were taking for your health?
19    A.  No.
20    Q.  Okay.  You weren't -- no physical injury
21  and having to take any kind of pain medication?
22    A.  No.
23    Q.  Okay.  Were you seeing any health or
24  mental professional around that time?
25    A.  No.

Page 56

1     Q.  Okay.  Have you ever had to participate in
2  any anger management class in the last ten years?
3     A.  No.
4     Q.  Participate in any drug or alcohol
5  treatment program in the last ten years?
6     A.  No.
7     Q.  I know I'm not there in front of you, so I
8  can't see weight, how tall you are, etc.  I've seen
9  a redacted driver's license that says somewhere
10  around -- well, I know I'm not supposed to ask a
11  lady her weight and necessarily her height, but how
12  tall are you and at least in July of 2017, what was
13  your weight?
14    A.  I'm five-foot tall, and around that time I
15  was about 107, 110 pounds.
16    Q.  Okay.  And then some of the information
17  I've gotten from the sheriff's office, it talks
18  about you playing sports in high school.
19    A.  Yes.
20    Q.  And I guess weightlifting and being in
21  certain competitions.  Tell me about that.
22    A.  When I was in college, I worked at a gym
23  and I was on their powerlifting team.
24    Q.  Okay.  I think I saw something about
25  winning some deadlift awards.  What's a deadlift?

Page 57

1   A.  A deadlift is basically how much weight
2   you can pull from the ground up to your waist and
3   lock out your legs, basically.
4   Q.  Okay.  So if you're -- you've got a bar
5   that's got weight on each end of it; is that
6   correct?
7   A.  Correct.
8   Q.  And you're -- you're bending over -- it's
9   not what you see in the Olympics where they're
10  lifting the weight all the way on top of their head?
11  A.  Correct.  That's power clean.
12  Q.  Power clean.  Okay.  So you're lifting it
13  up and getting it to about right here?
14  A.  No, just waist.  Just my waist.
15  Q.  Okay.
16  A.  My arms are locked out and just I'm coming
17  up.
18  Q.  Okay. I guess would you consider yourself
19  to be pretty physically fit and in shape?
20  A.  Yes.
21  Q.  Okay.  And I can tell you, I don't know --
22  I lift weights occasionally.  I don't know that I've
23  ever done a deadlift, but it talks about 270 pounds,
24  which seems like quite a bit or 22 reps with 180
25  pounds.  Is that -- I guess for your size and

Page 58

1   stature, is that a lot?
2   A.  I would say that's pretty decent, yes.
3   Q.  Okay.  You don't have to be modest with
4   it.  If that's a good amount, you can tell me.
5       I guess at that time, were you doing
6   any -- I guess were you still in weight training,
7   lifting weights and all this as well?
8   A.  No, I was not.
9   Q.  Okay.  During that time of at least July
10  the 3rd, 2017, would you have said you were in the
11  same or similar shape of what we were talking about
12  with winning these awards at college?
13  A.  No.
14  Q.  Okay.  Why is that?
15  A.  In college, you know, I had quite a bit of
16  muscle from lifting weight and working at the gym.
17  Before I went to the academy, I had lost pretty much
18  all of that muscle and those gains.  And when they
19  send you to the academy, you run consistently and
20  quite often.  So I was in shape, but a different
21  kind of shape.  I'd say cardiovascular shape.  Still
22  strong, yes, but not compared to what I was back
23  when I was in college.
24  Q.  Okay.  And you say college, but we're
25  talking about a year timeframe I guess between

Page 59

1   graduating college and this incident; is that right?
2   A.  Yes.
3   Q.  If you graduated in -- I assume it was May
4   of 2016 that you graduated from Arkansas Tech?
5   A.  I graduated in August.
6   Q.  Okay.
7   A.  The competition was in March of 2016.
8       MR. WILSON:  Okay.  Well, let's do this,
9   let's take a five-minute break.  I don't know that
10  I've got much more, but I'm just going to look over
11  my notes and make sure I didn't miss anything.  I
12  may not have anything else and be done or may have a
13  couple of follow-up questions for you.
14      THE WITNESS:  Okay.
15      (A short break was taken.)
16  Q   (By Mr. Wilson) I glanced over and I
17  appreciate you providing me responses to
18  interrogatories.  We talked about this a little bit,
19  but I just want to make sure I've got your testimony
20  correct.  I had inquired if Ms. Arnold had ever
21  gotten arrested the date in question of July 3,
22  2017.  It's my understanding she ultimately was
23  never arrested or charged with any offense; is that
24  correct?
25  A.  I am a hundred percent not sure on that.

Page 60

1   Once Ms. Arnold left in the ambulance, I never made
2   contact with her again.
3   Q.  Okay, understood.  And in your response
4   you said, I began to place Ms. Arnold under arrest
5   for disorderly conduct and terroristic threatening.
6       Were those the charges that you were going
7   to arrest her for?
8   A.  Yes.
9   Q.  Okay.  And I asked earlier and said, Did
10  you ever tell her she was under arrest.  And I
11  believe your response was "I don't know."
12  A.  Correct.  I don't recall.
13  Q.  Okay.  And the only thing you do recall
14  was telling her to put her hands behind her back?
15  A.  Correct.
16  Q.  Okay.  At this time involving Ms. Arnold,
17  were you scared or afraid of her?
18  A.  No.
19  Q.  Okay.  She didn't seem like a threat to
20  you?
21  A.  Her personally, no.  The mace spray that
22  possibly was in her left pocket was a threat.
23  Q.  Okay.  And you never saw the mace spray
24  come out of her pocket?
25  A.  No.

Page 61

1   Q. Okay. And you don't know if it even was
2   in her pocket?
3   A. Correct.
4   Q. Okay. In your employment with the Saline
5   County Sheriff's Office, did you ever detain an
6   individual?
7   A. Yes.
8   Q. Okay. Do you recall how many times?
9   A. No.
10  Q. Okay. And I understand it may have been
11  several, and I want to just kind of get some
12  parameters. Would it have been more than five
13  times?
14  A. I don't recall exactly how many times.
15  Q. Okay. So you don't know whether if it was
16  5, 50, or a hundred times you would have physically
17  detained someone?
18  A. Correct. I'm not for sure on the exact
19  number.
20  Q. Okay. But it was -- it was more than one?
21  A. Correct.
22  Q. And do you think it would have been less
23  than 50?
24  A. Considering that I was not on patrol that
25  long, I would say it was probably less than 50, yes.

Page 62

1   Q. Okay. Do you think it was less than 25?
2   A. I don't -- I don't know.
3   Q. Okay. Fair enough. Did you ever have to
4   use any type of use of force when you were employed
5   with the sheriff's -- Saline County Sheriff's
6   Office?
7   A. I don't recall. I don't -- I don't think
8   so.
9   Q. Okay. What about with Benton Police
10  Department?
11  A. Yes.
12  Q. Okay. What happened there?
13  A. A shoplifting incident at Dollar General.
14  The guy wouldn't put his hands behind his back. I
15  got one cuff on, and he went pretty crazy,
16  wouldn't -- wouldn't listen or anything like that.
17  In this instance, I did manipulate the handcuff.
18  This guy was probably six-foot tall, and I tried --
19  tried to do the leg sweep and he didn't get off his
20  feet. Ultimately, a bystander was watching and came
21  over, and we were able to get him in both handcuffs.
22  Q. Okay. Was this incident towards the end
23  of your employment with Benton -- I mean with the --
24  yeah, with the Benton Police Department?
25  A. I don't think so.

Page 63

1   Q. Okay. Other than this issue regarding
2   this gentleman, no other use of force that you can
3   recall?
4   A. Not that I can recall.
5   Q. Okay. And you talked about this
6   manipulation move. What was that again?
7   A. With the handcuff? Just putting pressure
8   on the pressure point in the wrist by using the
9   handcuff. So you turn the handcuff up and it puts
10  pressure on the -- on the wrist, and it's a pressure
11  point, so it's somewhat painful for the -- for the
12  person.
13  Q. Okay. And that helps pull their hand back
14  towards the other one?
15  A. It lets them -- lets them know if you do
16  not give me your hand, you're going to continue to
17  be in pain.
18  Q. Okay. Anything else that you want me to
19  know regarding this incident that I didn't ask you
20  or we didn't talk about?
21  A. No.
22      MR. WILSON: Okay. That's all I have. I
23  appreciate your time this morning.
24      THE WITNESS: Thank you.
25      MR. WILSON: Thank you.

Page 64

1       MR. JORGENSEN: I have no questions.
2       REPORTER: Do you need a copy, Mr.
3   Jorgensen?
4       MR. JORGENSEN: Yes, please. Electronic
5   would be great.
6       MR. WILSON: The same.
7       (Ending time of the deposition: 10:49 a.m.)

16 (Pages 61 to 64)

**Plaintiff's Statement in Opposition - Exhibit A**

```
                                          Page 65
 1          CERTIFICATE OF REPORTER
 2          I, Christine Hoenig, MO-CCR, do hereby certify
 3   that the witness whose testimony appears in the
 4   foregoing deposition was duly sworn by me; that the
 5   testimony of the said witness was taken by me to the
 6   best of my ability and thereafter reduced to typewriting
 7   under my direction; that I am neither counsel for,
 8   related to, nor employed by any of the parties to the
 9   action in which this deposition was taken, and further
10   that I am not a relative or employee of any attorney or
11   counsel employed by the parties thereto, nor financially
12   or otherwise interested in the outcome of the action.
13
14   _____
15          Christine Hoenig, MO-CCR
16
17
18
19
20
21
22
23
24
25
```

17 (Page 65)

**Plaintiff's Statement in Opposition - Exhibit A**

Electronically signed by Chris Hoenig (101-050-243-2525)                    2dde67bd-22a8-4b4d-9135-d0faa59321ee