Page 1

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF ARKANSAS
CENTRAL DIVISION

NELLIE ARNOLD,                )
                              )
    Plaintiff,                )
                              )
v.                            ) No. 4:20-cv-729
                              )
DEPUTY MARANDA TURNER, et al. )
                              )
    Defendants.               )

DEPOSITION OF BRENT BITTLE
TAKEN ON BEHALF OF THE PLAINTIFF
JANUARY 26, 2022

(Starting time of the deposition: 11:15 a.m.)

Page 2

```
            I N D E X

QUESTIONS BY:                    PAGE
Mr. Wilson                         5


            E X H I B I T S

EXHIBIT    DESCRIPTION           PAGE

           (No exhibits marked.)
```

Page 3

Deposition of BRENT BITTLE, produced, sworn and examined on January 26, 2022, between the hours of 11:00 a.m. and 1:00 p.m. via Zoom videoconference, before Christine Hoenig, a Missouri Certified Shorthand Reporter within and for the state of Missouri, in a certain cause now pending in the above matter.

Page 4

```
           A P P E A R A N C E S
FOR THE PLAINTIFF:
Mr. Ralph Wilson (via videoconference)
Hope, O'Dwyer, Wilson & Arnold, PA
211 Spring Street
Little Rock, Arkansas 72201
501-372-4144

FOR THE DEFENDANT:
Mr. Colin Jorgensen (via videoconference)
Association of Arkansas Counties
1415 West Third Street
Little Rock, Arkansas 72201
501-372-7550



Ms. Christine Hoenig, CCR No. 1417
Alaris Litigation Services
711 North Eleventh Street
St. Louis, Missouri, 63101
314-644-2191
```

1 (Pages 1 to 4)

**Plaintiff's Statement in Opposition - Exhibit B**

Page 5

1   IT IS HEREBY STIPULATED AND
2   AGREED by and between counsel for Plaintiff and
3   counsel for the Defendant that this deposition
4   may be taken in shorthand by Christine Hoenig,
5   Certified Court Reporter, and afterwards
6   transcribed into typewriting; and the signature
7   of the witness is expressly waived.
8           * * * * *
9           BRENT BITTLE,
10     Of lawful age, produced, sworn and
11  examined on behalf of the Plaintiff, deposes and
12  says:
13           EXAMINATION
14  QUESTIONS BY MR. WILSON:
15     Q.  Would you state your name and address.
16     A.  Bobby Brent Bittle.  My address is 1907
17  Highway 5 North, Apartment 1210, Benton, Arkansas
18  72019.
19     Q.  Have you ever given a deposition before?
20     A.  No.
21     Q.  Okay.  I'm just going to go over some
22  house rules.  I don't think we're going to be very
23  long this morning, but if you need to take a break
24  for any reason, use the restroom, get something to
25  drink, visit with your attorney, just let us know

Page 6

1   and we'll do that, take a little short break.  The
2   only thing I would ask, if there's a good question
3   pending that we get an answer to that question prior
4   to the break for that.
5      A.  Okay.
6      Q.  And one thing that -- the court reporter
7   is attempting to transcribe our conversation of our
8   question and answers, and she's needing to get a
9   clear record of that.  And the only thing I would
10  ask, and I'll do the same with you, is that you wait
11  until I finish a question before answering and I'll
12  wait until you finish an answer before I ask you my
13  next question or interject or anything of that
14  nature.  Is that fair?
15     A.  Yes, sir.
16     Q.  Okay.  Are you on any medication today
17  that would affect understanding a question of mine
18  or giving testimony this morning?
19     A.  No, sir.
20     Q.  Okay.  And the other thing I will tell
21  you, if by chance you don't understand a question of
22  mine or it's confusing, please let me know and I'll
23  rephrase that so that we get a valid and truthful
24  answer on your part.
25     A.  Yes, sir.

Page 7

1      Q.  Okay.  I guess just starting for what I
2   can call you, at least back in July 3, 2017, it's my
3   understanding you were a corporal with the Saline
4   County Sheriff's Office; is that correct?
5      A.  Yes, sir.
6      Q.  Okay.  Has your title changed since then?
7      A.  Yes, sir.
8      Q.  Okay.  What is it now?
9      A.  Lieutenant.
10     Q.  Okay.  Okay.  Lieutenant Bittle, have
11  you -- are you currently married?
12     A.  No, sir.
13     Q.  Okay.  Have you ever been married?
14     A.  Yes, sir.
15     Q.  Okay.  How many times?
16     A.  Twice.
17     Q.  Okay.  What are the names of your past
18  spouses?
19     A.  I'm trying to think of maiden names.
20  Stacy Gorham and --
21     Q.  How do you spell Stacy's last name?
22     A.  G-O-R-H-A-M.
23     Q.  Okay.
24     A.  And Shanna -- what was her maiden name.
25     Q.  I saw something about Hastings somewhere

Page 8

1   in the paperwork.
2      A.  That's her married name, yes, sir.
3      Q.  Okay.
4      A.  That's her new married name.
5      Q.  Okay.
6      A.  I can't remember her maid -- her last
7   maiden name.
8      Q.  She goes by Hastings now?
9      A.  Correct.
10     Q.  To your knowledge.  Okay.  Do you have any
11  adult children over the age of 18?
12     A.  No, sir.
13     Q.  Okay.  Where do Stacy and Shanna reside?
14     A.  Stacy resides in Arkadelphia.  And Shanna
15  I do not know.  She's in Saline County somewhere,
16  but we do not -- we don't have any children
17  together, so we don't keep in contact.
18     Q.  Okay, fair enough.  Do you have any other
19  relatives, parents, siblings in the Central Arkansas
20  area?
21     A.  Heber Springs.
22     Q.  Okay.  Who all is that?
23     A.  I have a mother, father, and a sister.
24     Q.  Okay.  What's your mom's name?
25     A.  Faye, F-A-Y-E, Bittle.

2 (Pages 5 to 8)

**Plaintiff's Statement in Opposition - Exhibit B**

Page 9

1  Q. Okay. Dad's name?
2  A. Bob Bittle.
3  Q. Okay. And sister's name?
4  A. Carey, C-A-R-E-Y, Perry, P-E-R-R-Y.
5  Q. Okay. Any other immediate family members
6  that you can think of that live in roughly Central
7  Arkansas?
8  A. No, sir.
9  Q. Okay. What is your date of birth?
10  A. 6/17/1980.
11  Q. Did you graduate from high school?
12  A. I did.
13  Q. Okay. Where was that?
14  A. Quitman.
15  Q. What year did you graduate?
16  A. 1998.
17  Q. Okay. Did you attend college?
18  A. I did attend a college, yes.
19  Q. Okay. Where was that?
20  A. I attended at Arkansas State
21  University-Beebe and University of Arkansas
22  Community College at Batesville.
23  Q. Okay. Did you get a degree from either of
24  those schools?
25  A. No, I did not finish my degree at either

Page 10

1  school. No, sir.
2  Q. Okay. What were you majoring in at
3  ASU-Beebe?
4  A. Criminology.
5  Q. Do you know approximately how many hours
6  or how many years you got through?
7  A. No, sir. I would be lying if I said I
8  knew for sure on the answer to that one.
9  Q. Okay. You don't know if you were there
10  for one semester, three years?
11  A. I believe two years, but it might have
12  been two and a half. I'm just not positive.
13  Q. Understood. And what about at UA -- it's
14  UACCB; is that right?
15  A. Yes, sir. I was there for one year.
16  Q. Okay. Did you get any diplomas,
17  certification, certificate from there?
18  A. I was -- I finished my program, but I
19  wasn't able to test, the final test.
20  Q. Okay. What was that program?
21  A. Emergency medical technician, paramedic.
22  Q. Did you have hours remaining to finish?
23  A. It's a technical program to get your
24  certification. And I finished the program, but I
25  never tested.

Page 11

1  Q. Okay. Well, why didn't you test?
2  A. I got into law enforcement.
3  Q. Okay. That leads me into my next
4  questions. Did you have any jobs between that
5  program and getting into law enforcement?
6  A. No.
7  Q. Okay. Where was your first law
8  enforcement job?
9  A. At Rose Bud Police Department.
10  Q. Okay. And what year was that?
11  A. 2002.
12  Q. Okay. And what did you do there at Rose
13  Bud?
14  A. I was a patrolman.
15  Q. Okay. How long were you with Rose Bud
16  Police Department?
17  A. Approximately four years.
18  Q. Okay. And where did you go after that?
19  A. Arkansas State Police.
20  Q. Okay. In connection with Rose Bud, were
21  you terminated, asked to leave? What were the
22  reasons for leaving that department?
23  A. I joined the state police.
24  Q. Okay. And that would have been roughly
25  2006?

Page 12

1  A. It was June of 2005.
2  Q. Okay. And what were you doing with the
3  state police?
4  A. I was a highway patrol trooper.
5  Q. And what division were you with?
6  A. Highway patrol.
7  Q. Okay. Was there a certain area you were
8  stationed?
9  A. I was stationed -- my first station was
10  Troop B out of Newport, and my last station, the
11  last two and a half, was Troop A in Little Rock.
12  Q. Okay. How long were you there with
13  Troop B in Newport?
14  A. Approximately eight years.
15  Q. Okay. And with Troop A?
16  A. Two, two and a half.
17  Q. And when you say a state trooper, you were
18  just a general state trooper with a vehicle and
19  patrolling the highways?
20  A. Yes, sir, accidents and traffic
21  enforcement.
22  Q. Okay. Nothing in-house for them or
23  investigation-wise?
24  A. Paperwork issues that I got and that was
25  it.

3 (Pages 9 to 12)

**Plaintiff's Statement in Opposition - Exhibit B**

Electronically signed by Chris Hoenig (101-050-243-2525)     547af424-1a4d-45c0-9f92-5f76bfe756dd

Page 13

1  Q. Okay. Paperwork that you had from your
2  patrol?
3  A. Correct.
4  Q. Okay. And where did you go after state
5  police?
6  A. Saline County.
7  Q. Okay. And when was that?
8  A. April of 2016.
9  Q. Okay. What was the reason for leaving
10 state police?
11 A. They wouldn't give me time off to see my
12 daughter and I -- she was a lot younger at the time
13 and she didn't understand why Dad wasn't at home.
14 And they wouldn't work with me, so I had to find
15 something where I could spend it with my daughter.
16 Q. All right. Were they in the -- was she
17 living in the Saline County area at that time?
18 A. No, she was living in Heber Springs.
19 Q. Approximately how long's that drive --
20 strike that. Where were you living in Saline County
21 at that time?
22 A. I wasn't in Saline County when I was with
23 the state police.
24 Q. Okay. When you moved to start working
25 with Saline County Sheriff's Office, did you move to

Page 14

1  somewhere in Saline County?
2  A. Yes, sir.
3  Q. Okay. And where did you live there?
4  A. The same address I gave you earlier. I've
5  always lived at the exact same spot.
6  Q. Okay. Approximately how long does it take
7  you to get from your house to at that time see your
8  daughter in Heber Springs?
9  A. I'm confused, sir. When I moved to Saline
10 County, I was with Saline County Sheriff's
11 Department and they -- their schedule worked to
12 where I could see her. It was when I was with the
13 state police that I had issues.
14 Q. Okay, understood. And a bad question on
15 my part. When you would see your daughter, was she
16 coming to stay with you in Benton?
17 A. Yes.
18 Q. Okay. You weren't necessarily having to
19 drive up to Heber Springs to go spend time with her?
20 A. I'm confused here. Are we talking about
21 the state police or Saline County?
22 Q. Saline County. I'm done with -- I'm
23 finished with state police, moving specifically to
24 Saline County.
25 A. Okay. No --

Page 15

1  Q. After April of 2016.
2  A. Okay. No, after that, I've never had any
3  problems. I always went up there and picked her up,
4  brought her back, and then her mother picks her up
5  and takes her home.
6  Q. Okay, understood. Back in April of 2016,
7  what was your job title with the Saline County
8  Sheriff's Office?
9  A. When I joined?
10 Q. Correct.
11 A. Just a deputy.
12 Q. Okay. Did you have to go through field
13 training at that time?
14 A. No -- yes, sir, I did.
15 Q. Okay. How long did you do that for?
16 A. I don't remember approximate time, but it
17 wasn't very long. A few days.
18 Q. Okay. That was going to be my next
19 question. If you'd been an officer doing patrol
20 duty for 14 years approximately at that time, it
21 wasn't the full program that new deputies would
22 ultimately do; is that correct?
23 A. No, sir, correct.
24 Q. So you sped through it and they realized
25 you were good to go?

Page 16

1  A. Yes, sir.
2  Q. Okay. When did you become -- my
3  understanding at the time of the incident, July 3rd
4  of 2017, you were a corporal at that time; is that
5  correct?
6  A. Yes, sir.
7  Q. Okay. When did your rank change from
8  deputy to corporal?
9  A. I would be lying if I told you I had any
10 clue.
11 Q. Okay. And just for my knowledge, is there
12 any step up between deputy and corporal within the
13 Saline County Sheriff's Office?
14 A. At the time there was, yes, sir.
15 Q. Okay. And what was that?
16 A. A dollar an hour.
17 Q. Okay. And I'm sorry. Not -- not
18 income-wise. Title-wise, is corporal the next --
19 A. Step up, yes, sir.
20 Q. -- step up from deputy?
21 A. Yes, sir.
22 Q. Okay. And then is lieutenant the next
23 step up from --
24 A. Sergeant.
25 Q. Sergeant, okay. And then corporal. I

**Plaintiff's Statement in Opposition - Exhibit B**

Page 17

1  mean and then lieutenant?
2      A.  Yes, sir.
3      Q.  Okay.  Do you have any other employment
4  other than with the Saline County Sheriff's Office
5  in July of 2017?
6      A.  No, sir.
7      Q.  You were a full-time employee?
8      A.  Full-time deputy, yes, sir.
9      Q.  Okay.  In the July of 27 [sic] timeframe,
10 what would have been your normal work hours?
11     A.  It rotated every month.
12     Q.  Okay.
13     A.  I would be lying to you if I told you I
14 knew if we were -- you know, which one we were on.
15 But it rotates every month from days to nights.
16     Q.  Okay.
17     A.  So work days for a month, nights for a
18 month, days for a month, nights for a month.
19     Q.  Okay.  And the hours, are they 12-hour
20 shifts?
21     A.  Yes, sir.
22     Q.  Okay.  And what are those -- are there
23 standard hours from six to six or?
24     A.  That's what they are now, and I do not
25 remember when they changed.  They were 3 to -- 3:30

Page 18

1  to 3:30, but I do not remember if it was changed
2  before or after this incident.
3      Q.  Okay.  And then days-wise, were you
4  working five days in a row all five?  What was your
5  normal schedule?
6      A.  No, sir.  We've always worked a two on,
7  two off, every other weekend.
8      Q.  Okay.  What about weekdays?  Or was the
9  two on, two off rotating?
10     A.  Yeah, rotating, yes, sir.
11     Q.  Okay.  There wasn't -- there wasn't any
12 three on, two off?  It was always two and two?
13     A.  Yes, sir.  So it was Monday, Tuesday work;
14 off Wednesday, Thursday; work Friday, Saturday,
15 Sunday; off Monday, Tuesday; work Wednesday,
16 Thursday; off Friday, Saturday, Sunday.
17     Q.  Okay.  So I'm trying to get this straight,
18 and I don't want to take any out of your memory.  My
19 understanding is the date of this incident, July the
20 3rd, was a Monday.  And if -- and I know you may not
21 know.
22     A.  If you say so.
23     Q.  If it was a Monday, that would have been
24 your first day working a Monday, Tuesday shift?
25     A.  Correct.

Page 19

1      Q.  Okay.  And we may get into some of the
2  incident reports, but my understanding, it was
3  around 6 p.m. was at least one of the times you went
4  out to Ms. Arnold's residence?
5      A.  Yes, sir.
6      Q.  Okay.  And you had been working the -- I
7  guess at that time a 3:30 p.m. to 3:30 a.m. shift?
8      A.  That would be correct.
9      Q.  Okay.
10     A.  Now, if it was -- you said it was what
11 time now?
12     Q.  I believe there's a 6 p.m. was one of the
13 times.  6 p.m. and maybe a 7 or 8 p.m.
14     A.  Then that would have been night shift.
15     Q.  Night shift.  And I may have -- I may have
16 said that incorrectly, but 3:30 p.m. to 3:30 a.m.
17     A.  Yes.
18     Q.  Okay.  On the day of this incident, July
19 the 3rd, do you recall how many times you
20 specifically made trips out to Ms. Arnold's
21 residence?
22     A.  No, sir.
23     Q.  Okay.  Was it more than once?
24     A.  Yes, sir.
25     Q.  Okay.  And my understanding is if you got

Page 20

1  on duty at 3:30 p.m. that day, other officers may
2  have made a trip out there earlier that day; is that
3  correct?
4      A.  Yes, sir.
5      Q.  Okay.  How did you come by that
6  information?
7      A.  The incident report.
8      Q.  Okay.  So there's other incident reports
9  from earlier in the afternoon from other officers?
10     A.  No.  It was just put -- it was in our
11 incident report that there was seven calls that day
12 at that residence.
13     Q.  But you don't recall how many of those
14 seven you specifically made it to?
15     A.  No, sir.
16     Q.  Okay.  Who all was with you on July the
17 3rd?
18     A.  Maranda Turner was with me that day.
19     Q.  Okay.  We'll get into some of her training
20 in a little bit, but by that time had she finished
21 all of her field training and able to do patrol on
22 her own?
23     A.  I -- I do not believe so.
24     Q.  Okay.  Tell me your recollection of what
25 occurred the first time you went out to Ms. Arnold's

5 (Pages 17 to 20)

**Plaintiff's Statement in Opposition - Exhibit B**

Page 21

1  residence.
2       A.  There was an argument between Mr. Best and
3  Ms. Arnold.  They were arguing back and forth.  They
4  were calling each other names.  And we had finally
5  got them settled down and just advised them that we
6  weren't going to do anything this time, but if we
7  came -- if we had to come back out there again that
8  we would be making arrests for the disorderly
9  conduct charges.
10      Q.  Okay.  So you get called by dispatch to go
11  out to the residence; correct?
12      A.  Correct.
13      Q.  What were you -- was there any specific
14  reason to go out there, or what did dispatch tell
15  you if you recall?
16      A.  It was called in as a disturbance.
17      Q.  Okay.  Did you go inside the house at that
18  time?  At least on this first trip?
19      A.  I'd be lying if I told you if I knew the
20  answer to that.
21      Q.  Okay.  And I know it's been some time
22  since this incident happened.
23          Do you recall if Mr. Best and Ms. Arnold
24  were outside the residence when you showed up?
25      A.  I don't recall the first time if they were

Page 22

1  inside or outside.
2       Q.  Okay.  You mentioned them arguing and
3  fighting with each other.  Do you know where that
4  took place?
5       A.  No, sir, not the first time.
6       Q.  But you specifically recall them arguing
7  with each other?
8       A.  Correct.  Yes, ma -- yes, sir.
9       Q.  Okay.  Do you remember any statements they
10  were telling each other?
11      A.  Just -- no, just general arguing.  I don't
12  remember the exact words that were said.
13      Q.  Okay.  Any physical altercation between
14  them?
15      A.  No.  If there had have been, we would have
16  made arrests.
17      Q.  Okay.  See any marks on either of the
18  parties?
19      A.  No, sir.
20      Q.  I believe there's been some conversation
21  of Mr. Best asking about whether mace is legal.  Do
22  you recall him making any statement on this initial
23  time out there?
24      A.  It was in the incident report that that
25  was stated.  I personally do not remember anything.

Page 23

1       Q.  Okay.  Do you recall if you stayed in the
2  police car while Ms. Turner got out to talk to the
3  parties?
4       A.  No, I exited the vehicle with her every
5  time.  I never -- she never did anything by herself.
6       Q.  Okay.  And other than -- other than your
7  statement that if we have to come back out here,
8  we're going to arrest you, do you recall telling
9  them anything else?
10      A.  No, sir.
11      Q.  During that first incident?  Okay.  At
12  that time did you notice anybody across the street
13  or was anybody out in their yards in the
14  neighborhood?
15      A.  I would be lying if I said that I could
16  remember that far back, sir.  I'm sorry.  I don't
17  remember any -- if there was people outside or not.
18      Q.  Okay.  And I don't recall, I don't
19  remember, I know we're talking about four and a half
20  years, but what I'm trying to do is, you know,
21  understand what you're going to tell the jury at
22  trial.
23      A.  Yes, sir.
24      Q.  And, you know, I don't want to have a
25  "Hey, I don't remember today" and then show up at

Page 24

1  trial and it's a whole, "Hey, this -- I've got a
2  whole new recollection of this."  Okay?  So if I
3  take a -- you know, I do want to understand and know
4  that if I'm asking a question today and you don't
5  recollect, that's to the best of your knowledge and
6  essentially your answer that you would otherwise
7  provide.
8       A.  Okay.
9       Q.  Okay?  Is that correct?
10      A.  Yes.
11      Q.  Okay.  Between this incident that we're
12  talking about, if we have to come back out and
13  arrest you, and the main incident in question, do
14  you recall any other trip that you made out there?
15      A.  In between the two?
16      Q.  Correct.
17      A.  No, sir.
18      Q.  Okay.  You don't believe there would have
19  been another trip out there?
20      A.  Correct.
21      Q.  Okay.  The incident in question, the last
22  trip out there, how were you notified to go to
23  Ms. Arnold's residence?
24      A.  Dispatch dispatched us back to the
25  address.

6 (Pages 21 to 24)

**Plaintiff's Statement in Opposition - Exhibit B**

Page 25

1  Q. Okay. Any specific reason or information
2  given by them?
3  A. Disturbance.
4  Q. Okay. Were you driving the vehicle on
5  this date?
6  A. I do not recall.
7  Q. Okay. But with Ms. Turner, sometimes you
8  may drive and sometimes she may drive?
9  A. Correct.
10 Q. Okay. What do you recall -- I guess what
11 did you do when you got to Ms. Arnold's property and
12 the vehicle?
13 A. Ms. Arnold was outside. I advised Maranda
14 to place her into custody and put her in the back
15 seat of the car while I went inside to get Mr. Best.
16 Q. Okay. And when you say outside, my
17 understanding there's a fence that's at her
18 residence; is that correct?
19 A. That's correct.
20 Q. Was she inside that fence towards the
21 house or was she outside that fence towards the
22 road?
23 A. She was outside at her vehicle.
24 Q. Okay. Do you recall where the squad car
25 was parked?

Page 26

1  A. It was parked in the roadway just past
2  their vehicle. So it was just about halfway past
3  the residence.
4  Q. Okay. It wasn't -- it wasn't parked at an
5  angle or anything to stop her from driving off or?
6  A. No.
7  Q. Or trying to stop the vehicle in general?
8  A. No, sir.
9  Q. Okay. After you advised Deputy Turner
10 to -- you said place Ms. Arnold into custody; is
11 that correct?
12 A. That's correct.
13 Q. Okay. Did you get out of the vehicle with
14 Ms. Turner? With Deputy Turner?
15 A. I did.
16 Q. Okay. And what did you observe Deputy
17 Turner do?
18 A. When I first exited the vehicle, I was
19 going inside, so actually laying eyes on the first
20 part of it, I was headed inside the house.
21 Q. Okay. Do you recall Deputy Turner making
22 any statements to Ms. Arnold?
23 A. Yes. I heard her tell -- tell her to quit
24 and give her her hand. She was telling her to take
25 her hand out of her pocket. She said that several

Page 27

1  times. And then once I heard this -- once I heard
2  that is when I turned around and started back
3  towards the two of them.
4  Q. Okay. Had you already gone through the
5  gate towards the residence?
6  A. No, sir.
7  Q. Okay. Do you recall if Ms. Arnold --
8  where was Ms. Arnold standing when you got out of
9  the vehicle?
10 A. At the trunk -- at the trunk of her car.
11 Q. Okay. Do you know if the trunk was open
12 or closed?
13 A. It was open.
14 Q. Okay. Did Ms. Arnold make any statements
15 that you could hear?
16 A. She said that -- I just kept hearing her
17 say no. And that's pretty much all I remember
18 from -- from Ms. Arnold is her -- her saying no.
19 Q. Okay. Did she make any statement saying,
20 "I'll go with you" or any other type of agreeable
21 statement?
22 A. Not that I recall, no, sir.
23 Q. Okay. So I'm trying to get your
24 recollection specifically of what you witnessed. So
25 you saw Ms. Arnold at the back of her trunk;

Page 28

1  correct?
2  A. Right.
3  Q. Tell me where Deputy Turner was at that
4  time when you were heading at least towards the
5  inside of the house?
6  A. She was behind Ms. Arnold trying to put
7  her into handcuffs.
8  Q. Okay. I guess -- and I'm just trying to
9  figure out the part of what you may have missed or
10 otherwise turned away from. What part would you not
11 have witnessed?
12 A. Just the very beginning. Just the very
13 initial contact with Ms. Arnold.
14 Q. Okay. So you saw Deputy Turner walk
15 behind Ms. Arn -- Ms. Arnold; correct?
16 A. Well, when I turned around, she was
17 already behind her.
18 Q. Okay. At that time did you see Ms. Arnold
19 do anything to resist arrest?
20 A. Yes, she would not give Deputy Turner her
21 arm.
22 Q. Okay. Do you recall which arm?
23 A. The left arm.
24 Q. Okay. At that time was -- did Deputy
25 Turner already have the other arm detained?

7 (Pages 25 to 28)

**Plaintiff's Statement in Opposition - Exhibit B**

Page 29

1   A.  She had a handcuff on the other arm, yes.
2   Q.  Okay.  Tell me what all you witnessed
3   after that.
4   A.  Ms. Arnold had her hand in her pocket, and
5   Maranda was telling her to take her hand out of her
6   pocket.  She would not.  She kept refusing.  Maranda
7   tried to take her left arm and, of course, bring it
8   behind her to handcuff her.  When she did,
9   Ms. Arnold made a turn to her.  I guess it would
10  be -- that would be a turn in this direction so
11  toward --
12  Q.  This direction.  I know we're backward, so
13  I'm trying to figure out if it's a left or a right.
14  A.  Right.  It would be her right side.
15  Toward -- to try to pull away from Maranda.  And
16  Maranda held onto the handcuff like she's trained to
17  do, and Ms. Arnold tripped over and fell on her left
18  side.
19  Q.  Okay.  Did you see Deputy Turner apply any
20  type of force or restraints --
21  A.  No.
22  Q.  -- at that time?
23  A.  No.
24  Q.  Did Ms. Arnold make any threat to you or
25  Deputy Turner that you heard on this last time?

Page 30

1   A.  Threats to us?
2   Q.  Correct.
3   A.  No, sir.
4   Q.  Okay.  What was her demeanor, if you can
5   describe it, at this incident?
6   A.  Ms. Arnold's?
7   Q.  Correct.
8   A.  She was very agitated.  She was -- I mean,
9   she was just -- that's how I would describe her,
10  severely agitated.
11  Q.  Okay.  Were you all agitated or irritated
12  with having to go back out there again?
13  A.  No, I mean, that's part of the job.
14  Q.  Did you give Ms. Arnold any commands?
15  A.  No, sir.
16  Q.  After the injury to Ms. Arnold, what did
17  you do?
18  A.  I immediately got on the radio, asked for
19  dispatch to dispatch fire and -- or rescue and an
20  ambulance.
21  Q.  Do you know if anybody else contacted or
22  called 911?
23  A.  I do not know if anybody else did.
24  Q.  Okay.  No one else told you they were
25  calling as well?

Page 31

1   A.  No.
2   Q.  Did you do anything to help assist
3   Ms. Arnold with any medical attention?
4   A.  No.
5   Q.  Okay.  Why not?
6   A.  When I looked at Ms. Arnold, she had a
7   compound fracture of her arm.  There was -- I had
8   absolutely no type of supplies in my car that could
9   have been of any kind of assistance to her at that
10  point in time.  Just trying to keep her calm and
11  letting her know that help was on the way.
12  Q.  Okay.  Do you normally carry any type of
13  trauma bag or medical equipment in your vehicle?
14  A.  Then?
15  Q.  Correct.
16  A.  No.  We had basic -- like 4x4s, eyewash,
17  Band-Aids, that kind of stuff, but no kind of trauma
18  kit at all.
19  Q.  Okay.  What about now?
20  A.  We do have first-aid kits in our vehicles
21  now.
22  Q.  Okay.  Is that in all vehicles, it's
23  standard?
24  A.  Correct.
25  Q.  Okay.  When did that start?

Page 32

1   A.  Last year.
2   Q.  My understanding is -- you mentioned a
3   compound fracture.  Could you see the bone
4   protruding out of Ms. Arnold's body?
5   A.  Yes, sir.
6   Q.  Okay.  Was there blood?
7   A.  Not that I recall.
8   Q.  Okay.  Was Ms. Arnold in pain regarding
9   this injury?
10  A.  Yes.
11  Q.  Okay.  Well, how was she acting?
12  A.  She just kept saying, You broke my arm,
13  you broke my arm.
14  Q.  Okay.  Was she saying it gently?  Was she
15  screaming?
16  A.  Oh, she was screaming, yes, sir.
17  Q.  Okay.  There's been some talk that it took
18  approximately 45 minutes for at least the ambulance
19  to show up or Medtran to show up.  Do you have any
20  reason to dispute that?
21  A.  I do not recall how long it took them.
22  Q.  Okay.  Did it feel like they showed up --
23  Medtran showed up immediately?
24  A.  No.  I mean, Med -- no.
25  Q.  Did it feel like it took Medtran a while

Plaintiff's Statement in Opposition - Exhibit B

Electronically signed by Chris Hoenig (101-050-243-2525)    547af424-1a4d-45c0-9f92-5f76bfe756dd

Page 33

1  to show up?
2      A.  Their normal response time to the east
3  district.
4      Q.  Okay.  And when you say "normal response
5  time," is that 15, 30, 45 minutes depending on the
6  issue?
7      A.  Yes.  It's usually between 15 to 20
8  minutes.
9      Q.  Okay.  Did anybody show up prior to
10 Medtran?
11     A.  Yes, sir.
12     Q.  And who was that?
13     A.  Shannon Hills Police Department.
14     Q.  Okay.  And what did they do if anything?
15     A.  They had I guess what you would call a
16 trauma bag.  Some people call it a jump kit or a
17 jump bag.  Just had, you know, lots of medical
18 supplies.  And they started assisting Ms. Arnold.
19 When they started assisting, it was just a very
20 short period of time later rescue got there and took
21 over from them.
22     Q.  And when you say "rescue," who was that?
23     A.  I believe it was Northeast Fire.
24     Q.  Do you recall how long it took Shannon
25 Hills Police to get there?

Page 34

1      A.  An exact time, no, sir.  I couldn't tell
2  you an exact time, but I would say within a handful
3  of minutes.
4      Q.  When you say "handful," are we talking
5  about five minutes?
6      A.  Within five minutes.
7      Q.  Okay.  And do you recall specifically what
8  they did, meaning Shannon Hills Police?
9      A.  No, sir.  I could not tell you.  I was on
10 the phone with my supervisor.
11     Q.  Okay.  What were you talking to him about?
12     A.  What had occurred.
13     Q.  Okay.  What did he say to you?
14     A.  Just he was on his way and -- and wanted
15 to know what had occurred.
16     Q.  Okay.  And who was your supervisor?
17     A.  Wade Gilliam.
18     Q.  Okay.  And did -- so was he lieutenant at
19 the time?
20     A.  Sergeant.
21     Q.  Sergeant.  Did Sergeant Gilliam make it
22 out to the residence?
23     A.  Oh, goodness.  I don't remember if he made
24 it out there -- if he came all the way out there or
25 not.  I don't remember.

Page 35

1      Q.  Okay, understood.  Okay.  So Shannon Hills
2  Police shows up and then Northeast Fire shortly
3  thereafter.  That's your statement; correct?
4      A.  Yes, sir.
5      Q.  Okay.  Do you -- do you recall anything
6  specifically of what they did medically for
7  Ms. Arnold at that time?
8      A.  No, sir.  I couldn't -- I couldn't tell
9  you.  Like I said, I was on the phone with my
10 supervisor trying to give him a rundown of
11 everything that had happened, so I wasn't paying
12 attention to the exact what the department was
13 doing.
14     Q.  Okay.  But they didn't ask you to assist
15 and you didn't assist in any way?
16     A.  No, sir.
17     Q.  With Ms. Arnold?  And then eventually,
18 Medtran shows up?
19     A.  That's correct.
20     Q.  Okay.  And did Medtran put Ms. Arnold in
21 the ambulance?
22     A.  Yes.
23     Q.  Okay.  How long was -- how long did it
24 take them to do that if you recall?
25     A.  I don't recall how long they were on scene

Page 36

1  before they were loaded in the ambulance.
2      Q.  Okay.  Did it feel like they were there
3  for some time?
4      A.  No.
5      Q.  Pretty quick in and out?
6      A.  Yes.
7      Q.  Okay.  Do you know where they took
8  Ms. Arnold?
9      A.  No, sir.
10     Q.  You didn't go to the hospital?
11     A.  No, sir.
12     Q.  Okay.  After the injury to Ms. Arnold,
13 were there other people around that came out to the
14 scene?
15     A.  Yes, there were.
16     Q.  Okay.  Do you recall anybody specifically?
17     A.  No, I don't have any idea who they were.
18     Q.  Okay.  Do you know if Ms. Arnold's son
19 came out to help her?
20     A.  I don't remember if it was family or
21 neighbors.  I don't -- I just remember there being
22 other people there.
23     Q.  Okay.  Any clue of how many people might
24 have been around?
25     A.  No, I couldn't give you an exact number.

**Plaintiff's Statement in Opposition - Exhibit B**

Electronically signed by Chris Hoenig (101-050-243-2525)    547af424-1a4d-45c0-9f92-5f76bfe756dd

Page 37

1    Q.  Okay.  Do you recall people being at the
2    house across the street?
3    A.  I believe that's where these people came
4    from, but I'm -- I mean, I just -- that's -- I can't
5    say that for sure, but I believe that's where they
6    came from.
7    Q.  Okay.  It's my understanding you didn't
8    get any statement or take a statement from any of
9    these individuals; is that correct?
10   A.  That's correct.
11   Q.  Okay.  Do you recall any of these
12   individuals making a statement to you or Deputy
13   Turner that they saw what happened?
14   A.  No, sir.
15   Q.  Okay.  Recall any of these individuals
16   telling you or Deputy Turner to help or otherwise
17   assist Ms. Arnold?
18   A.  No, sir.
19   Q.  Did Ms. Arnold yell out for help from you
20   or Deputy Turner?
21   A.  All I remember her yelling is, "Oh, my
22   God, you broke my arm" and -- and just yelling in
23   general pain.  I don't remember her actually saying
24   "help me" or anything of that nature, no, sir.
25   Q.  Okay.  But she could have been saying

Page 38

1    "help me"; you just don't recall?
2    A.  Yes, sir, it's possible.
3    Q.  Does the Saline County Sheriff's Office,
4    do you all have body cams now?
5    A.  No, sir.
6    Q.  Does anybody within the sheriff's
7    department have body cams?
8    A.  No, sir.
9    Q.  Okay.  Would this have been any type of
10   event for you to have other -- I understand the blue
11   lights weren't switched for the dash cam to come on;
12   is that correct?
13   A.  That's correct.
14   Q.  Would this have been another type of event
15   to at least have switched the dash cam on?
16   A.  Could you -- could you reword that?
17   Q.  Sure.  Sure.  The vehicle that you and
18   Deputy Turner were in, was there a dash cam in that
19   vehicle?
20   A.  Yes.
21   Q.  Okay.  Would an incident of this nature
22   been one where you should have otherwise switched
23   the dash cam on?
24   A.  If it was -- no.  I mean, any other
25   situation, it was the exact same parameters, no.

Page 39

1    Q.  Okay.  If you were going to arrest
2    somebody and it was outside of the vehicle, you
3    wouldn't have the dash cam on?
4    A.  I mean, it would depend upon the
5    situation.
6    Q.  Okay.  Do you recall -- do you recall
7    Deputy Turner making any statement to Ms. Arnold
8    that she's under arrest specifically?
9    A.  Actually recalling her saying those words,
10   no, I do not.
11   Q.  Did Sergeant Gilliam instruct you at any
12   point not to provide any medical assistance to her?
13   To Ms. Arnold?
14   A.  No.
15   Q.  Are there any guidelines or policies with
16   the Saline County Sheriff's Office in making an
17   arrest or detaining?
18   A.  Is there a policy regarding that?
19   Q.  Correct.
20   A.  Is that what you're asking?  Yes, sir.
21   Q.  Okay.  And what is that policy?
22   A.  I would be remiss to even try to tell you
23   the -- I mean, it's a book that thick, so, I mean,
24   if I tried to tell you the policy word for word, I
25   would not -- I would not make it.

Page 40

1    Q.  Okay.  Well, in general layman's term, if
2    you're out in the field and don't have a chance to
3    review it, what do you normally do if you're trying
4    to detain somebody?
5    A.  You place them in handcuffs.
6    Q.  Okay.  Do you give them any type of -- do
7    you give them verbal instructions?
8    A.  I guess I'm kind of lost here.  Verbal
9    instructions as to what?  Like --
10   Q.  I'm just trying to figure out if there's
11   anything in the guidelines or the training of step
12   by step, this is how you're supposed to do it.
13   A.  No, every arrest is different.
14   Q.  Okay.  What about use of force?  Is there
15   any policy regarding use of force?
16   A.  There is a use-of-force policy, yes, sir.
17   Q.  Okay.  My understanding it's normally a
18   lethal use of force and a nonlethal use of force; is
19   that correct?
20   A.  Yes, sir, I believe so.
21   Q.  Okay.  Did you provide any training on
22   Deputy Turner regarding nonlethal use of force?
23   A.  Not me specifically, no, sir.
24   Q.  Okay.  What are some nonlethal use of
25   force things that you're authorized to do with the

**Plaintiff's Statement in Opposition - Exhibit B**

Electronically signed by Chris Hoenig (101-050-243-2525)                                    547af424-1a4d-45c0-9f92-5f76bfe756dd

Page 41

1  Saline County Sheriff's Office?
2       A.  I mean, technically, handcuffing is a use
3  of force, so that's -- we do that all the time.  You
4  have taser.  You have your baton.  You have pepper
5  spray.  You have your hands.
6       Q.  Okay.  What about any takedown-type moves?
7  Are there any that you're trained on or authorized
8  to do?
9       A.  None that I would say we're trained on,
10 and we're not trained in any kind of specific
11 takedown, no, sir.
12      Q.  Not trained on leg sweeps or restraints
13 and takedowns of some form or fashion?
14      A.  Not to my knowledge.  I mean, what they're
15 teaching in the academy is probably a lot different
16 than what I was taught in 2002.  So they could be,
17 but it's -- I wouldn't know that.
18      Q.  Okay.  And I understand there's a police
19 academy training and then there's some field
20 training with the actual department; is that
21 correct?
22      A.  That's correct.
23      Q.  Okay.  And at least with Saline County
24 Sheriff's Office, you don't know -- do -- you all
25 don't do some police training -- strike that.

Page 42

1  Saline County Sheriff's Office, you all don't
2  specifically do training on takedown-type maneuvers?
3       A.  No, sir.
4       Q.  Okay.  We talked about the dash cam.  I
5  understand that you don't have any recollection or
6  knowledge there's a video of the incident; is that
7  correct?
8       A.  Correct.
9       Q.  Okay.  Did you do anything today to
10 prepare for your deposition?
11      A.  Just to read over the incident report.
12      Q.  Okay.  Did you have any conversation with
13 Deputy Turner?
14      A.  No.
15      Q.  Did you have any conversation with anybody
16 else at the sheriff's office?
17      A.  Today?
18      Q.  In preparation of your deposition?
19      A.  Mr. Jorgensen.
20      Q.  Okay.  And I don't want to go into what
21 any conversation you had with the attorney.  But
22 anybody else besides your attorney, have a
23 conversation with them?
24      A.  No, sir.
25      Q.  Okay.  My understanding you were one of

Page 43

1  the FTO officers or supervisors for Deputy Turner;
2  is that correct?
3       A.  That is correct.
4       Q.  Okay.  And you helped with her FTO
5  training?
6       A.  Correct.
7       Q.  Okay.  Do you recall how long her training
8  lasted?
9       A.  Twelve weeks I believe is what the FTO
10 period is.
11      Q.  Okay.  And that's just the normal
12 training?
13      A.  Correct.
14      Q.  And I understand you did it much faster
15 than that, but her being a new deputy, it took the
16 full 12 weeks?
17      A.  Full 12 weeks.
18      Q.  Okay.  And my understanding is there's a
19 couple phases of that training.  Can you explain
20 those for me?
21      A.  There's three phases.  The first phase is
22 basically your learning of the alphanumerics, the
23 radio jargon, the speaking on the radio, writing
24 reports, things of that nature.  The second phase
25 you get into making traffic stops, officer safety,

Page 44

1  that kind and -- and then the third phase, you're
2  going into more of criminal law, some preparing them
3  more for, you know, the testifying in court and
4  things of that nature.
5       Q.  Okay.
6       A.  They don't actually -- we just call it
7  phase one, phase two, and phase three.  So there's
8  no actual like defined.
9       Q.  Okay.  And are they still on patrol doing
10 things during all these phases?
11      A.  Yes, sir.
12      Q.  Was there any officer other than you that
13 was helping with Deputy Turner's training?
14      A.  I do not remember if she had other FTOs or
15 not.
16      Q.  Okay.  You know, I think it was talked
17 about maybe a Knabb or a Kosters?
18      A.  Okay.
19      Q.  Any specific recollection that you would
20 know that they were an FTO officer for her?
21      A.  All I can say is that's normal practice,
22 but I can't recall who she was with if she was with
23 anyone else.
24      Q.  Okay.  And you don't recall any statement
25 from either of them or any other officer regarding

11 (Pages 41 to 44)

**Plaintiff's Statement in Opposition - Exhibit B**

Page 45

1  her performance?
2     A.  No, sir.
3     Q.  Okay.  How was her performance?  In
4  training.
5     A.  It was good.  She was a good officer.
6     Q.  Okay.  And the sheriff's office -- and
7  there's some discovery.  I've seen a handful of her
8  I guess training, information, reports, etc., and
9  I've noticed that there's kind of a 1 through 7 -- I
10 guess 1 being the lowest, 7 being the highest -- for
11 performance.  Was that what was in place at that
12 time to your knowledge?
13    A.  To my knowledge, that is correct.
14    Q.  Okay.  And a lot of what I saw was a lot
15 of -- there'd be some 2's but there might be some
16 6's as well?  Is that standard for somebody going
17 through training to?
18    A.  Yes, sir.
19    Q.  Okay.  Did you have any specific issues
20 that you can recall regarding Deputy Turner?
21    A.  Not that I can recall.  We always -- we
22 list the best and the worst.  But, I mean, as far as
23 I can recall like something specific, I -- I don't
24 recall anything --
25    Q.  Okay.

Page 46

1     A.  -- off the top of my head.
2     Q.  Okay.  And I'll go through a couple of
3  these.  I know one of them you weren't involved in,
4  but there's a note from -- I don't know if it was
5  Deputy or Corporal Kosters at the time, but it
6  refers to Deputy Turner needs to be more secure in
7  her decision-making and voice commands while on
8  calls.
9         Would you agree or disagree with that
10 statement?
11    A.  When she was with me, she was -- she did
12 pretty well in that department I would say.
13    Q.  Okay.  There's also an incident at least
14 on one of your reports about her allowing a suspect
15 that was to be detained and let him walk away, use
16 the bathroom, and come back.  Do you recall that
17 incident?
18    A.  Yes, sir.  Now that you've -- yes, I do
19 now.  Yeah.
20    Q.  Okay.  What happened with that one?
21    A.  She was just -- she allowed him to walk --
22 even though he was under arrest, she allowed him to
23 go to the bathroom, and that was just not -- she
24 shouldn't have done that.
25    Q.  Okay.  Did you have any state -- did you

Page 47

1  tell her anything or discipline her in any form or
2  fashion?
3     A.  Well, we don't have disciplinary power.
4  But we -- I did go over it with her and explained to
5  her, you know, the risk factors in doing something
6  like that and that we didn't -- she didn't need to
7  ever do that again.
8     Q.  Okay.  Essentially never letting anybody
9  walk off if they're being arrested?
10    A.  Right.
11    Q.  Okay.  We talked a little bit about Deputy
12 Turner, where she was in July of 2017.  And do you
13 believe she had finished all phases at that point?
14    A.  Again, I would be -- I don't know.
15    Q.  Okay.  But at least as of that date, she
16 was with you in the vehicle?
17    A.  She was still in an FTO phase.
18    Q.  Okay.  And doing FTO-type training with
19 you on that day?
20    A.  Correct.
21    Q.  Okay.  Have you ever been disciplined by
22 the Saline County Sheriff's Office?
23    A.  Yes.
24    Q.  Okay.  And what was that?
25    A.  I was disciplined once for not wearing my

Page 48

1  seat belt, and I was disciplined once for an
2  evidentiary issue.
3     Q.  Okay.  No discipline regarding making
4  arrests or training any other officer?
5     A.  No.
6     Q.  No discipline regarding any victim,
7  suspect, etc.?
8     A.  No.
9     Q.  Okay.  What about with any other police
10 department, with Rose Bud or state police, any
11 discipline with them?
12    A.  No.
13    Q.  Okay.  My understanding you're still
14 employed with the Saline County Sheriff's Office;
15 correct?
16    A.  That is correct.
17    Q.  And currently lieutenant?
18    A.  That is correct.
19    Q.  Back in July of 2017, were you taking any
20 medicine that you were prescribed at that time?
21    A.  Gosh, I don't.
22    Q.  Do you take any type of normal medicine
23 today for --
24    A.  Yes.
25    Q.  Okay.  Would you have been on the same

12 (Pages 45 to 48)

**Plaintiff's Statement in Opposition - Exhibit B**

Page 49

1  medication back in 2017?
2      A.  Probably.
3      Q.  Okay.  And what medication is that?
4      A.  I take a cholesterol medicine.  I would
5  lie to you if I told you the names of them because I
6  can't pronounce most of them.
7      Q.  I can't either.
8      A.  One was cholesterol.  One's heart.  One's
9  blood pressure.  One's a water pill.  And one is for
10 heart-related anxiety.
11     Q.  Okay.  I saw where there might have been
12 an accident you had back in 2016 with an injury that
13 you -- were you prescribed any pain medication at
14 that time regarding that accident?
15     A.  In 2016?
16     Q.  I believe I saw that, but you may -- I
17 don't know if it was an accident or said there was
18 some kind of injury I believe I had saw prior to
19 July of '17?
20     A.  I don't -- I don't remember anything prior
21 to -- I was -- that I can recall at all.
22     Q.  Okay. Fair enough.  You don't recall
23 taking any type of pain medication in July of '17?
24     A.  No, sir.
25     Q.  Okay.  Were you seeing any health

Page 50

1  professional back in July of '17?
2      A.  No, sir.
3      Q.  Okay.  Any mental health professional back
4  in July of '17?
5      A.  No, sir.
6      Q.  Okay.  Have you seen any mental health
7  professional in the past ten years for any reason?
8      A.  No, sir.
9      Q.  Have you had to participate or have you
10 participated in any anger management classes in the
11 past ten years?
12     A.  No, sir.
13     Q.  Any drug or alcohol program in the last
14 ten years that you participated in?
15     A.  No, sir.
16     Q.  You talked a little bit earlier that you
17 got -- I guess you got training through UACCB with
18 EMT program or the EMT program there; is that
19 correct?
20     A.  That's correct.
21     Q.  Okay.  And you never took -- I guess what
22 is the test that you would have taken?
23     A.  Well, you have to take advanced cardiac
24 life support, pediatric advanced life support, heart
25 rhythms.  And then if you pass those three, then you

Page 51

1  go on to test for the national registry, but I never
2  took any -- any of them.
3      Q.  Okay.  And the reason I ask is in some of
4  the documentation that got sent to me, I see an
5  emergency medical technician card.  What is -- how
6  did you come by that card if you recall?
7      A.  I was -- that's an EMT card, not a
8  paramedic card.
9      Q.  Okay.
10     A.  I was an EMT prior to -- back when I was
11 an 18-year-old, 19-year-old.
12     Q.  Okay.  Explain, you know, what you're
13 allowed to do or able to do as an EMT.
14     A.  Pretty much drive the ambulance.
15     Q.  Okay.  You're not allowed to perform any
16 type of medical?
17     A.  No.  Your oxygen and -- and just basic
18 first aid-type stuff.  Just -- there's no -- no
19 advanced training at all.  That's all -- that's all
20 for paramedics.
21     Q.  Okay.  Can an EMT put a tourniquet on
22 someone?
23     A.  I believe anybody can put a tourniquet on
24 someone.
25     Q.  Was there a specific training to get the

Page 52

1  EMT certification regarding that?
2      A.  Regarding tourniquets?  I don't know.  I
3  mean, that was, gosh, 20 years ago.
4      Q.  Okay.  Now, I've seen a couple -- handful
5  of other certificates you've gotten over your years
6  in law enforcement for specialty training.  I see
7  CELOX traumatic bleeding kit training.  Do you
8  recall that?
9      A.  Yes, sir.
10     Q.  What was that?
11     A.  Basically training you how to -- if you
12 got shot how to pour something in the wound to
13 start -- stop -- start the clotting process.
14     Q.  Okay.  And it's specifically related to
15 gunshots, that training?
16     A.  Related to puncture wounds of any type and
17 the actual CELOX granules that you pour into the
18 wound.
19     Q.  Okay.  I see a first responder first aid
20 certificate back in July -- I think it was 2005.
21 Any recollection of what that certificate was for?
22     A.  That would have been first aid that we
23 took in troop school.
24     Q.  Okay.  Any specific training that you
25 would have gotten from either one of those that

13 (Pages 49 to 52)

**Plaintiff's Statement in Opposition - Exhibit B**

Page 53

1  would have helped or assisted Ms. Arnold on this
2  day?
3      A.  No, no, absolutely not.
4      Q.  Okay.  Did you work as an EMT at all?
5      A.  I did.
6      Q.  Okay.  How long did you do that for?
7      A.  Six months probably.  Six to eight months.
8      Q.  Was that in between graduating high school
9  and starting at ASU-Beebe?
10     A.  Yes, sir.
11     Q.  Okay.  And I see a NIMS training.  What is
12 that?  I think it's National Incident Management
13 System.
14     A.  Yes.
15     Q.  But what is the specifics of that
16 training?
17     A.  It's -- it's what was developed after 9/11
18 to where all police, fire, and EMS can work
19 together, and how to set up incident command, and
20 the supply chain networks, and that kind of thing.
21     Q.  Okay.  With your EMT and other medical
22 training that you've received, did you feel like you
23 could have helped Ms. Arnold?
24     A.  No.
25     Q.  Okay.  Do you feel like you could have

Page 54

1  bandaged or otherwise wrapped Ms. Arnold's arm to
2  help protect it from any contaminants or anything
3  else in the atmosphere?
4      A.  No.
5      Q.  While you've been employed with the Saline
6  County Sheriff's Office, have you provided medical
7  assistance to injured persons?
8      A.  Narcan count?
9      Q.  Sure.
10     A.  I have delivered Narcan once.
11     Q.  Okay.  So other than -- and that's for an
12 overdose; correct?
13     A.  Correct.
14     Q.  Okay.  For any type of, you know, medical
15 injury regarding a puncture or bleeding, have you
16 provided any medical care to an injured person?
17     A.  No, sir.
18     Q.  Okay.  What about while employed with
19 state police?
20     A.  No, sir.
21     Q.  Okay.  So if you showed up at a car
22 accident while working for state police, it would be
23 the paramedics or EMT that would do any type of
24 medical treatment?
25     A.  Well, the fire departments usually beat us

Page 55

1  there, so they were the ones that did medical
2  treatment.
3      Q.  Does the sheriff's office have any policy
4  or guidelines regarding providing medical treatment
5  to injured persons?
6      A.  It's possible.  Again, the policy manual
7  is extremely thick.  I would be remiss if I said I
8  knew every one of them.
9      Q.  Have you ever been directed through anyone
10 with the sheriff's office to not perform medical
11 treatment either through --
12     A.  No.
13     Q.  Okay.  Either through training or
14 statements to you?
15     A.  No.
16     Q.  Okay.  Was Mr. Best arrested on the day in
17 question, on July 3, 2017?
18     A.  I believe so, yes.
19     Q.  Okay.  Do you know what he was arrested
20 for?
21     A.  I believe it was disorderly conduct.
22     Q.  Okay.  Do you know whether it was
23 specifically you or Detective Turner that I guess
24 applied the handcuffs to him?
25     A.  No.  No, sir, I don't recall who actually

Page 56

1  handcuffed him.
2      Q.  Okay.  Would it have been the two of you
3  all taking him to the sheriff's office for booking?
4      A.  Yes.
5      Q.  Okay.  Do you recall any conversation or
6  statement that he told you on the way there
7  regarding Ms. Arnold's injury?
8      A.  No.
9      Q.  Do you recall any person -- do you recall
10 any person making any statement to you that they saw
11 what happened other than Deputy Turner?
12     A.  No.
13     Q.  Ms. Arnold contends that she was
14 ultimately slammed down by Deputy Turner.  Would you
15 dispute that?
16     A.  One hundred percent.
17     Q.  On that day in question, did you feel
18 threatened in any form or fashion by Ms. Arnold?
19     A.  No.
20        MR. WILSON:  Let's take a quick
21 five-minute break.  I'm going to look over my notes
22 again, but I shouldn't have anything else on this.
23 And hopefully we'll be done from there.
24        THE WITNESS:  Okay.
25        MR. WILSON:  I appreciate it.

Page 57

1      (A short break was taken.)
2      MR. WILSON: I know we're back on the
3  record. I don't have any other questions.
4      MR. JORGENSEN: I also have no questions.
5      MR. WILSON: Mr. Bittle -- Corporal
6  Bittle, thank you for participating in this
7  deposition this morning. We're off the record.
8      MR. JORGENSEN: You can read the
9  transcript and make edits if you think something is
10 recorded wrong or, you know, misspelled or whatever
11 or you can waive the opportunity to do that and not
12 have to read through it. It's your choice. If you
13 want to take the time to read it, you can. Or you
14 can just not even bother. So you need to tell the
15 court reporter if you want to read and sign.
16     THE WITNESS: No.
17     REPORTER: Mr. Jorgensen, do you need a
18 copy of this as well?
19     MR. JORGENSEN: Yes, please. Electronic.
20     MR. WILSON: Same for me.
21
22    (Ending time of the deposition: 12:27 p.m.)
23
24
25

Page 58

1           CERTIFICATE OF REPORTER
2      I, Christine Hoenig, MO-CCR, do hereby certify
3  that the witness whose testimony appears in the
4  foregoing deposition was duly sworn by me; that the
5  testimony of the said witness was taken by me to the
6  best of my ability and thereafter reduced to typewriting
7  under my direction; that I am neither counsel for,
8  related to, nor employed by any of the parties to the
9  action in which this deposition was taken, and further
10 that I am not a relative or employee of any attorney or
11 counsel employed by the parties thereto, nor financially
12 or otherwise interested in the outcome of the action.
13
14     _Christine Hoenig_
15     Christine Hoenig, MO-CCR
16
17
18
19
20
21
22
23
24
25

15 (Pages 57 to 58)

**Plaintiff's Statement in Opposition - Exhibit B**

Electronically signed by Chris Hoenig (101-050-243-2525)  547af424-1a4d-45c0-9f92-5f76bfe756dd