Page 1

```
 1    UNITED STATES DISTRICT COURT
      EASTERN DISTRICT OF ARKANSAS
 2         CENTRAL DIVISION
 3
 4   NELLIE ARNOLD,            )
           Plaintiff,          )
 5   vs.                       )
                               )
 6   DEPUTY MARANDA TURNER, Individually   )Case No. 4:20-cv-729
     and in her Official Capacity;         )
 7   DEPUTY BRENT BITTLE, Individually     )
     and in his Official Capacity;         )
 8   SALINE COUNTY SHERIFF'S OFFICE;       )
     SHERIFF RODNEY WRIGHT, Individually   )
 9   and in his Official Capacity; and     )
     SALINE COUNTY, ARKANSAS,              )
10        Defendants.                      )
11
12
13      VIDEOCONFERENCE DEPOSITION OF NELLIE ARNOLD
14        Taken via remote means whereby all parties
15   appeared via Zoom on January 25, 2022 at 9:03 a.m.
```

Page 2

```
 1              APPEARANCES
 2   FOR THE PLAINTIFF:
 3   MR. RALPH "WIN" WILSON, III
     Hope, O'Dwyer, Wilson & Arnold, P.A.
 4   211 Spring Street
     Little Rock, AR 72201
 5   (501)313-4208
     wwilson@hope-lawyers.com
 6
 7   FOR THE DEFENDANTS:
 8   MR. COLIN R. JORGENSEN
     Association of Arkansas Counties
 9   1415 W. 3rd Street
     Little Rock, AR 72201
10   cjorgensen@arcounties.org
11
12
13   -Stevi R. Way - Certified Court Reporter
```

Page 3

```
 1                  INDEX
 2   TESTIMONY BY MS. NELLIE ARNOLD:      PAGE:
 3   EXAMINATION BY MR. JORGENSEN          4
 4   EXAMINATION BY MR. WILSON            61
 5
 6                EXHIBITS
 7   (No Exhibits Offered.)
```

Page 4

```
 1              PROCEEDINGS
 2           (BEGAN AT 9:03 AM)
 3       THE COURT REPORTER:  Today's date is January 25,
 4   2022 and the time is 9:03 a.m.  This is the zoom
 5   deposition of Nellie Arnold.  At this time I need
 6   counsel to agree on the record that there is no
 7   objection to me administering a binding oath to the
 8   witness via zoom.  And we'll start with Mr. Jorgensen.
 9       MR. JORGENSEN:  No objection.
10       MR. WILSON:  No objection on my end either.
11       THE COURT REPORTER:  Ma'am, if you'll raise your
12   right hand to be sworn?
13       NELLIE ARNOLD,
14   called as a witness herein, having been first duly sworn
15   under oath, was examined and testified as follows:
16              EXAMINATION
17   BY MR. JORGENSEN:
18   Q.  Good morning, Ms. Arnold.
19   A.  Good morning.
20   Q.  My name is Colin Jorgensen.
21   A.  Good morning.
22   Q.  I represent the defendants in the lawsuit you filed
23       that we're here for today for you to give your
24       deposition.  Have you ever given a deposition before
25       in any other cases?
```

Page 5

1   A.  No, sir, I haven't.
2   Q.  Okay. Let me go over a few things just so that we're
3       all on the same page and we try to do this as well as
4       we can for the court reporter. Do you understand you
5       are under oath that you just took an oath swearing to
6       tell the truth in this?
7   A.  Yes, yes, I do understand that.
8   Q.  Very good. Do you understand that is the same oath
9       you would take if you testified in court in a trial?
10  A.  Yes, sir, I do understand that.
11  Q.  Very good. If you do not understand a question I ask
12      at any time today will you please just tell me and I
13      will try to ask it in a different way or ask you a
14      different question? I only want you to answer
15      questions that you understand. Is that fair?
16  A.  Yes, sir.
17  Q.  If, at any time, during the deposition you realize an
18      answer you gave earlier is incomplete or inaccurate if
19      you'll please just let me know then you can clarify or
20      change the answer right then if you'll just tell me,
21      is that fair?
22  A.  Yes.
23  Q.  Do you understand that my questions and your answers
24      today all the words we say are being recorded by the
25      court reporter and so we therefore need to give

Page 6

1       audible verbal responses? We can't shake our head or
2       use body language. We have to speak and say yes, no,
3       actual words. You understand that?
4   A.  Okay. Thank you.
5   Q.  Very good. And also for the court reporter and for me
6       and you both let's please try not to talk over each
7       other because that makes it very difficult for the
8       court reporter to get a good transcript. So if you
9       will please wait until I finish a question before you
10      begin to answer I will also do my best not to
11      interrupt you. Does that sound good?
12  A.  Thank you.
13  Q.  Very good. I don't expect us to go past the morning
14      today. I don't think this is going to take all day.
15      But I will suggest a short break every hour or so if
16      we're going that long. If you need a break at any
17      time just say so please and we can take a break. The
18      only caveat about that is if I've asked a question and
19      you ask for a break then you need to answer the
20      question first then we can take a break. But, please,
21      if you need a break at any time just let us know.
22      Okay?
23  A.  Yes, sir.
24  Q.  Very good. Is there anything you need any special
25      needs or concerns before we get going on this with the

Page 7

1       questions and the answers?
2   A.  I would like to address that and let you know I am a
3       little hard hearing. Not bad but I am a little. So
4       if it seems I'm not paying attention it's because I'm
5       trying to, you know.
6   Q.  Very good. Thank you for telling me. I will try to
7       be loud and clear. And if you need me to repeat
8       something just tell me. Okay?
9   A.  Okay. Thank you.
10  Q.  Very good. Is there any reason why you are not able
11      to give full and complete and accurate testimony
12      today? Are you on any sort of medication, or drugs,
13      or alcohol or do you have any sort of medical
14      condition anything like that that would affect your
15      ability to give truthful answers to questions?
16  A.  No, there's no reason. I haven't had any medicine
17      this morning.
18  Q.  What was that last part? You haven't had any medicine
19      this morning?
20  A.  No, I've got bronchitis, excuse me, I said that. No,
21      I haven't had any medicine.
22  Q.  Okay. Great. Do you normally take medicines that
23      might would effect and you're not taking them to do
24      because of this or is this --
25  A.  No, no.

Page 8

1   Q.  Okay. I don't want you --
2   A.  I was nausea.
3   Q.  I'm sorry?
4   A.  I was nauseated when I went home so I didn't take
5       anything.
6   Q.  Okay. If you have any issues with that today let me
7       know we can take a break, whatever we need to do.
8       Okay?
9   A.  Thank you.
10  Q.  You bet. Okay. Will you state your full name and
11      your address for the record please?
12  A.  I'm Nellie Arnold. I live at 13804 Royal Oaks in
13      Mabelvale 72103. That's in Saline County.
14  Q.  How long have you lived at that address?
15  A.  Thirty-seven years.
16  Q.  All right. What is your birthdate?
17  A.  January the 8th, 1941.
18  Q.  Are you married?
19  A.  No. My husbands are deceased.
20  Q.  Some of that I already knew that because you provided
21      some answers to some things in written discovery and
22      we gathered a lot of information already. And I will
23      try not to duplicate that sort of stuff today. If I
24      already know an answer to something I don't need to
25      ask you again. What is your educational background?

Page 9

1  What is the highest level of education you've
2  obtained?
3  A. Well, my grandfather raised me so he only sent me to
4  the eighth grade.
5  Q. Okay.
6  A. I've been working since.
7  Q. Did you get a GED at any point?
8  A. No, I haven't. No, I haven't.
9  Q. You haven't gone back to school or college or
10  community college or anything like that?
11  A. No, sir, I haven't.
12  Q. Okay. Have you ever served in the military?
13  A. No, sir.
14  Q. When I pause like this and I'm looking away I'm
15  skipping things which actually makes it go faster just
16  so you know. Did you meet with anyone to talk about
17  or prepare for your deposition today?
18  A. Yes.
19  Q. Did you meet with your attorney?
20  A. Yes.
21  Q. Anyone else besides your attorney?
22  A. No, sir.
23  Q. Have you spoken with anyone besides your attorney
24  about your deposition today?
25  A. I'm sorry. Would you repeat that please?

Page 10

1  Q. Sure. Have you spoken to anyone besides your attorney
2  about your deposition today?
3  A. No, not really, no.
4  Q. Not other than maybe just mentioning to somebody I'm
5  doing my deposition?
6  A. That I'm going today for it.
7  Q. Right. But you haven't talked with anyone in detail
8  about the deposition?
9  A. No, sir.
10  Q. Okay. Have you spoken with anyone besides your
11  attorney about your lawsuit more generally? Not just
12  your deposition but this whole case?
13  A. In what way do you mean that, sir?
14  Q. In any way that involves talking about this case.
15  A. Are you talking about business or just conversation?
16  Q. Both, either.
17  A. Not business just conversation.
18  Q. Okay. Who have you had just conversation with about
19  your case?
20  A. Oh, my daughter.
21  Q. Anyone else?
22  A. No, sir.
23  Q. What's your daughter's name?
24  A. Charlotte Mastin, M-A-S-T-I-N.
25  Q. What did you say to your daughter when you talked to

Page 11

1  her about this case?
2  A. I told her that I had gotten an attorney and that I
3  was proceeding.
4  Q. Did you tell her anything else?
5  A. On and off little things, you know, like gosh it's
6  been a long time, you know. Nothing -- nothing that I
7  can say that -- of course she would come and say hey
8  when are you going. I would say I don't know, I don't
9  know that. And that's about all we would say.
10  Q. Does she mean when she would ask you that does she
11  mean when is the trial?
12  A. When was I going to go see my attorney.
13  Q. Okay.
14  A. I guess that's what she meant.
15  Q. Have you spoken with anyone else in the world besides
16  your daughter and your attorney about your case?
17  A. Oh, yeah.
18  Q. Who else?
19  A. People make comments.
20  Q. What people?
21  A. Everywhere.
22  Q. Well, let's try to list them all out if we can. I
23  would like to know.
24  A. I didn't know them, sir. I don't know them.
25  Q. But you were speaking with them?

Page 12

1  A. Well, yes, sir.
2  Q. About your case? Who was it?
3  A. I believe I said I didn't know the people, all of
4  them. I didn't know them.
5  Q. Tell me the ones you do know, please.
6  A. My son, my best friend. I can't, like, specifically
7  name off. I mean, I guess I could but I would have to
8  sit here and think because it's been quite a while,
9  so...
10  Q. Are there any other folks you've talked to about the
11  case that you can remember who they are? You've said
12  your daughter, your son, and your best friend.
13  Anybody else?
14  A. Since then probably a lot of people but, you know, I
15  didn't just do it every day, you know.
16  Q. What is your son's name?
17  A. Shawn Eddings.
18  Q. And your best friend's name?
19  A. Pat Stalter.
20  Q. Can you spell Stalter?
21  A. S-T-A-L-T-E-R.
22  Q. Were your daughter or your son or your best friend
23  present at the scene on July 3rd, 2017 when the
24  incident that this case is about happened?
25  A. Well, I was screaming and my son come up. My best

3 (Pages 9 to 12)

Page 13

1   friend wasn't there.  My daughter wasn't there, no.
2   Q.  Was your son in your house on your property?
3   A.  No, he was across the street.  He could hear me
4       hollering.
5   Q.  Does he live across the street?
6   A.  No, sir.  He lived with me at the time.
7   Q.  Was he over there visiting a neighbor or something?
8   A.  That's right.
9   Q.  Whose house was he at?
10  A.  He was at the Wooten's residence had broke down.
11  Q.  The Wooten's?
12  A.  W-O-O-T-E-N.  Calvin, C-A-L-V-I-N, Wooten.
13  Q.  Okay.  You mentioned that you've spoken to some other
14      folks about your case beyond your daughter, your son,
15      and your best friend but you can't recall who those
16      folks are, is that correct?  Or you don't know the
17      names?
18  A.  That's right.  I didn't know them at all.
19  Q.  How did you come to be speaking to folks that you
20      didn't know at all about your case?
21  A.  My arm speaks for itself.  And they go oh my God what
22      happened and I told them.
23  Q.  And what would you tell them?
24  A.  I said that I was knocked down by a police officer.
25  Q.  Anything else?

Page 14

1   A.  No.  I didn't want to get into it.
2   Q.  Okay.  Does your daughter Charlotte Mastin live in
3       Central Arkansas?
4   A.  Yes, she does.
5   Q.  How about Pat Stalter?
6   A.  Yes, she does.
7   Q.  Do you have any other close family members who live in
8       Central Arkansas?  And the reason I ask is so that we
9       would know who they are they just happen to get called
10      to jury duty on your case.
11  A.  I don't talk to this about this to them.
12  Q.  Okay.  I would still like you to tell me what other
13      family members close family members you have who live
14      in Central Arkansas.  Just their names, please?
15  A.  I don't have any close family members.  I have family
16      members but not close ones.
17  Q.  Okay.
18  A.  We don't sit around every morning and drink coffee and
19      we don't, you know --
20  Q.  Okay.  Have you ever been convicted of any felonies?
21  A.  Felon, no.
22  Q.  No felonies?
23  A.  No.
24  Q.  Have you ever been charged with any felonies?
25  A.  No.

Page 15

1   Q.  Have you ever been a plaintiff in any other lawsuit
2       aside from divorce proceedings?  I don't need to know
3       about the divorce cases.
4   A.  You mean like go to court or what?
5   Q.  I mean like this case we're here for today where you
6       are the plaintiff and filed the lawsuit?
7   A.  No, I -- no.
8   Q.  You've not had any other lawsuits where you are the
9       plaintiff like this?
10  A.  No, no.
11  Q.  In your discovery responses in response to a similar
12      question you indicated you were involved in a car
13      accident in 2017 as a passenger?
14  A.  Yes.
15  Q.  And you were paid $15,000.  Do you recall the date of
16      that car accident?
17  A.  It was July the 4th in I believe '17.  I'm not certain
18      about the year but it was July the 4th.  I was coming
19      from my husband's funeral.
20  Q.  And that was on your husband's funeral was on July 4,
21      2017?
22  A.  Yes.
23  Q.  The day after the day when the incident happened --
24  A.  It was a different incident.  It was same day but
25      different year.

Page 16

1   Q.  Oh, so was it not 2017 the car accident?
2   A.  The car accident?
3   Q.  Let me pause a second and I will find your answer and
4       it might help us.
5   A.  I might be wrong about that, sir, you know, I don't.
6   Q.  Can you remember if this car accident was before or
7       after the day that the Saline County deputies came to
8       your residence which was July 3, 2017?  Can you
9       remember if the car accident was before or after that?
10  A.  It was after.
11  Q.  After.  Okay.  But it wasn't the next day?
12  A.  No, no.  Pardon me.
13  Q.  So perhaps sometime -- do you remember the date your
14      husband died?
15  A.  I believe, sir, you can correct me if I'm wrong, I
16      believe it was on the 28th.
17  Q.  Of July?
18  A.  Yeah.
19  Q.  Okay.  So maybe a few weeks after?
20  A.  No, no.  This was years.
21  Q.  Okay.
22  A.  This was years.
23  Q.  All right.  I'll move on from that.  Sorry to get
24      confusing about things.
25  A.  I'm sorry, I'm getting old.

Page 17

1  Q. Well, and it's a long time ago no doubt regardless of
2     your age.
3  A. Well, I had two husbands die so there you go.
4  Q. All right. Please tell us in your own words why you
5     filed the lawsuit in this case?
6  A. I was pushed down unnecessarily by a Saline County
7     officer.
8  Q. Anything else?
9  A. No.
10 Q. Did you know any of the defendants in your lawsuit
11    before the incident on July 3, 2017?
12 A. Would you repeat that please?
13 Q. The defendants in your lawsuit are Maranda Turner,
14    Brent Bittle, the Saline County Sheriff's Office and
15    Saline County, and the Saline County Sheriff Rodney
16    Wright. Did you know any of those folks before the
17    incident on July 3, 2017?
18 A. I did not know them, sir, no.
19 Q. Had you had any interactions with any of them before
20    that date?
21 A. Yes, sir.
22 Q. Who did you have any interaction with before July
23    3rd?
24 A. I don't know their name. I don't know if it was them
25    or another officer, officers --

Page 18

1  Q. Are you talking about -- I'm sorry. Are you talking
2     about other times when Saline County Sheriff's
3     Deputies came to your residence before that date?
4  A. Yes, sir. Yes, sir.
5  Q. You don't recall which deputy on which day. You just
6     know that --
7  A. No, sir, it was too many of them.
8  Q. Understood. Do you know who the deputy was who pushed
9     you on July 3, 2017?
10 A. Her first name is Maranda.
11 Q. Maranda Turner, the one I just --
12 A. Yes.
13 Q. One of the defendants, right?
14 A. Maranda Turner.
15 Q. Can you recall if you know if Maranda Turner had ever
16    been to your residence before?
17 A. No, I can't -- yes, she had been.
18 Q. Earlier that day or before that day?
19 A. Yes, sir, earlier that day.
20 Q. Okay. What about before that day, do you know?
21 A. No, I don't believe so.
22 Q. Okay. How about Brent Bittle? He was the other
23    deputy who was with Maranda Turner according to your
24    complaint and I think we all agree?
25 A. In that subject I'm not good, you know, when you say

Page 19

1     an officer. A lot of people I remember their face. I
2     don't remember their face so I would like to say she
3     could have been or could not have been. I don't know.
4  Q. That's fine. If you don't know or don't remember
5     that's a truthful answer. I understand. Okay. When
6     I'm asking you these questions about the past I'm only
7     asking for the answer if you remember it. So why have
8     you named Maranda Turner as a defendant in your
9     lawsuit?
10 A. Because she's the one done it.
11 Q. Okay. Anything else?
12 A. No, sir.
13 Q. Why have you named Brent Bittle as a defendant?
14 A. As a defendant what do you mean, sir?
15 Q. I mean you filed a lawsuit.
16 A. Right.
17 Q. In which you are the plaintiff and you named multiple
18    defendants including Maranda Turner and Brent Bittle
19    and some others. And so why is Brent Bittle a
20    defendant in your lawsuit?
21 A. He's the one who told her to arrest me.
22 Q. Okay. Any other reason he's a defendant in your
23    lawsuit?
24 A. No, sir.
25 Q. Why is the Saline County Sheriff's Office or Saline

Page 20

1     County a defendant in your lawsuit?
2  A. I believe they are the boss of these officers. Is
3     that not true?
4  Q. Yes, these officers are Saline County employees,
5     that's true.
6  A. So they would be telling them what to do.
7  Q. Okay. Any other reason they are named as a defendant?
8  A. No.
9  Q. And the final defendant is Saline County Sheriff
10    Rodney Wright. Why is he a defendant in your lawsuit?
11 A. He's the main man there.
12 Q. I'm sorry?
13 A. He's the main man I thought at the facility.
14 Q. Oh, right, you mean he's the top boss?
15 A. Right.
16 Q. Is that what you mean? Okay. So because he is the
17    boss over Miranda Turner and Brent Bittle who were at
18    your residence?
19 A. Yes.
20 Q. Any other reason Sheriff Rodney Wright is a defendant?
21 A. Well, in my way of thinking -- which I could be
22    wrong -- he's over them and they should be taught not
23    to do what they did.
24 Q. Okay. You filed your complaint in this case on June
25    10th, 2020. And I want to ask you a few questions

Page 21

1   about the complaint.  Do you know what I'm talking
2   about when I say the complaint the lawsuit?
3   A.  Yes, sir.
4   Q.  Okay.  And on page 20 of the complaint you filed you
5   signed a verification stating that you had reviewed
6   the allegations in the complaint, is that correct?
7   A.  I don't understand that, sir.  Would you repeat that?
8   Q.  Did you sign the complaint that you filed in this
9   case?
10  A.  If I filed it I did.
11  Q.  Okay.  Let me see if I can share my screen real quick
12  and show you.  This is a copy of the Court's website
13  the complaint you filed.  See it says document one at
14  the top and verification?  Can you see that?
15  A.  Yes, I see that notification.
16  Q.  And is that your signature?
17  A.  Yes, sir, it is.
18  Q.  Okay.  So did you review your complaint and confirm
19  the allegations in your complaint before it was filed?
20  A.  I reviewed it a lot of times, sir.
21  Q.  Okay.  And when you reviewed it were you comfortable
22  that everything that was stated in there is true and
23  accurate to the best of your knowledge?
24  A.  Yes, sir.
25  Q.  And that's why you signed the verification, right?

Page 22

1   That's what that means?
2   A.  Yes, sir.
3   Q.  Okay.  In your complaint you indicate that deputies
4   with the Saline County Sheriff's Office were
5   dispatched to your residence multiple times on July
6   3rd, 2017, is that correct?
7   A.  Yes, sir.  Probably three.  I'm not sure.
8   Q.  You anticipated my next question.  I was going to ask
9   you do you recall how many times deputies came out to
10  your residence on that day?
11  A.  I believe three.
12  Q.  But you're not sure?  Is that kind of an estimate?
13  A.  It's an estimate, yes.  I know they came two.
14  Q.  Okay.  Who called to ask for Sheriff's Deputies to
15  come to your residence the first time on July 3, 2017?
16  A.  I'm really not sure, sir.  I don't know if I did or if
17  the gentleman that stayed at my house then.
18  Q.  The gentleman --
19  A.  Yes.
20  Q.  I'm sorry, I just only heard the gentleman.  The
21  gentleman what?
22  A.  That stays at my house.
23  Q.  Is that Lowell Best?
24  A.  Right.
25  Q.  Does he still stay at your house today?

Page 23

1   A.  Yes, sir.
2   Q.  And he was living at your house on that day on July 3,
3   2017?
4   A.  Yes, sir.
5   Q.  So it could have been you or him that called?
6   A.  It wasn't me that called.
7   Q.  Oh, okay.  Well, who might it have been if it wasn't
8   Lowell Best?
9   A.  There was about 15 people standing outside looking
10  with their phones and cameras.
11  Q.  At the time when the phone call was made?
12  A.  No, later.  But they were all listening arguing not
13  with the police but with each other.
14  Q.  So I'm trying to go back a little in time on that day
15  until the first time someone called and requested
16  assistance from the Sheriff's Office at your home.
17  And I believe you said it wasn't you that called it
18  might have been Lowell Best.  Is there anyone else it
19  could have been?
20  A.  Yes, yes.
21  Q.  That could have made that call?
22  A.  No, no.
23  Q.  So was it Lowell Best then that called?
24  A.  I think so, yes, sir, I believe so.
25  Q.  Was it Mr. Best who called each time that --

Page 24

1   A.  Not every time, no.  I called some myself.
2   Q.  Do you remember which time you called?
3   A.  No.  I called so many times I don't remember.
4   Q.  Okay.  Do you remember if --
5   A.  I needed help so I called the police department.
6   Q.  Do you remember if it was you or Mr. Best who called
7   the -- I don't think we know exactly how many times so
8   let's talk about the -- I mean, we do, there's
9   dispatch records but I don't think we're going to be
10  able to remember every detail of each earlier in the
11  day.  I'm really interested in the time that deputies
12  came.  The second to last time they came to your home
13  that day.  Then of course the final time when you were
14  injured.  Okay?  So the time before, the second to
15  last time deputies came to your home do you remember
16  that visit by the deputies?
17  A.  Second to last time?
18  Q.  The time they were at your home immediately before the
19  time they came and you were injured?
20  A.  Are you saying the second time?
21  Q.  The second to last.  I don't know what numbered time
22  it was for the day.  Just the time immediately before
23  6:18 p.m. that ended in you riding in an ambulance to
24  a hospital.  The time right before that that deputies
25  came to your home do you remember that?

Page 25

1   A.  You mean different officers?
2   Q.  I don't know.
3   A.  Well, I don't either.
4   Q.  Okay. Do you remember if Maranda Turner and Brent
5       Bittle had been to your residence themselves earlier
6       in the day before the final time they came that day?
7   A.  Yes, sir.
8   Q.  Okay. Do you think it might have been the same two
9       deputies?
10  A.  Yes, sir.
11  Q.  Multiple times that day?
12  A.  Yes.
13  Q.  Okay.
14  A.  Not multiple.
15  Q.  Okay. But they had been to your home earlier in the
16      day before the final time?
17  A.  Yeah, they had been there at least two times.
18  Q.  Okay. Did you have any conversations with Maranda
19      Turner or Brent Bittle the deputies when they visited
20      your home earlier in the day?
21  A.  They asked for the reason to call and I answered them.
22  Q.  Okay. What was your answer?
23  A.  That I called them a lot of times and that Mr. Best
24      was verbally abusing me without hitting me and not
25      getting arrested and I called the police so many times

Page 26

1       it was ridiculous. And so I told them this and they
2       replied back to me saying there has to be a lick, a
3       hit of some sort. He doesn't have to leave here
4       because you want him to.
5   Q.  Did you or they -- do you remember which if that was
6       Maranda Turner or Brent Bittle who told you that?
7   A.  I think they both discussed it a little with me.
8   Q.  Okay. Did you want them to arrest Mr. Best?
9   A.  Yes.
10  Q.  Did they have any conversations with Mr. Best?
11  A.  Yes.
12  Q.  Were you a part of those conversations involving
13      Mr. Best or was it separate from you so you don't know
14      what they said?
15  A.  They would talk a little bit then they would walk away
16      from me. Then, you know, step out on the porch or
17      something. They didn't go off anywhere or anything,
18      no.
19  Q.  Can you recall anything any part of any conversation
20      between the deputies and Mr. Best?
21  A.  Yes, I did.
22  Q.  What was said in those conversations?
23  A.  Well, they asked him did you hit her.
24  Q.  What was his response?
25  A.  No.

Page 27

1   Q.  Did they ask him or tell him anything else?
2   A.  What was the problem.
3   Q.  What was his response?
4   A.  That I was trying to get him to leave and my family
5       was causing all the trouble and he didn't have
6       anywhere to go.
7   Q.  Do you recall any other details of any other
8       conversations involving the deputies before the final
9       time they came to your home that day?
10  A.  It was almost the same thing every time.
11  Q.  Do you recall at any point during any of those visits
12      at your home that day that anyone said anything about
13      you having a can of mace?
14  A.  That's right. I'm glad you told me, said that. That
15      brings me back to knowing that he made the call. I
16      had a can of that and he called the police department
17      to ask them was it legal for me to carry that.
18  Q.  Did he get a response to that question?
19  A.  Yes.
20  Q.  What was the response?
21  A.  No.
22  Q.  No meaning that it was not legal for you to have mace?
23  A.  No, it was legal for me to have it.
24  Q.  Correct. Okay. So someone with -- was this on the
25      phone or was this a conversation he had with them when

Page 28

1       the deputies came to --
2   A.  I didn't know it until they got there because I didn't
3       know he was talking about it, you know.
4   Q.  Okay.
5   A.  When they got there he said well I asked them I didn't
6       want them to do anything to you I just wanted to know
7       that.
8   Q.  And they told him you are allowed to have mace?
9   A.  (Nods head up and down.)
10  Q.  Did you use the mace at any point that day?
11  A.  No, no, never.
12  Q.  Did you have the mace on you somewhere on that day?
13      Did you have it with you?
14  A.  I don't believe I had it on me that day at all, no. I
15      don't know why it was brought up that day.
16  Q.  Well, it sounds like Mr. Best brought it up, is that
17      right?
18  A.  Sounds like.
19  Q.  Did Deputies Bittle and Turner provide any warnings at
20      any point to Mr. Best or you during any of their
21      visits that day?
22  A.  Yes, sir, they did. They asked me was there anywhere
23      that I could go.
24  Q.  What was your response to that question?
25  A.  I said what do you mean is there any way I could go

Page 29

1       this is my house.
2    Q. Did either of the deputies provide any warnings to you
3       or Mr. Best during any of their visits to your
4       residence that day?
5    A. Yes, they did.
6    Q. What warning or warnings?
7    A. For us to take Mr. Best and he has to do something
8       towards you like hit you, push you, something to
9       irritate you, do something that would, you know, harm
10      him not just talk.
11   Q. Okay. So is it your understanding that was a warning
12      to Mr. Best that if he did any of those things he
13      would be arrested?
14   A. He knew, yes, sir. I'm sure they were talking to both
15      of us.
16   Q. Did they provide any warnings to you at any point that
17      day?
18   A. They told me, you know, they lectured me do you know
19      how many times we've been out here. I said I haven't
20      counted them but I'm sure you've been out here a lot
21      of times.
22   Q. Did they say anything else when they lectured you
23      about how many times they've been out there?
24   A. No. I think I counted after that and I said I think
25      they've been out here 17 times. I counted it up.

Page 30

1       When they said that after they left I said oh my God
2       they've been out here about 17 times. Not that one
3       day. Okay. They've come other times.
4    Q. Sure. But they had been out there multiple times that
5       day also, right?
6    A. More than once.
7    Q. So what was your understanding why did you interpret
8       that comment as a warning, if you did?
9    A. They were letting me know what I was lawfully allowed
10      to do and not do without being arrested.
11   Q. Okay. So was it your understanding they were warning
12      you that if you called them out too many times that
13      somebody might get arrested?
14   A. No.
15   Q. Okay. Did you have a different understanding that you
16      can tell us?
17   A. No. I knew what they were saying when they told me
18      this we're not going to come out here, we're not going
19      to arrest him just because you and he are into an
20      argument. It has to be more than verbal for us to
21      take him in or you.
22   Q. In that conversation with that warning was sometime
23      earlier in the day before the final time they came to
24      your residence, is that correct? It wasn't the --
25   A. It wasn't the last time?

Page 31

1    Q. Right.
2    A. No, it wasn't the last time.
3    Q. Okay. Do you remember --
4    A. Excuse me, I'm sorry. The last time they come out
5       they didn't tell me anymore. But they had told me
6       previous times.
7    Q. Okay. Very good. Do you remember if it was you or
8       Mr. Best who called them out the last time?
9    A. You mean when I went to the hospital?
10   Q. Yes.
11   A. I didn't call anybody. I was begging them to let me
12      up and they didn't offer to help me up. I laid there
13      45 minutes.
14   Q. I'm talking about the call that somebody made that
15      resulted in them being dispatched to your residence
16      that time?
17   A. He says that he called them.
18   Q. He being Lowell Best?
19   A. He being Lowell Best.
20   Q. All right. Can you please tell us what happened when
21      the deputies arrived the final time on July 3, 2017?
22      Can you please just tell us in your own words every
23      detail of what happened?
24   A. You mean when they come out the last time?
25   Q. Yes.

Page 32

1    A. Well, they come out the last time and they said do you
2       realize how many times we've been out here. I said I
3       know you've been a lot of times but I don't know how
4       many. And that's when I counted them or tried to
5       remember. And I said, yes, sir, and I think that's
6       ridiculous.
7    Q. What happened next?
8    A. They said well you called or someone called from this
9       residence. I said yes, sir.
10   Q. So was this Brent Bittle you were talking to if you're
11      saying yes, sir?
12   A. I don't really know. I was just really talking to
13      both of them I guess.
14   Q. Were you outside the residence during this
15      conversation?
16   A. I was on my front porch.
17   Q. All right. What happened next?
18   A. They said for us to take you or take him there has to
19      be licks, blow, or some kind of reaction other than
20      orally. Do you understand that. I mean, I'm not
21      saying that to you. I'm saying what they said to me.
22      And I said, yes, I understand that. I said what you
23      need for me is to either get hit or hit him. I said
24      yes.
25   Q. What happened next?

Plaintiff's Statement in Opposition - Exhibit D

Page 33

1  A. I slapped his face.
2  Q. You slapped Lowell Best's face?
3  A. Yes.
4  Q. What happened next?
5  A. He slapped mine.
6  Q. What happened next?
7  A. I was so irritated, sir, I don't really remember to
8     the effect everything that I said. And I apologize
9     for that been angry and my memory. I know they said,
10    you know, they would take me to jail because I had hit
11    him. And then my son run down from across the street
12    and was just hysterical and said to them before they
13    paid any attention aren't you going to take him. And
14    they put him in the back of the car and took him.
15 Q. You're talking about Lowell Best again?
16 A. (Nods head up and down.)
17 Q. So Mr. Best was placed under arrest?
18 A. (Nods head up and down.)
19      MR. WILSON: Is that a yes?
20      THE WITNESS: Yes, sir.
21      MR. JORGENSEN: Q. All right. What else
22 happened during the final dispatch to your residence on
23 July 3, 2017?
24 A. Well, I told them I said I'll go with you, you know,
25    you don't have to make me go with you or anything.

Page 34

1     But I said we live in a bad neighborhood I've lived
2     down here a long time and I want to put my phone, my
3     medication, and what money I have in the back of my
4     car. Not the backseat but in the very back. Which
5     sat very close to their car. I mean, I could just
6     almost stop over into their car. It was like almost
7     even with my car. Okay.
8  Q. Okay.
9  A. And I was doing that. I wasn't handcuffed. I was not
10    handcuffed. So my turtle what we call it put my purse
11    in there. Put the thing I had over in there and
12    slammed it down. And when I slammed it down I turned
13    around like this. I was barefooted too, I'm sorry.
14    But I was barefooted, which doesn't make any
15    difference. But I was going to step over into their
16    car, you know, get into their car. I was going to.
17    But before I could do this Miranda she just she did
18    what she did to me what the other officers told her
19    to. He said arrest her.
20 Q. So Deputy Bittle said arrest her and Deputy Maranda
21    Turner did what she did to you, is that correct?
22 A. That's right.
23 Q. And what is that that she did to you?
24 A. She slammed me down as hard as she could and I wasn't
25    expecting it like that. I mean, I wouldn't expect her

Page 35

1     to do that but there was no reason for it. I was
2     going to get into the car. You understand, sir? I
3     was voluntarily going to get into the car.
4  Q. Okay. Was Maranda Turner attempting to put handcuffs
5     on you at this time? You said earlier you were not
6     handcuffed. Were there ever handcuffs involved?
7  A. There were never any handcuffs at all.
8  Q. She never placed any handcuffs on either of your
9     hands?
10 A. No. She tried to when he said that. She was reaching
11    for me and she knocked me down.
12 Q. Was she reaching for you to try to put handcuffs on
13    you?
14 A. I didn't have any on me.
15 Q. Do you know why she was reaching for you?
16 A. To put me into the car.
17 Q. Did she say anything to you at this time when she was
18    reaching for you?
19 A. No.
20 Q. Did she ever ask you to put your hands behind your
21    back?
22 A. Yes.
23 Q. And did you when she asked you to?
24 A. I said I will just a minute. And I was going to close
25    my car down and I did. I didn't have anything in my

Page 36

1     hands. Okay.
2  Q. Did you have either of your hands in your pockets?
3  A. Well, she said because I read documentation saying
4     this that I put my hands in my right but I wouldn't
5     have been doing that I'm left-handed. If I had been
6     reaching for anything I would have been reaching with
7     my left hand.
8  Q. Okay. Well, were you reaching for anything with your
9     left hand?
10 A. No.
11 Q. Did you ever have your left hand in your pocket?
12 A. No.
13 Q. Did Maranda Turner ever when she reached for you did
14    she ever get a hold of you in any way?
15 A. No. She might have thought when I had done like this
16    I was trying to look in my pocket. I didn't have
17    anything in my pocket. Okay.
18 Q. Okay. Was it when she reached for you at this time
19    we've been talking about is that the same moment when
20    she pushed you to the ground?
21 A. No.
22 Q. Okay. What else happened in there leading up to the
23    moment where she pushed you to the ground?
24 A. I started to turn around to get into their car and
25    their car was like right there. I would have to took

Page 37

1    two or three steps but when I turned around I just
2    said boom and hit the ground.  I wasn't expecting her
3    to take me down.
4  Q.  Was this after she had asked you to put your hands
5    behind your back?
6  A.  I don't remember.
7  Q.  Did she ask you to put your hands behind your back
8    after you hit the ground and had a broken wrist or
9    before?
10 A.  No.  I was screaming at the top of my lungs please
11   will one of you please help me up.  My arm is broke
12   please help me.  And they stood there and looked down
13   at me 45 minutes.
14 Q.  Forty-five minutes until what?
15 A.  Until the ambulance got there.  They didn't help me
16   up.  They had no intent of helping me up.  They didn't
17   try.  They didn't talk to me.  They didn't try to pick
18   me up, either one of them.
19 Q.  Did anyone else arrive on scene between the moment of
20   your injury and 45 minutes later when the ambulance
21   arrived?
22 A.  My son.
23 Q.  Anyone else?
24 A.  And a lot of people.  The neighbors were all out
25   taking pictures.  There were at least 12 people

Page 38

1    standing out.
2  Q.  Did those people all come out because they heard you
3    screaming?  Did any other police officers arrive on
4    the scene and have any interactions with you during
5    that 45 minutes besides --
6  A.  I was hurting so bad but I don't know.  I don't think
7    so.
8  Q.  What about firefighters or any other type of first
9    responder aside from the ambulance?
10 A.  Firefighters, I think firefighters came.
11 Q.  Did they provide you any medical care?
12 A.  Somebody called the ambulance.  I don't know who
13   called the ambulance.  The ambulance was -- excuse me.
14 Q.  I'm sorry, I'll stop.  You finish.
15 A.  After she tripped me I was beside myself.  My ball was
16   taken out of my arm.  My son was hysterical screaming.
17   And they were doing nothing but standing straight over
18   me and looking at me.
19 Q.  Do you recall if any other law enforcement or
20   firefighters or anyone aside from the two deputies who
21   had been there the whole time ever showed up at the
22   scene?
23 A.  No, I don't but they could have.  I was in such agony
24   I just couldn't explain to you.
25 Q.  Okay.  So you don't remember because you were in pain

Page 39

1    that's all you remember is the pain I guess; is that
2    right?
3  A.  I remember the pain, yes.
4  Q.  Okay.  You don't know who called the ambulance or
5    anyone else who may have come to the scene?
6  A.  Lowell Best said he did after they put him in the
7    police car.
8  Q.  How would he have done that from the police car?
9  A.  That is a good question.
10 Q.  I guess we would have to ask him.  Are you suing the
11   defendants for negligence in this case?
12 A.  You mean like not knowing what they are doing or what
13   are you saying?
14 Q.  I mean negligence and maybe I should explain maybe you
15   don't know, I'm sorry.
16 A.  Yes, yes, yes.  Negligence.  They should have known
17   better.
18 Q.  Okay.  So you understand what negligence is.  Okay.
19   That's a claim you make in your complaint.  A cause of
20   action.  Besides negligence are you bringing any other
21   claims against the defendants?
22 A.  Pardon me?
23 Q.  Are you bringing any other claims in your lawsuit
24   against the defendants besides negligence?
25 A.  No, I think that's enough.

Page 40

1  Q.  Okay.  In your complaint -- and I fully understand if
2    some of this if you don't know on some of this but I
3    will just ask.  And if you don't know that's fine just
4    tell me.  You have language in your complaint about
5    alleging that there's a custom in the Saline County
6    Sheriff's Office of allowing deputies to conduct
7    improper negligent or otherwise insufficient searches
8    and seizures and detentions or arrests of individuals.
9    Is it your testimony that there has been other
10   incidences similar to the incident involving you on
11   July 3, 2017 where the Saline County Sheriff's
12   Deputies have committed similar negligence involving
13   other people or you or do you know?
14 A.  Saline County police officers have always been rude to
15   me and I didn't know why because I wasn't talking to
16   them loud, I wasn't screaming at them for no reason.
17   And they were very very rude to me.  Which I
18   understand that's their job to calm people and to make
19   them, you know, act civil or whatever.  But I had been
20   robbed and Mr. Brown was there then.  I shouldn't even
21   bring this up I suppose.  Is it okay?  He's not there
22   anymore.
23 Q.  Are you aware of any other incidents to your knowledge
24   where Saline County Deputies have hurt anyone else or
25   been otherwise negligent in any other situations

Page 41

1  involving other people?
2  A.  I haven't seen them do it, no.  They talk awful to
3     people around me that I thought was insufficient for
4     them to do so.
5  Q.  Are you talking about at other times when they were at
6     your residence?  Or have you had other interactions
7     with the Saline County Sheriff's Office besides the
8     times they've been to your residence?
9  A.  Well, I've had other.  I was being robbed.  I called
10    officer out, Officer Brown.  He left my purse inside
11    the people that were robbing me inside and took me to
12    jail.
13 Q.  Was this before or after July 3, 2017?
14 A.  It was before.
15 Q.  And you were arrested?
16 A.  Yes, sir.
17 Q.  Do you know if Officer Brown was a Saline County
18    Sheriff's Deputy or a different law enforcement agency
19    or do you know?
20 A.  He was an officer.  He took me in.  He was by himself.
21 Q.  Do you know if he was a Saline County Sheriff's
22    Deputy?
23 A.  Yes, he was.
24 Q.  Any other instances?
25 A.  It was very insufficient.

Page 42

1  Q.  What happened in that case or in that incident after
2     you were arrested?
3  A.  He went back into my house, got my purse, brought it
4     back out to me.  I was in the car asking if he had his
5     radio on because I had stuff I wanted to say.  He
6     didn't say one word.
7  Q.  Did he take you to jail?
8  A.  He took me to jail.
9  Q.  What was the result of you being arrested and taken to
10    jail on that day?  I'm sorry, were you --
11 A.  They told me the next morning that I could go home.
12    Not by the judge, just told.  I wasn't told by the
13    judge.  I was just told you can go home.
14 Q.  Was that the end of it?  There was no court case or
15    charges or anything?
16       MR. WILSON:  Is that a no?
17       THE WITNESS:  That's a no.  No, sir.
18       MR. JORGENSEN:  Q.  Can you recall any other
19 instances that you know about -- wait, I think I already
20 asked that and got the answer.  Nevermind.  I'm still
21 looking at your complaint.  And there's language in your
22 complaint saying that Deputy Turner's action of slamming
23 Ms. Arnold to the ground and the injury Ms. Arnold
24 sustained would constitute a felony under Arkansas law.  Do
25 you remember saying that in the complaint?

Page 43

1  A.  That I said it was a what, sir?
2  Q.  That you said Maranda Turner's actions were a felony.
3  A.  I might've said that.  I don't remember.
4  Q.  Okay.
5  A.  But I would certainly call it more than a felony.
6  Q.  Did you submit a complaint to the prosecuting attorney
7     regarding Deputy Turner's actions on July 3, 2017?
8  A.  Sure did.
9  Q.  What was the response --
10 A.  I was in the hospital for two surgeries.  They
11    couldn't use regular instruments to put my hand back
12    together so they had to go and find something to do it
13    with.  This is a professional A-1 doctor.
14 Q.  We'll talk about your doctor in a minute.  I'm curious
15    if you had any interaction with the prosecuting
16    attorney's office about Maranda Turner.  Did you
17    attempt to pursue charges against Maranda Turner;
18    felony charges?
19 A.  No, I didn't go down there.
20 Q.  Okay.
21 A.  I thought they already knew it.
22 Q.  Since you -- well, let's just go ahead and talk about
23    the doctor you just mentioned, your excellent doctor.
24    Is that John Bracey, Dr. John Bracey that you're
25    talking about?

Page 44

1  A.  Yes, it is.
2  Q.  Was he your treating physician for your broken wrist?
3  A.  Yes.  But I had therapy.
4  Q.  Okay.  You said you had two surgeries.  I assume those
5     happened pretty quickly after the injury, is that
6     right?
7  A.  Well, yes, sir.  I was in the hospital.
8  Q.  And Dr. Bracey performed the surgery or surgeries?
9  A.  He did a surgery then I had to go back and have the
10    instruments took out of my hand that I had to wear and
11    arm.  My bone was out of my arm.
12 Q.  Right.
13 A.  I can't use it now.
14 Q.  You mean your left hand?
15 A.  This one right here.  I can't hold a cup of coffee.
16 Q.  Did you know Dr. Bracey before he became your treating
17    physician after this injury?
18 A.  Never saw him before in my life.
19 Q.  Have you spoken to Dr. Bracey about what happened that
20    caused the compound fracture in your wrist?
21 A.  Of course he asked me what happened.  I told him.
22 Q.  What did you tell him?
23 A.  I said there was an argument at my house and the
24    officer slammed me down and this is what I got.
25 Q.  Did you tell him anything else?

11 (Pages 41 to 44)

Page 45

1  A. No.
2  Q. Did he say anything to you in response when you told
3     him that?
4  A. He said I didn't know if I was going to be able to
5     save your arm or not. He said girl you scared me.
6  Q. Did he say anything about what you told him about the
7     incident with the officers or was he just talking
8     about your arm?
9  A. No, I told him the officers done it.
10 Q. And did he say anything back to you about the
11    officers?
12 A. I don't know. I was goofy when I went in and then I
13    went into surgery.
14 Q. Okay. That's fair. I would like to ask a few
15    questions about the witnesses that you've identified
16    in this case. And we've already talked about Lowell
17    Best and your son. And you said a bunch of neighbors
18    came outside. But just to confirm your testimony
19    about those neighbors is they came out when they heard
20    you screaming, is that right?
21 A. (Nods head up and down.)
22 Q. They didn't see what happened before the screaming.
23    They came out in response to the screaming, is that
24    right?
25 A. They knew that we were into an argument. But that's

Page 46

1     all they knew.
2  Q. Okay. There's three names of witnesses that you've
3     disclosed for this case and so I want to ask you about
4     those three.
5  A. Okay.
6  Q. Okay?
7  A. Okay.
8  Q. The first one is Treasa Styles. And it's T-R-E-A-S-A.
9     Styles, S-T-Y-L-E-S. Why have you named Ms. Styles as
10    a witness in this case?
11 A. Because she saw it.
12 Q. Did she see the whole incident meaning even before you
13    were screaming?
14 A. What? Repeat that please.
15 Q. What did she see?
16 A. She saw her slam me down. She wasn't standing over us
17    but she saw me hit the ground. Okay.
18 Q. Okay. And where was Ms. Styles when she witnessed
19    this?
20 A. Sitting on the neighbor's porch.
21 Q. Does she live there?
22 A. I believe so.
23 Q. So she was outside the whole time?
24 A. Yes. I don't know about the whole time. Now, I know
25    about that.

Page 47

1  Q. Okay. Do you know Ms. Styles?
2  A. No.
3  Q. You don't have a relationship --
4  A. I know her casual. But we don't drink coffee together
5     and we don't go shopping, no.
6  Q. Okay. Have you spoken with Ms. Styles about your
7     case?
8  A. No, not really. Just the only thing that's been said
9     your arm sure looks bad and I said, yeah, it does.
10 Q. Have you had any conversations with Ms. Styles about
11    her being a witness in your case or about what
12    happened?
13 A. Yes. Yes, I did.
14 Q. What was said in that conversation? What did she say?
15 A. I asked her did she see it, did she see what happened
16    because I was, like, screaming. And she said yes.
17    She's the one that got my son I believe and said hey
18    the police are beating your mother up.
19 Q. Did she say anything else to you?
20 A. No.
21 Q. Did you say anything to her?
22 A. No.
23 Q. Okay. The next witness is Marilyn Faber-Tucker.
24    Marilyn Faber-Tucker. Do you recognize that name as a
25    witness you've identified in this case?

Page 48

1  A. Yes, I recognize it.
2  Q. And who is she, if you know?
3  A. Well, I know her.
4  Q. How do you know her?
5  A. She lives across the street also.
6  Q. Was she on the same porch with Ms. Styles?
7  A. I don't know. You know, I just --
8  Q. Did she -- does Marilyn Faber-Tucker live across the
9     street?
10 A. No.
11 Q. Was she visiting someone who lives across the street?
12 A. Yes.
13 Q. But you're not sure if it was Ms. Styles or a
14    different residence?
15 A. I don't know who she was actually visiting. There
16    were two or three people there. The weekend was
17    coming up so people were getting ready to celebrate
18    the fourth.
19 Q. You said you know Marilyn Faber-Tucker. What's your
20    relationship with her?
21 A. She's just a friend. Just a hello friend.
22 Q. Have you spoken with Marilyn Faber-Tucker about what
23    happened that day or your lawsuit?
24 A. I asked her did she see it because like I told you I
25    was in so much agony. She said, yes, she seen it,

Page 49

1  so...
2  Q. Did she say anything else?
3  A. Shook her head.
4  Q. Did you say anything else to her other than asking her
5    if she'd seen it?
6  A. Excuse me. See, I can't even cut this off with my
7    left hand. I'm sorry.
8  Q. It's quite alright. You're doing great, we're doing
9    great. Thank you for doing your best here today. Are
10   you ready --
11 A. Yes, sir.
12 Q. -- to continue? Did you or Marilyn Faber-Tucker say
13   anything else when you talked about the case you said
14   you asked her if she saw it she said yes and she shook
15   her head. Did either of you say anything else in that
16   conversation?
17 A. No.
18 Q. There's one more witness but would you like to take a
19   break? We've been going a little over an hour?
20 A. I believe if I would I'm going to get rid of this
21   phone. I think so, sir. I'm going to let the phone
22   go.
23 Q. Okay. Let's take a break. And just so you know I'm
24   close to finished so we're definitely going to finish
25   by lunch. Okay. But let's take a break. 10:30, 10

Page 50

1  minutes, when?
2  A. That will be fine.
3     MR. WILSON: Sounds good.
4       (BREAK TAKEN AT 10:25 AM)
5       (BEGAN AT 10:38 AM)
6     MR. WILSON: We're back on the record. I guess
7  before you get started too far there was one thing of
8  clarification in your questioning from earlier and I
9  will let you get into it. You had asked questions
10 about a conviction and then following the conviction
11 answer you said charged. And Ms. Arnold responded no
12 to that charge portion of that time. It's my
13 understanding there was a charge out of Texas some 20,
14 30 years ago that's since been expunged or no
15 conviction, what have you. You're welcome to ask
16 Ms. Arnold about it but I just wanted to clarify that
17 information.
18    MR. JORGENSEN: Q. All right. Thanks. If it's
19 20 or 30 years ago I'm just happy to let that go.
20 A. They paid me. They paid me my money back.
21 Q. That doesn't sound like that ended bad for you then.
22 A. They cleared my record too.
23 Q. That's excellent. You can do that in Arkansas too. I
24 think the law says once you've had a conviction
25 expunged you're allowed to say truthfully that you've

Page 51

1  not been convicted.
2  A. I didn't do that intentionally.
3  Q. I don't intend to do anything about it anyway.
4     Before we took a break we were talking
5  about the witnesses you had named for your case. And
6  we talked about Treasa Styles and Marilyn
7  Faber-Tucker. And the third witness that you have
8  named is Tricia Caplette, C-A-P-L-E-T-T-E. Do you
9  know Ms. Caplette?
10 A. Not personally. She lives with Marilyn. I know
11 Marilyn better than the others. I know her like drink
12 coffee with her, talk to her I don't now that she
13 works but I know Marilyn. And I think they were
14 visiting.
15 Q. So Ms. Caplette and Marilyn were together when they
16 became witnesses, they lived together?
17 A. They were at the same -- no, they didn't live
18 together. Two was staying there but Marilyn wasn't,
19 no. Marilyn lived in a house somewhere.
20 Q. Oh, okay. Marilyn was visiting Ms. Caplette?
21 A. I believe so, sir, to the best of my knowledge.
22 Q. Okay. And you don't really have a relationship with
23 Ms. Caplette you said?
24 A. No, I don't have a relationship with any of them now.
25 Q. Okay. Have you spoken with Ms. Caplette about what

Page 52

1  happened on July 3rd, 2017?
2  A. Well, it's been quite a few years and I have certainly
3  spoken to her about it.
4  Q. Do you recall what you've said to her?
5  A. She was trying to get her phone fixed because she
6  taped it and I don't know if she had it fixed or not
7  but she had taped it.
8  Q. You mean she video recorded what happened?
9  A. Yeah, just out of humanity not just because she knew
10 me but because it was happening.
11 Q. Do you know if she has a copy of any video that she
12 took?
13 A. I don't know if she ever got -- the phone got dropped
14 in water and then somebody stepped on it. She might
15 have. I don't know.
16 Q. Has she said anything to you about what happened on
17 July 3, 2017? Can you give an audible response?
18 A. No, she hasn't spoken to me about it. She did to -- I
19 take that back. She asked me have you been to court.
20 I said no and she said well I just wondered it'd been
21 so long. So she did say that.
22 Q. She's right. It has been a long time. We're talking
23 about four-and-a-half years ago now?
24 A. This is my arm.
25 Q. So let's talk about your injury. I'm not a doctor. I

Plaintiff's Statement in Opposition - Exhibit D

Page 53

1  don't need to inspect your arm.  But tell me what
2  problems or pain or anything like that you still have
3  today with your arm resulting from the injury on
4  July 3, 2017.  I think you mentioned earlier you can't
5  use it in all the ways you used to still today, is
6  that right?
7  A.  No, I can't.  No, sir, I can't.
8  Q.  Can you elaborate?  Can you use your left arm for
9  anything?  Is it limited, is it completely useless to
10 you?  Explain for us, please.
11 A.  I can't drink a cup of coffee.  I can't vacuum.  I
12 can't do anything with my arm.  It's like my arm, you
13 know, I have it and I have pain.  Like right now it's
14 hurting right here.  But other than that I have it.  I
15 thank God I do but there's nothing else the doctor can
16 do for it even.
17 Q.  Can you use your hand, your fingers?  Does your hand
18 work?
19 A.  I can do like this like get a penny or something and
20 then I'll have to slide it into my hand.  I can, you
21 know, raise my arm.  This is as high as I can raise
22 it.  It seems like it's just on there for looks but I
23 want it to keep looking.
24 Q.  Fair enough.  How would you describe the pain you
25 still have from the injury?

Page 54

1  A.  How often?
2  Q.  Yeah.  How often, how bad; whatever you would say
3  about it?
4  A.  It hurts every day.  It hurts right there, it's
5  hurting right here.
6  Q.  Is it a constant like there's constantly pain or does
7  it hurt every day any time you move it in a certain
8  way?
9  A.  I always prop it up like this and it doesn't hurt as
10 bad.  It hurts some.  If I do anything like if I move
11 it out of commotion it hurts, you know.  Like, I don't
12 know what to say.  If you handed me a candy bar.
13 Okay.  And I had my hand like this, you put it on
14 there it will still be on there and I transfer it over
15 to the other hand because I can't hold it.
16 Q.  Are you still receiving any kind of medical treatment
17 related to it?  Or you said they've done what they can
18 do does that mean you're done getting medical
19 treatment?  They can't make it any better, it is what
20 it is at this point?
21 A.  Well, I asked Mr. Bracey I said Mr. Bracey it looks
22 really bad can't you do anything.  He said, yes.  He
23 said he could cut this bone off right here.  And he
24 said it probably wouldn't make it hurt but it would
25 look better.  But he said I wouldn't want to do

Page 55

1  anything to your hand right here.  He said I could put
2  a thing down in there but you still wouldn't be able
3  to use it.  It wouldn't benefit you so I'd rather not.
4  Q.  Sounds like what he was offering there is more
5  cosmetic?
6  A.  Yeah.  Because people do -- I do get a lot.  You asked
7  me did I talk to people about it.  Well, if I'm
8  wearing something short sleeve and you see me just by
9  me, oh my goodness, what happened to your arm.  Well,
10 there's a conversation.
11 Q.  Right.  But those are all basically the same
12 conversation you already described earlier?
13 A.  That's right.  Same conversation.
14 Q.  Yeah, we don't need to dig up every 10 second
15 conversation you've had like that.
16 A.  No, no.
17 Q.  Have you ever had any other injuries to that to your
18 left wrist or arm or hand?
19 A.  Normally just basically, like, if you bump it in the
20 kitchen or something like that but not broke.
21 Q.  Okay.  That's exactly what I meant and my question was
22 bad.  I'm not talking about scrapes, bruises, small
23 things.  I mean have you ever broken it before have
24 you ever had a serious injury where you had to get,
25 you know, where you were hospitalized or needed

Page 56

1  medical care?
2  A.  No, sir, no.
3  Q.  Your left arm, wrist, hand was everything fully
4  functional before the injury?
5  A.  Yes.  Yes.  Yes, sir.
6  Q.  I think you mentioned you're left-handed?  Or I guess
7  you were left-handed at least?
8  A.  Yeah.
9  Q.  So in your lawsuit you're seeking what's called
10 damages meaning payment for the damages associated
11 with what happened to you.  And we talked about the
12 physical injury, the medical stuff, and your arm and
13 your hand and everything before during and after.  Are
14 you also seeking compensation for mental or emotional
15 damages separate from the physical injury?
16 A.  No but I should.
17 Q.  Well, why should you?  How would you describe that if
18 you should?  I think maybe you are in your complaint
19 actually, so --
20 A.  I used to go get my nails done and now I won't go.  So
21 who wants to look at if somebody is going to look at
22 my nails if they're colored they're going to look at
23 it more so I don't do that anymore.  I'm also you may
24 not believe in this and that's your privilege I'm not
25 an evil person I don't consider myself.  I talk to

Page 57

1  people and read them and I use a deck of cards.  I
2  can't do that anymore.  I can't shuffle them so that
3  deprived me.
4  Q.  When you say you read people are you talking about
5  psychic or tarot or what is that?
6  A.  Yes, psychic.
7  Q.  Psychic?
8  A.  Not Taro.  Regular cards.
9  Q.  Gotcha.  I know just enough to not even be dangerous
10  about that kind of stuff and I would never accuse that
11  of being evil or anything like that.  Don't worry.
12       Are there any other examples of things
13  that cause that upset you emotionally about being
14  unable to do something in a certain way or at all such
15  as the psychic reading?
16  A.  Certainly, yes, it does.  Anxiety.
17  Q.  What else?
18  A.  When somebody comes in and they don't know trying to
19  hold my arm a different way and that makes them look
20  sure enough they really look then.  They go what's
21  wrong with your arm because I'm trying to hide it, you
22  know, so they can't visualize it.
23  Q.  What about sort of routine things like handwriting?
24  The sort of things that you do with your dominant hand
25  and you being left-handed now presumably you now have

Page 58

1  to try to do things with your right hand even though
2  you're not right-handed?  Has that caused you
3  difficulty?
4  A.  Look at my signature.
5  Q.  I see your signature on the verification we talked
6  about earlier and I can read it.  If you did that with
7  your right hand I'm impressed.
8  A.  I had to.
9  Q.  Well, I kind of know exactly what you mean because
10  when I was in college I broke my right hand and I'm
11  right-handed and I had to take all of my final exams
12  left-handed.  It was not easy.
13  A.  That was bad.
14  Q.  I'm not sure it was easy for the professors to grade
15  my writing either.  Is there anything else you can
16  tell us about how this has impacted your life
17  emotionally, mentally, your daily routine, things you
18  like to do but can't do anymore or can't do as well
19  because of the injury?
20  A.  Well, I like to cook and I'm a real good cook too and
21  I can't do it like I used to.
22  Q.  That's a shame if you're a good cook.  Anything else?
23  A.  No, sir.
24  Q.  Has there been any other big stressful events in your
25  life around this same time July 3, 2017 or since then

Page 59

1  that might also be affecting your mental and emotional
2  well-being such as deaths of someone you're close to,
3  illnesses, domestic issues, anything else like that
4  that might also be causing you anxiety?
5  A.  Well, I lost two husbands.
6  Q.  Those were both before the injury, right?
7  A.  Yeah but I still -- oh, I thought you meant -- I'm
8  sorry, go ahead.
9  Q.  No, that's fine if you still have some emotional
10  symptoms related then I want to hear about it.  Yes?
11  A.  Well, I mean, I still miss them.  I still grieve.  I
12  mean, I would still be doing that if my arm was in
13  enabling shape but it just adds to the flame, you
14  know.
15  Q.  Yes, that's exactly the kind of thing I'm asking
16  about.  Like other sources of some of these same
17  symptoms because we all know we have many things going
18  on in our lives.  Other than the loss of your two
19  husbands are there any other issues in your life that
20  give you mental distress?
21  A.  Yes.
22  Q.  What else?
23  A.  My grandchildren.
24  Q.  Okay.  What's that about?
25  A.  Well, one is very small and one is grown and they all

Page 60

1  ask me questions about my arm.  They go, what's wrong
2  Granny.  I don't know, you know, I don't want to turn
3  them against police.  I'm not trying to turn nobody
4  against police.  We have to have policemen.  We need
5  them.  And I don't, you know, I'm not a hater of
6  policemen but I can't explain to my grandchildren.  If
7  I say, oh, I fell.  How do you fall?  A policeman
8  pushed me down.  Okay.  They're thinking policemen are
9  bad now they pushed my granny down.  And that bothers
10  me.
11  Q.  I don't believe I asked you if you work.  I think
12  that's because you made it clear in your written
13  discovery responses that you --
14  A.  I worked some years ago.  My husband owned a company
15  and he didn't want me to work but I worked some.  I
16  worked at Northeast Hill School for exceptional
17  children that had mental ability, you know,
18  situations.
19  Q.  But that was before 2017, right?
20  A.  Oh, yes, it was.
21  Q.  Have you worked at all since 2017?
22  A.  No.
23  Q.  Do you want to or is it you are done working and
24  already were done working --
25  A.  Well, I'm just too old.  I would do something probably

15 (Pages 57 to 60)

Page 61

1    but not in the line of I could say employment.  If you
2    go out and you're 80 years old and try to get a job
3    nobody wants to hire you.
4    Q.  I think I have no more questions at this time.  Is
5        there anything -- we already clarified one thing.  Is
6        there anything you would like to add or clarify about
7        anything we've talked about today?  You're welcome to
8        if you want to.
9           MR. WILSON:  Colin, if you're done for a minute
10       I've got a couple questions for clarification purposes
11       to go over with her.
12          MR. JORGENSEN:  Okay.
13                  EXAMINATION
14   BY MR. WILSON:
15   Q.  Ms. Arnold, in your complaint you testified here today
16       and gave some testimony about the events that happened
17       on July the 3rd of '17, correct?
18   A.  Yes.
19   Q.  There's a paragraph 17 to your complaint and for
20       clarification purposes the way the question's asked it
21       says Deputy Bittle advised Deputy Turner to put Ms.
22       Arnold into handcuffs.
23   A.  He did not.
24   Q.  Deputy Bittle advised Deputy Turner to arrest you.
25   A.  Yes, he did.

Page 62

1    Q.  But there was no statement to put you in handcuffs?
2    A.  No.
3    Q.  Paragraph 18 talks about you having your hand in your
4        pocket.  You testified today and said you never put
5        your hand in your pocket or had your hand in your
6        pocket related to the incident prior to Ms. Turner
7        slamming you to the ground, is that correct?
8    A.  That's true.
9    Q.  You were also asked about your signature on this
10       verification.  Other than these two incidences we
11       talked about your understanding there's nothing else
12       that's different or that needs to be changed?
13   A.  About my signature or?
14   Q.  About the complaint; the facts in the complaint and
15       the allegations.
16   A.  I would like to say this.  When the officers came out
17       it may not apply to this but they were always wanting
18       me to leave the house.  Why don't you go somewhere and
19       stay.  I said why should I have to this is my house.
20       And they would never do anything to him no matter what
21       he said but they did it to me.
22   Q.  And, Ms. Arnold, we've got a handful of legal jargon
23       of causative action against the defendants.  Are you
24       aware of that?
25   A.  I'm aware of it.

Page 63

1    Q.  And you were asked a couple information in one of the
2        statements you testified related to the actions of
3        Deputies Turner and Bittle related to either arresting
4        you, telling you to be arrested, and Ms. Turner
5        slamming you to the ground.  Do you recall making
6        those statements?
7    A.  Would you repeat that please?
8    Q.  I sure can.  You testified earlier when you were asked
9        about, you know, what is this lawsuit about and you
10       were specifically asked about Deputy Turner.  And I
11       believe you said well she slammed me to the ground or
12       pushed me to the ground.  Do you recall saying that?
13   A.  Yes.
14   Q.  Same way you were asked about Deputy Bittle and asked
15       about, you know, why are you filing this lawsuit
16       against him.  Do you recall that?
17   A.  I recall it but I understand he's over her.  I didn't
18       know but it seemed like she was in training under him
19       and he was not.  I'm just saying this because you
20       asked me.  But he was, you know, it's like -- you
21       know, I just don't know what to say about it.  I'm
22       just confused about the whole thing.  I don't
23       understand.  I don't know why they would want to
24       handcuff me anyway and me willing to get into the car.
25       I was willing to step into the car but why would they

Page 64

1        want to handcuff me.
2    Q.  Okay.  In my understanding is you've got another
3        argument.  The argument about being slammed to the
4        ground by the officers you've got another argument
5        that they didn't provide you any medical assistance,
6        is that correct?
7    A.  No, they wouldn't help me up and me begging them I
8        said please, please you broke my arm, please.  And
9        they just looked at me like I was nothing.  And then
10       the ambulance came and I don't remember nothing.  I
11       didn't even know I was took to the hospital.  I said
12       two hospitals?  He said, yeah, you went to one and
13       then they transferred you to the other.  I didn't even
14       know that.
15   Q.  It's your understanding you might have gone to Saline
16       Memorial first and then got transferred?
17   A.  I don't remember it.
18   Q.  Okay.
19   A.  If he said where did you go I'd say UAMS.
20   Q.  You were asked about some of these other causative
21       actions that we've got against the defendants.  And
22       there's a handful of them.  I don't necessarily need
23       to get into them.  But you stand by those causative
24       actions that we've alleged against each defendant, is
25       that correct?

Page 65

1  A. Yes. I don't understand why I would have to go to a
2     battered women's place and stay when that is my house.
3  **Q. That's all I have.**
4        MR. JORGENSEN: I also have no further questions.
5  Thank you, Ms. Arnold, for being here today.
6        THE WITNESS: Thank you, sir. Thank you very
7  much.
8           (CONCLUDED AT 11:05 AM)

Page 66

```
 1              C E R T I F I C A T E
 2     STATE OF ARKANSAS      )
                              )ss
 3     COUNTY OF BENTON       )
           I, STEVI WAY, Certified Court Reporter, in and
 4     for the aforesaid county and state, do hereby certify that
       the above named witness was duly sworn by me prior to the
 5     taking of testimony as to the truth of the matters attested
       to and contained therein; that the testimony of said
 6     witness was taken by me in voice writing and was thereafter
       reduced to typewritten form by me or under my direction and
 7     supervision; that the foregoing transcript is a true and
       accurate record of the testimony given to the best of my
 8     understanding and ability.
           I FURTHER CERTIFY that I am neither counsel for,
 9     related to, nor employed by any of the parties to the
       action in which this proceeding was taken; and, further,
10     that I am not a relative or employee of any attorney or
       counsel employed by the parties hereto, nor financially
11     interested, or otherwise, in the outcome of this action;
       and that I have no contract with the parties, attorneys, or
12     person with an interest in the action that affects or has a
       substantial tendency to affect impartiality, that requires
13     me to relinquish control of an original deposition
       transcript or copies of the transcript before it is
14     certified and delivered to the custodial attorney, or that
       requires me to provide any service not made available to
15     all parties to the action.
           IN WITNESS WHEREOF, I have hereunto set my hand
16     and affixed my seal of office this ___ day of ____, 2022.
17
18     _____
19     STEVI WAY, CCR
       Certified Court Reporter
20     License No. 769
```



17 (Pages 65 to 66)

ALARIS LITIGATION SERVICES
www.alaris.us            Phone: 1.800.280.3376            Fax: 314.644.1334

**Plaintiff's Statement in Opposition - Exhibit D**